## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**CLEAR SPRING PROPERTY AND CASUALTY COMPANY,**

       **Plaintiff,**

**v.**

**ARCH NEMESIS, LLC,**

       **Defendant and Third-Party Plaintiff,**

**v.**

**CONCEPT SPECIAL RISKS LTD., et al.,**

       **Third-Party Defendants.**

**Case No. 22-2435-DDC-TJJ**

## MEMORANDUM AND ORDER

This case involves a boat that no longer floats and all the parties allegedly responsible for covering the loss. Three third-party defendants hope to cut anchor and depart this suit's troubled waters. The court here addresses their two Motions to Dismiss (Doc. 15; Doc. 29) and one Motion to Quash service of process, offered in the alternative (Doc. 15). The court denies both Motions to Dismiss (Doc. 15; Doc. 29), so the moving defendants remain firmly anchored to the case.

Defendant, Arch Nemesis, LLC, owned a yacht that sank off Mexico's coast. Arch Nemesis sought to recover the loss from the insurer of the boat, Clear Spring Property and Casualty Company. Clear Spring, plaintiff here, denied the insurance recovery claim and filed this action seeking a declaratory judgment declaring that the insurance policy was void from inception and Arch Nemesis's claim was excluded from coverage. Arch Nemesis answered,

counterclaimed, and asserted third-party claims against four third-party defendants, each allegedly involved in acquiring either the boat itself or the boat's insurance coverage.  In essence, Arch Nemesis contends that these third-party defendants bear some responsibility for Clear Spring's denial of the insurance recovery claim.  To say it another way, if Clear Spring won't pay, there are many other fish in the sea.

Those other fish include third-party defendants Off the Hook Yacht Sales NC, LLC ("OTH-NC") and Off the Hook Yacht Sales, LLC ("OTH-MD") (collectively "OTH Defendants").  The two OTH Defendants purportedly helped Arch Nemesis purchase a suitable yacht and insure it for use in international waters, acting as boat brokers through employee Al DiFlumeri.  The parties debate which entity (or entities) actually employed Mr. DiFlumeri.  Arch Nemesis asserts negligent misrepresentation and negligence claims against the OTH Defendants. The OTH defendants maintain that they aren't proper parties to the suit because they had nothing to do with the insurance policy and have no relevant contacts with Kansas.  The OTH Defendants jointly filed a Motion to Dismiss (Doc. 29) asserting lack of personal jurisdiction.

The other fish sued by Arch Nemesis also include third-party defendant Concept Special Risks Ltd.  Concept acted as the "Underwriting Agents" for Clear Spring and as claims handlers for any loss arising out of the insurance policy provided by Clear Spring.  Concept gathered information from Arch Nemesis during the insurance application process, enlisted adjusters after the boat sank, and, along with Clear Spring, issued a reservation of rights letter asserting the insurance policy was void from inception.  Arch Nemesis asserts fraud and negligent misrepresentation claims against Concept.  Concept maintains Arch Nemesis never effectuated proper service on it and, even if it had, Concept has no contacts with Kansas.  So, Concept seeks

to dismiss the suit against it for lack of personal jurisdiction, insufficient process, or insufficient service of process.  Doc. 15.  Alternatively, Concept seeks to quash service of process.  *Id.*

This Order denies the OTH Defendants' Motion to Dismiss for lack of personal jurisdiction (Doc. 29).  Two reasons produce this result.  *First*, Mr. DiFlumeri's communications with Arch Nemesis constitute sufficient minimum contacts to establish specific personal jurisdiction under *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).  *Second*, under *Hood v. American Auto Care, LLC*, the court, at the motion to dismiss stage, must resolve the factual dispute about precisely which entity or entities employed Mr. DiFlumeri in Arch Nemesis's favor.  21 F.4th 1216, 1220 (10th Cir. 2021).

This Order also denies Concept's Motion to Dismiss for lack of personal jurisdiction (Doc. 15) because, under *Benton v. Cameco Corp.*, sufficient minimum contacts exist for specific jurisdiction based on the ongoing contractual relationship and obligations between Concept and Arch Nemesis.  375 F.3d 1070 (10th Cir. 2004).  This Order also denies Concept's Motion to Dismiss for insufficient process (Doc. 15) because insufficient process is an improper motion on these facts.  The Order also denies Concept's Motion to Dismiss for insufficient service of process.  The court agrees service of process was insufficient but, following *Gregory v. United States/United States Bankruptcy Court for the District of Colorado*, the court elects to quash service instead of dismissing the action.  942 F.2d 1498 (10th Cir. 1991).  So, the court grants Concept's Motion to Quash (Doc. 15).

This Memorandum and Order explains these decisions in this sequence:  Part I provides the relevant background facts.  Part II summarizes the legal standard for personal jurisdiction and discusses, first, the OTH Defendants' joint Motion to Dismiss for lack of personal jurisdiction (Doc. 29), and second, Concept's Motion to Dismiss for lack of personal jurisdiction (Doc. 15).

3

Next, in Part III, the court considers Concept's Motion to Dismiss for insufficient process or insufficient service of process (Doc. 15). Finally, the court addresses Concept's Motion to Quash service of process (Doc. 15) in Part IV.

## I.   BACKGROUND

The following facts come from Arch Nemesis's Third-Party Complaint. Doc. 12. The court accepts the facts as true and views them in the light most favorable to Arch Nemesis, the party opposing the Motion to Dismiss. *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining that on a motion to dismiss the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" the party opposing the motion (citation and internal quotation marks omitted)).

### A.   Purchasing the Yacht

In September 2020, Jamie and Kimberly McAtee sought to purchase a yacht for use in Cabo San Lucas, Mexico. Doc. 12 at 55–56, 58 (Third-Party Compl. ¶¶ 1, 10). The McAtees live in Kansas. *Id.* at 55–56 (Third-Party Compl. ¶ 1). The McAtees were referred to Off the Hook Yacht Sales and started working with Al DiFlumeri, a boat broker with OTH-NC or OTH-MD, or both. *Id.* at 55 (Third-Party Compl. ¶ 1).

In November 2021, the OTH Defendants notified the McAtees that OTH had found a yacht for them to purchase. *Id.* at 58 (Third-Party Compl. ¶ 14). The McAtees purchased the yacht through Arch Nemesis, LLC on December 1, 2021. *Id.* at 59 (Third-Party Compl. ¶ 15). When Arch Nemesis purchased the yacht, it was moored in Texas. *Id.* (Third-Party Compl. ¶ 19).

### B. Securing Insurance on the Yacht

Arch Nemesis intended to move the yacht from Texas to Cabo San Lucas, where it would use the boat for both commercial and personal purposes. *Id.* at 61 (Third-Party Compl. ¶ 27). With that intent in mind, Arch Nemesis worked with third-party defendant and insurance broker West Coast to acquire the necessary marine insurance coverage for the yacht's use in Mexico. *Id.* at 62 (Third-Party Compl. ¶ 30). The McAtees had used West Coast as an insurance broker for several years to insure other property they owned in Mexico. *Id.* (Third-Party Compl. ¶ 31). West Coast worked with Concept, "an independent insurance underwriter that was acting as Underwriting Agents for Clear Spring to obtain for Arch Nemesis the coverage that West Coast had recommended[.]" *Id.* at 63 (Third-Party Compl. ¶ 38) (quotation cleaned up). As part of the application process, Concept sought several documents from Arch Nemesis, including Concept's standard yacht application form, captain charter supplementary sheet, hurricane questionnaire, and standard operator form. *Id.* at 63, 64 (Third-Party Compl. ¶¶ 39, 42). Later, Concept required Arch Nemesis to complete a paid crew supplemental form and a letter of survey recommendations compliance. *Id.* at 64 (Third-Party Compl. ¶ 44). Arch Nemesis asked the OTH Defendants to complete the survey of recommendations compliance, and Mr. DiFlumeri provided the completed form on December 15, 2021. *Id.* at 65 (Third-Party Compl. ¶¶ 47–48).

On February 14, 2022, Clear Spring issued an insurance policy to Arch Nemesis. *Id.* at 68 (Third-Party Compl. ¶ 66). The policy listed the effective date as December 24, 2021. *Id.* at 69–70 (Third-Party Compl. ¶ 69). It also identified the applicable territory for the policy and other conditions that could invalidate the policy. *Id.* When it received the policy, Arch Nemesis learned that Clear Spring was its insurer, not Concept. *Id.* at 70 (Third-Party Compl. ¶ 71).

After it received the policy, Arch Nemesis paid the premiums to West Coast, the insurance broker. *Id.* at 71–72 (Third-Party Compl. ¶ 80).

### C.  The Yacht's Sinking

In spring 2022, Arch Nemesis arranged to have OTH Defendants relocate the yacht from Texas to Cabo San Lucas. *Id.* at 72 (Third-Party Compl. ¶¶ 81, 83).  The McAtees sailed the yacht on two occasions, during which they experienced no incidents or mechanical issues. *Id.* at 73 (Third-Party Compl. ¶ 86).  On May 28, 2022, the boat's designated captain took the yacht out without permission. *Id.* (Third-Party Compl. ¶ 87).  During that excursion, the yacht ran aground on some rocks, which punched a hole in the hull and caused the yacht to sink. *Id.* (Third-Party Compl. ¶¶ 87–89).  Arch Nemesis learned of the yacht's sinking when it received a call from the boat's manager in Mexico. *Id.* (Third-Party Compl. ¶ 93).

### D. Arch Nemesis's Insurance Claim

The following day, Arch Nemesis submitted an insurance claim. *Id.* at 74 (Third-Party Compl. ¶ 102).  Clear Spring and Concept hired Arnold & Arnold Inc. to investigate the claim. *Id.* at 75 (Third-Party Compl. ¶¶ 105–06).

On August 18, 2022, Clear Spring, through Concept, issued a reservation of rights letter, which stated that the policy was void from its inception and excluded Arch Nemesis's claim. *Id.* at 76 (Third-Party Compl. ¶ 111).  Clear Spring excluded the claim under the policy's exclusions for losses due to wear and tear, including lack of maintenance, and damage to the yacht's engines. *Id*. at 77 (Third-Party Compl. ¶ 112).  Clear Spring also believed the policy was void from inception because Arch Nemesis had failed to address all the recommendations raised in an earlier survey of the yacht. *Id.* at 77–78 (Third Party Compl. ¶ 114).  On August 22, 2022, Arch Nemesis responded to the reservation of rights letter, contending that it believed Clear Spring

performed a bad faith investigation of Arch Nemesis's claim.  *Id.* at 78 (Third-Party Compl.

¶ 115).  Clear Spring's counsel then sent Arch Nemesis a claim-denial letter on October 24,

2022, denying coverage and stating that Arch Nemesis would have an opportunity to contest the

denial.  *Id.* (Third-Party Compl. ¶ 117); *id.* at 83 (Third-Party Compl. ¶ 130).

The same day it issued the denial letter, Clear Spring filed its Complaint commencing

this action.  *Id.* at 83–84 (Third-Party Compl. ¶ 131); *see also* Doc. 1.  Clear Spring argues that

multiple theories of breach preclude Arch Nemesis's claim for recovery thus rendering the

insurance policy void from inception.  Doc. 1 at 18.  Clear Spring seeks a declaratory judgment

validating its claims of breach.  *Id.*  Arch Nemesis then filed an Answer, which also asserted a

Counterclaim against Clear Spring and third-party claims against Concept, West Coast, and OTH

Defendants.  Doc. 11; Doc. 12.

### E.  The Relevant Third-Party Claims

Arch Nemesis asserts a negligent misrepresentation claim against the OTH Defendants,

contending that they didn't accurately represent the boat's "current condition" to Arch Nemesis.

*Id.* at 91–92 (Third-Party Compl. ¶¶ 187–92).  Arch Nemesis also asserts a negligence claim

against both OTH Defendants, contending that they breached their duty to advise Arch Nemesis

to complete a new boat survey and ensure that the boat's issued insurance policy "actually [was]

effective."  *Id.* at 93 (Third-Party Compl. ¶¶ 194–99).  The OTH Defendants jointly filed a

Motion to Dismiss asserting lack of personal jurisdiction.  Doc. 29.

Arch Nemesis asserts a fraud claim against Concept, alleging Concept possessed

sufficient information to know that the insurance policy was void from inception but nonetheless

"sought to induce Arch Nemesis to pay the demanded premiums."  *Id.* at 85–86 (Third-Party

Compl. ¶¶ 145–48).  Arch Nemesis also asserts a negligent misrepresentation claim against

Concept, alleging that Concept failed to reveal Clear Spring's role as insurer and the policy's potential void-from-inception status. *Id*. at 87 (Third-Party Compl. ¶¶ 153–55). Concept filed a Motion to Dismiss for lack of personal jurisdiction, insufficient process, insufficient service of process or, in the alternative, a Motion to Quash service of process. Doc. 15.

## II. MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION BY THE OTH DEFENDANTS AND CONCEPT

### A. LEGAL STANDARD FOR PERSONAL JURISDICTION

The OTH Defendants and Concept all contend this court lacks personal jurisdiction over them. In a state such as Kansas—where the state's long arm statute permits personal jurisdiction to the full extent constitutionally allowed—due process principles govern the personal jurisdiction analysis. *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1090 (10th Cir. 1998) (citing *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994)). The Due Process clause of the Fourteenth Amendment limits a court's power to exercise personal jurisdiction over an out-of-state defendant in accordance with the nature and extent of "the defendant's relationship to the forum State." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citation and internal quotation marks omitted). That relationship may permit the court's exercise of either general or specific jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014). General jurisdiction inheres when a party is "essentially at home" in a state. *Id*. at 127. The parties' arguments here rely solely on specific jurisdiction, however, so the court confines its analysis to that theory of jurisdiction.

### 1. Specific Jurisdiction: Minimum Contacts

The "constitutional touchstone" of the specific jurisdiction inquiry is "whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King*, 471 U.S. at 474 (citation omitted). Foreseeability is critical to this analysis. To meet the

foreseeability requirements, "defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court" there. *Id.* (citation and internal quotation marks omitted). "Those contacts must be the defendant's own choice and not random, isolated, or fortuitous." *Ford Motor Co.*, 141 S. Ct. at 1025 (citation and internal quotation marks omitted).

Our Circuit has explained that communications with a "targeted" audience qualify as minimum contacts sufficient to support personal jurisdiction. *Shrader v. Biddinger*, 633 F.3d 1235, 1247 (10th Cir. 2011). Targeted communications include "phone calls, faxes, and letters made or sent by out-of-state defendants to forum residents." *Id.* "These have been found sufficient to support specific personal jurisdiction when they directly give rise to the cause of action[.]" *Id.* (collecting cases). To be sure, the Supreme Court has held that "the plaintiff cannot be the only link between the defendant and the forum," but this holding derives from a case where the defendant had "never traveled to, conducted activities within, *contacted anyone in*, or *sent anything* or anyone to" the forum state. *Walden v. Fiore*, 571 U.S. 277, 285, 288–89 (2014) (emphases added). In short, the plaintiff in *Walden* was considered the only link between the defendant and the forum when "no part of [defendant's] course of conduct occurred in" the forum state. *Id.* at 288.

Minimum contacts may "appear in different guises" depending on whether a lawsuit asserts tort claims or contract claims. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). Regardless of the context, both "guises" of the minimum contacts' analysis have "the shared aim of [the] 'purposeful direction' doctrine." *Id.* The Tenth Circuit has held that minimum contacts exist in the tort context when "(a) an intentional action . . . was (b) expressly aimed at the forum state . . . with (c) knowledge that the brunt of the injury would

be felt in the forum state[.]" *Id.* at 1072.  The Tenth Circuit also has found minimum contacts in the contracts context when parties "'reach out beyond one state and create continuing relationships and obligations with citizens of another state.'" *Benton v. Cameco Corp.*, 375 F.3d 1070, 1077 (10th Cir. 2004) (quoting *Burger King*, 471 U.S. at 473).  When conducting the minimum contacts analysis for either the tort or the contracts context, the court must distinguish between "well-pleaded facts" and "conclusory allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

## 2.  Specific Jurisdiction:  A Prima Facie Showing

In the early stages of litigation, when our Circuit's analysis evaluates personal jurisdiction based on the complaint and any affidavits, "plaintiffs need only make a prima facie showing of personal jurisdiction." *Hood*, 21 F.4th at 1220.  The Circuit resolves any factual disputes in the plaintiff's favor "notwithstanding [a] contrary presentation by the moving party." *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir. 1984).  "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" *OMI Holdings, Inc*, 149 F.3d at 1091 (quoting *Burger King*, 471 U.S. at 477).

## 3.  Specific Jurisdiction:  Fair Play and Substantial Justice

Finally, if minimum contacts exist, then our Circuit requires district courts to evaluate whether "'exercising personal jurisdiction over defendants' would otherwise 'be consonant with traditional notions of fair play and substantial justice,' in order to fully satisfy due process requirements." *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 966 (10th Cir. 2022) (quoting *Dudnikov*, 514 F.3d at 1071).  To evaluate these notions of fair play and substantial justice, the court must consider

(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*OMI Holdings, Inc.*, 149 F.3d at 1095 (citing *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987)).  In the fair play and substantial justice inquiry, a defendant must present a "'compelling'" case that jurisdiction is unreasonable.  *Compania de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1289 (10th Cir. 2020) (quoting *Burger King*, 471 U.S. at 477).  It is a "rare" case when a defendant meets the minimum contacts test but asserting jurisdiction would offend notions of fair play and substantial justice.  *Newsome v. Gallacher*, 722 F.3d 1257, 1271 (10th Cir. 2013).

## B.  SPECIFIC JURISDICTION OVER THE OTH DEFENDANTS

The court begins its personal jurisdiction analysis by asking whether it has specific jurisdiction over the OTH Defendants.  The parties' arguments about specific jurisdiction boil down to whether the communications between Mr. DiFlumeri—the boat broker—and Dr. McAtee/Arch Nemesis establish sufficient minimum contacts between the OTH Defendants and Kansas.  Doc. 40 at 3.  If Mr. DiFlumeri's communications do constitute minimum contacts, the question remains whether the court may ascribe those minimum contacts to OTH-NC, OTH-MD, or both.  The court addresses each issue, in turn, below.

### 1.  Minimum Contacts via Mr. DiFlumeri's Communications

First, the court considers whether Mr. DiFlumeri's communications with Arch Nemesis suffice to establish the requisite minimum contacts to exercise specific personal jurisdiction.  The claims brought against the OTH Defendants (negligent misrepresentation and negligence) sound in tort.  Doc. 12 at 91–93 (Third-Party Compl. ¶¶ 186–199).  So, the parties debate whether Mr.

11

DiFlumeri's actions meet the minimum contacts test as applied in the torts context. *See Dudnikov*, 514 F.3d at 1072. The parties do not disagree about the test's first prong—the intentionality of Mr. DiFlumeri's action. Nor do the parties disagree about the test's third prong—Mr. DiFlumeri's knowledge that Kansas would house the brunt of the injury. Instead, the parties dispute whether Mr. DiFlumeri "expressly aimed" his actions at Kansas.

The OTH Defendants argue that Dr. McAtee's mere presence in Kansas when communicating with Mr. DiFlumeri was "a fortuitous event" insufficient to create minimum contacts. Doc. 30 at 8. They also list a myriad of ways that they did *not* establish minimum contacts: the OTH Defendants did not solicit business from Dr. McAtee or Arch Nemesis; no representative of the OTH Defendants ever visited the State of Kansas; and the purchased yacht never entered Kansas. *Id.* at 10. Finally, the OTH Defendants assert that Mr. DiFlumeri communicated with Dr. McAtee, who is not a party to the case, rather than third-party plaintiff Arch Nemesis. Doc. 41 at 3. The OTH Defendants note that Arch Nemesis didn't even exist until December 1, 2021, according to its own Articles of Organization. *Id.*

But the OTH Defendants don't contest that Mr. DiFlumeri knew he was communicating with a Kansas resident who works full time in Kansas. Doc. 40 at 3. And our Circuit has held that courts can exercise jurisdiction over a person who "(1) directs electronic activity into the State, (2) with manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action[.]" *Shrader*, 633 F.3d at 1240–41 (emphasis, citation, and internal quotation marks omitted). Dr. McAtee's predictable presence in Kansas thereby negates the argument that Mr. DiFlumeri's communications with a Kansas resident were "a fortuitous event." Nor do the OTH Defendants contest that Mr. DiFlumeri's phone calls, texts, emails, and WhatsApp messages targeted a

specific audience in Kansas.  Doc. 40 at 3.  Such a "targeted" audience, coupled with communications of these types, supports personal jurisdiction under *Shrader*.  Finally, the OTH Defendants don't contest that Mr. DiFlumeri responded to Arch Nemesis and completed a Letter of Recommendation Compliance on December 15, 2021.  This letter renders inconsequential the OTH Defendants' argument that Mr. DiFlumeri communicated solely with non-party Dr. McAtee.  Doc. 12 at 65 (Third-Party Compl. ¶¶ 47–51).  In sum, Mr. DiFlumeri knew Dr. McAtee lived in Kansas and directly communicated with both Dr. McAtee and Arch Nemesis in Kansas to sell a yacht.  So, the OTH Defendants, through Mr. DiFlumeri, have had sufficient minimum contacts with Kansas to justify specific jurisdiction.

With the OTH Defendants' minimum contacts established, the court next considers whether Arch Nemesis has made a prima facie showing of personal jurisdiction over *both* of the two OTH Defendants.

### 2. A Prima Facie Showing of Personal Jurisdiction over OTH-MD and/or OTH-NC

The OTH Defendants argue that Arch Nemesis cannot establish a prima facie case against OTH-MD, even if Mr. DiFlumeri had sufficient minimum contacts with Kansas, because Mr. DiFlumeri did not work for OTH-MD.  The OTH Defendants assert that Mr. DiFlumeri has "no connections" to OTH-MD.  Doc. 30 at 7.  They argue that OTH-MD is an "unutilized entity" that "has no involvement with the field of brokering boat transactions" and thus no "connection to this cause of action."  *Id.*  And, the OTH Defendants contend that the Purchase and Sale Agreement, which Dr. McAtee signed, "establishes that OTH-NC (not OTH-[MD]) was the selling broker, and that Mr. DiFlumeri was OTH-NC's agent for purposes of that transaction."  Doc. 41 at 2.  Declarations from Mr. DiFlumeri and Jason Ruegg, an officer of OTH-MD, explicitly assert that OTH-MD didn't employ Mr. DiFlumeri.  Doc. 30-2 at 2 (Reugg Decl. ¶ 11);

Doc. 41-1 at 1 (DiFlumeri Decl. ¶¶ 3–4). A declaration from OTH-NC's Chief Operating Officer, Blake Phillips, asserts that OTH-NC employs Mr. DiFlumeri. Doc. 30-1 at 2 (Phillips Decl. ¶ 10).

Arch Nemesis counters, asserting that an employment relationship did exist between Mr. DiFlumeri and OTH-MD during the relevant timeframe. Doc. 40 at 6. In support, Arch Nemesis refers the court to Mr. DiFlumeri's employee profile on a website that OTH-MD allegedly maintains. *Id.* at 4; Doc. 40-10 at 6. The profile listed Mr. DiFlumeri as a "Crew" member employed "out of OTH Defendants' Grasonville, Maryland office." Doc. 40 at 4; Doc. 40-10 at 6.

At this early stage in the litigation, the court resolves factual disputes in favor of the plaintiff, Arch Nemesis, even with a contrary presentation by OTH Defendants. According to *OMI Holdings*, only a "compelling case" that would "render jurisdiction unreasonable" based on "other considerations" can surmount the plaintiff's light burden to make a prima facie showing of jurisdiction. 149 F.3d at 1091 (citation and internal quotation marks omitted). The OTH Defendants have offered a contrary presentation about Mr. DiFlumeri's employer. But the OTH Defendants fail to identify other considerations, beyond the one factual dispute, that render jurisdiction unreasonable. The court thus must resolve the debate about Mr. DiFlumeri's employment in favor of Arch Nemesis. Arch Nemesis has shouldered its light burden to make a prima facie case of jurisdiction over both OTH Defendants.[1]

---

[1] The court acknowledges that, according to Arch Nemesis's Answer, Mr. DiFlumeri "is employed by *either* [OTH-NC] *or* [OTH-MD]." Doc. 11 at 17 (emphasis added). But, Arch Nemesis asserts in its Third-Party Complaint that Mr. DiFlumeri was a "boat broker for [OTH-MD] *and/or* [OTH-NC]." Doc. 12 at 55 (Third-Party Compl. ¶ 1) (emphasis added). Given the court's duty to decide this Motion to Dismiss based on the factual allegations in the Third-Party Complaint, *see Doe*, 970 F.3d at 1304, and the binding authority prohibiting the court from resolving this factual debate at the motion to dismiss stage, the court dismisses neither party.

### 3. Fair Play and Substantial Justice

The OTH Defendants never argue that the court's exercise of personal jurisdiction over them will violate "'traditional notions of fair play and substantial justice.'" *Eighteen Seventy, LP*, 32 F.4th at 966 (quoting *Dudnikov*, 514 F.3d at 1071). Nor does the court find any indications that this is one of the "rare" cases where minimum contacts exist, but the exercise of jurisdiction would offend notions of fair play and substantial justice. *Newsome*, 722 F.3d at 1271. The court denies the OTH Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(2). And so, the OTH Defendants, at least for now, are not off the hook after all.

## C. SPECIFIC JURISIDICTION OVER CONCEPT

The court now addresses Concept's Motion to Dismiss or, in the Alternative, to Quash Service of Process (Doc. 15). Recall that Concept served as the independent insurance underwriter for insurer Clear Spring. Doc. 12 at 19 (Third Party Compl. ¶ 17). Concept, a British company, asks the court to dismiss Arch Nemesis's claims against it under Rule 12(b)(2) for lack of personal jurisdiction. Concept argues that it lacks sufficient minimum contacts with Kansas. Concept also asks the court to dismiss Arch Nemesis's claims against it under Rule 12(b)(4) and/or Rule 12(b)(5) for insufficient process or insufficient service of process. Alternatively, Concept asks the court to quash service of process because Arch Nemesis failed to effectuate service on Concept in a manner complying with international law. The court first examines Concept's Motion to Dismiss for lack of personal jurisdiction. Finding the requisite minimum contacts, the court then proceeds to the dispute over service of process.

### 1. Minimum Contacts and a Prima Facie Showing of Personal Jurisdiction

Like the OTH Defendants, Concept's Motion to Dismiss focuses on its lack of contacts with Kansas. Concept maintains that it didn't establish the requisite minimum contacts with

Kansas for a litany of reasons. *See* Doc. 16 at 9–10. Arch Nemesis responds with its own litany supporting the opposite contention. *See* Doc. 23 at 11. While this back-and-forth results in lively motion practice, it also muddies the waters even though the law is clear. First, to the extent these competing contentions originate in a factual dispute—*e.g.*, whether Concept forwarded application forms to Arch Nemesis in Kansas (Doc. 23 at 11; Doc. 27 at 5)—the court, at this early stage, resolves these disputes in favor of Arch Nemesis, the third-party plaintiff. Second, the court needn't ask whether Concept fulfilled all possible means of establishing personal jurisdiction. Instead, the correct question asks whether Concept has met the required minimum contacts. To assess this crucial question, the court turns to the minimum contacts tests in the tort and contracts contexts.

Arch Nemesis argues that Concept established minimum contacts under both the tort and the contracts analysis. The claims against Concept are tort claims (fraud and negligent misrepresentation) grounded in a contract. As such, the framework for both analyses seem potentially viable, particularly because our Circuit, in *Dudnikov*, considers these as "different guises" with a "shared aim." *Dudnikov*, 514 F.3d at 1071. The court thus considers Concept's minimum contacts under both frameworks. Arch Nemesis's torts-based minimum contacts argument is largely undeveloped, approaching a "conclusory allegation." Arch Nemesis simply contends, on all three prongs, that "Concept makes no argument." Doc. 23 at 11. This misses the boat, even when the burden of a prima facie showing of personal jurisdiction is light.

Arch Nemesis's minimum contacts argument in the contracts context— which centers on the existence of an ongoing relationship and obligations with Concept—proves more persuasive. Arch Nemesis identifies various stages of its relationship with Concept, spanning the entirety of this insurance story. First, Concept handled the application process, including requesting that

Arch Nemesis submit various forms displaying Concept's name and requesting that Arch Nemesis complete a compliance letter.  Doc. 12 at 63 (Third-Party Compl. ¶¶ 39, 41–42, 44).  Then, Concept, as Clear Spring's agent, functioned as the "claims handler," hiring Arnold & Arnold Inc. to adjust Arch Nemesis's claim and later issuing a reservation of rights letter.  Doc. 23 at 13; Doc. 12 at 75, 76 (Third-Party Compl. ¶¶ 106, 111).  The court concludes these various roles, occurring at various stages, show an ongoing relationship between Concept and Arch Nemesis.

Concept disagrees.  Concept argues that Arch Nemesis's "business relationship is with Clear Spring," not Concept (Doc. 27 at 5).  But Arch Nemesis alleges that Concept, as Clear Spring's agent, "'reach[ed] out beyond one state and create[d] continuing relationships and obligations with citizens of'" Kansas.  *Benton*, 375 F.3d at 1077 (quoting *Burger King*, 471 U.S. at 473).  Arch Nemesis thus has pleaded facts asserting Concept's requisite minimum contacts with Kansas because of its relationship with a Kansas LLC.

## 2. Fair Play and Substantial Justice

Like OTH Defendants, Concept never argues that the court's assertion of personal jurisdiction over it will violate "traditional notions of fair play and substantial justice," nor does the court find any indications that this case is one of those "rare" ones.  As such, Concept clears the final threshold required to establish the court's personal jurisdiction.[2]

The court's finding of personal jurisdiction over Concept does not fully resolve Concept's Motion to Dismiss, however.  Concept also moves the court to dismiss based on insufficient process and insufficient service of process under Rule 12(b)(4) and Rule 12(b)(5).  The court now turns to this question.

---

[2]   The court need not consider the parties' arguments about personal jurisdiction by consent given its ruling on personal jurisdiction based on minimum contacts.

### III.     CONCEPT'S MOTION TO DISMISS FOR INSUFFICIENT PROCESS AND INSUFFICIENT SERVICE OF PROCESS

Even if the court possesses personal jurisdiction over Concept based on sufficient minimum contacts, a federal court may not *exercise* personal jurisdiction over a defendant until "the procedural requirement of service of summons [is] satisfied." *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). A "constitutionally sufficient relationship between the defendant and the forum" isn't enough—either consent or "authorization for service of summons on the defendant" must also exist. *Id.* The parties here debate whether Concept consented to alternative service of process, or whether Arch Nemesis should have served Concept under the Hague Convention in accordance with the Federal Rules of Civil Procedure 4(f)(1). Concept, arguing that it never consented to alternative service and, thus, was not properly served, asks the court to dismiss under "[R]ules 12(b)(4) and/or 12(b)(5)." Doc. 16 at 3. Given the "and/or" in Concept's request, the court next considers the difference between Rule 12(b)(4) and Rule 12(b)(5).

#### A.  LEGAL STANDARD FOR A RULE 12(b)(4) VERSUS A RULE 12(b)(5) MOTION

A motion to dismiss under Rule 12(b)(4) "'concerns the form of the process rather than the manner or method of its service.'" *Brown v. Nationwide Ins. Co.*, No. 21-4122, 2023 WL 4174064, at *2 n.3 (10th Cir. June 26, 2023) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1353 (3d ed. 2023)). A defendant properly can bring a Rule 12(b)(4) motion "'only to challenge noncompliance with the provisions of Rule 4(b) . . . that deals specifically with the *content* of the summons.'" *Id.* (emphasis added) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1353 (3d ed. 2023)).

In contrast, a Rule 12(b)(5) motion to dismiss based on insufficient service of process "challenges the mode or lack of delivery of a summons and complaint." *Oltremari by McDaniel v. Kan. Soc. & Rehab. Serv.*, 871 F. Supp. 1331, 1349 (D. Kan. 1994) (quotation cleaned up). When a defendant moves under Rule 12(b)(5) based on insufficient service of process, the burden shifts to plaintiff to make a prima facie showing that plaintiff properly served process. *Fisher v. Lynch*, 531 F. Supp. 2d 1253, 1259 (D. Kan. 2008) (citation omitted). When considering whether plaintiff sufficiently served a defendant, a court may consider any "affidavits and other documentary evidence" submitted by the parties and must resolve any "factual doubts" in plaintiff's favor. *Id.* (citation omitted).

Here, Concept hasn't argued its Rule 12(b)(4) and 12(b)(5) motion with great precision, leaving the court to decipher which part of the rule—in Concept's view—applies. Concept contends that Arch Nemesis should have served it under the Hague Convention rather than by alternative service. Doc. 16 at 5. So, it appears Concept doesn't take issue with the "mode of process" or the "content of the summons," but rather with the delivery. The court thus concludes that Concept has invoked Rule 12(b)(5), not Rule 12(b)(4). Under Rule 12(b)(5), the burden rests on Arch Nemesis to make a prima facie showing that it properly served process. The court applies its Rule 12(b)(5) analysis, below.

**B.  LEGAL STANDARD FOR PROPER SERVICE ON A FOREIGN ENTITY AND CONSENT TO ALTERNATIVE SERVICE OF PROCESS**

Federal Rule of Civil Procedure 4 governs service of process. Under this rule, a party may serve an individual in a foreign country "at a place not within any judicial district of the United States . . . by an internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial

and Extrajudicial Documents." Fed. R. Civ. P. 4(f)(1). A party may serve a foreign corporation, partnership, or association in the same manner, excepting personal delivery. Fed. R. Civ. P. 4(h)(2).

But plaintiff need not serve defendant in accord with an international agreement when the parties to a contract consent beforehand "to submit to the jurisdiction of a given court [or] to permit notice to be served by the opposing party[.]" *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964). Indeed, "consent to receive service of process in a manner that deviates from Rule 4" is "common practice in many commercial contexts[.]" 4 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1062 (4th ed. 2023).

Here, no one disputes that Arch Nemesis failed to serve Concept in accordance with the Hague Convention under Rules 4(f)(1) and 4(h)(2). But Arch Nemesis contends it properly served Concept by alternative service of process—service to which Concept contractually consented. Doc. 23 at 4. In support, Arch Nemesis maintains that it followed the contract's process for alternative service. *Id.* Concept, for its part, argues that the contract's terms for alternative service don't apply to it, but only to Clear Spring. Doc. 16 at 5–6. Clear Spring signed the contract with Arch Nemesis and Concept didn't, so, Concept asserts, the alternative service provision applies to Clear Spring—but not Concept. *Id.*

The parties first attempt to bolster their positions by arguing about the meaning of the contractual term "Underwriters." According to the contract's terms, Arch Nemesis may serve process "upon any senior partner in the firm of[] Mendes & Mount, LLP," a law firm in New York. Doc. 1–1 at 17. The firm's partners "are authorised and directed to accept service of process *on behalf of Underwriters*[.]" *Id.* (emphases added). The parties spill much ink fighting about the meaning of the word "Underwriters" in this contractual provision, and with good

reason—if an entity isn't an "Underwriter," then the contract hasn't authorized alternative service on it.

The contract doesn't define "Underwriters" in its "Definitions" section or anywhere else. *See* Doc. 1-1 at 3–4.  Arch Nemesis argues "Underwriters" refers to Concept, who are the "Underwriting Agents" for Clear Spring.  Doc. 12 at 63 (Third-Party Compl. ¶ 38).  Concept contends, in contrast, that the contractual term "Underwriters" applies only to Clear Spring—not to Concept—because when Clear Spring signed the contract, it did so "on behalf of Participating Underwriters/Insurers."  Doc. 16 at 6.  This identifier under Clear Spring's signature line, Concept asserts, defines "Underwriters" as synonymous with "Insurers" and pinpoints Clear Spring as the "Underwriters."  *Id.*

The parties also spar about whether the contract can bind Concept even if Concept is an "Underwriter."  Concept maintains that the contract's alternative service provision doesn't apply to it because it is neither a signatory nor a party to the contract.  Doc. 16 at 7.  Arch Nemesis counters, arguing that the contract does apply to Concept.  Doc. 23 at 4.  While Arch Nemesis concedes that Concept didn't sign the contract, it presents two theories permitting the contract's procedural waiver to bind Concept nonetheless.  *Id.* at 5.

First, Arch Nemesis argues that a privacy notice pulled Concept into the insurance contract under an incorporation by reference theory.  Doc. 23 at 5.  The contract arrived with a privacy notice attached to it.  *Id.*  The privacy notice allegedly identifies Concept as an "Underwriter."[3]  *Id.*  By virtue of the notice's attachment to the contract upon delivery, Arch Nemesis argues, the contract incorporated the notice and, thereby, binds Concept.  *Id.*  Second,

---

[3]        Concept contests its asserted relationship to this privacy notice.  Doc. 27 at 3.  Concept asserts that "the notice was not drafted by Concept," but instead that Besso Limited, Arch Nemesis's London broker, drafted it.  *Id.*  The court must resolve "factual doubts" in plaintiff's favor, however.  *Fisher v. Lynch*, 531 F. Supp. 2d at 1259.

Arch Nemesis contends that Concept and Clear Spring are "closely related." *Id.* at 8.  So, even if a non-signatory, Concept, as a closely related entity, should still "be bound by [the contract's] procedural waivers." *Id.*

In the end, the court must determine Concept's status under the contract to decide whether Arch Nemesis's service was proper.  The court must apply contract law principles to decide how to interpret the contractual term "Underwriters," as well as to decide whether the contract binds non-signatory Concept under either of these two theories.  This raises the question of precisely which contract law to apply, a question the court takes up next.

### C.    LEGAL STANDARD FOR DETERMINING APPLICABLE CONTRACT LAW

The parties neglect to provide an *Erie* analysis or a conflict of laws analysis in their briefs.  The parties also fail to demonstrate any rigor or consistency in selecting applicable case law to cite.  First, to interpret the contractual term "Underwriters," the parties cite to federal law from the Supreme Court and various circuits—five different circuits by the court's count, and none of them are the Tenth Circuit.  Doc. 23 at 5–7; Doc.  27 at 2–3.  Without an *Erie* analysis that explains why the court should look to federal law to interpret a contract in a tort case, the parties' briefing is of little help.  Next, when it comes to the incorporation by reference theory, the parties argue about a Ninth Circuit case that applies New York state contract law.  Doc. 23 at 5; Doc. 27 at 3.  Presumably, the parties found New York state law applicable based on the contract's choice of law provision specifying New York.  Indeed, Concept includes a footnote which asserts, without explanation, that New York law applies absent federal admiralty law.[4]

_____

[4]      The footnote reads:  "Pertinently, the policy has a choice of law provision providing that the policy is to be interpreted [under] principles of entrenched federal admiralty law and, in the absence of such principles, New York law.  In the absence of federal admiralty law, New York law applies to the interpretation of the policy and any actions under the policy."  Doc. 27 at 2 n. 6.

Doc. 27 at 2 n. 6.  But neither party explains why this choice of law provision should apply when Concept didn't sign the contract, nor do they consistently apply New York law across these three contract issues.  Finally, for the closely related doctrine, Arch Nemesis relies on a Fifth Circuit case.  Doc. 23 at 8.  Concept challenges this proposition by citing a district court case from the District of Colorado, suggesting, perhaps, that the Tenth Circuit is unsympathetic to the closely related doctrine.  Doc. 27 at 4.  Concept then cites a Kansas Supreme Court case to define the closely related doctrine's third-party beneficiary term.  *Id*.  These erratic shifts between differing sources of law go unexplained.  To the court, it appears the parties are committed merely to cherry-picking law to their own advantage.

Also, neither party considers whether admiralty law should apply.  Concept does nod to federal admiralty law in its footnote about the contractual choice of law provision.[5]  Doc. 27 at 2 n. 6.  But neither party ever presents the court with governing maritime law.  Perhaps this is because Arch Nemesis, in its Third-Party Complaint, explicitly alleges diversity jurisdiction and does "not designate its third-party claims as admiralty or maritime [.]"  Doc. 12 at 56 (Third-Party Compl. ¶ 2) (emphasis in original).  But the court needn't adopt Arch Nemesis's jurisdictional interpretation as controlling.[6]  Given the deficient briefing on this issue, the court

---

[5]     As note 4 explains above, Concept includes a footnote which identifies New York law's applicability in "the absence of federal admiralty law."  Doc. 27 at 2 n. 6.

[6]     Much suggests that these third-party claims fall under the court's admiralty jurisdiction, despite the parties' assertions and assumptions to the contrary.  "Marine insurance contracts qualify as maritime contracts, which fall within the admiralty jurisdiction of the federal courts and are governed by maritime law."  *GEICO Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1139 (11th Cir. 2019); *see also Com. Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1305 (10th Cir. 2001) ("Other circuits have concluded that disputes pursuant to marine insurance contracts are governed by federal admiralty law when an established federal rule addresses the issues raised.").  Even when a suit is "properly brought in diversity," if "it could also be sustained under the admiralty jurisdiction by virtue of the maritime contracts involved[,]" then federal law governs the contract interpretation—unless the dispute is "inherently local."  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22–23 (2004); *Openwater Safety IV, LLC v. Concept Special Risks, Ltd*, No. 18-cv-01400-NYW, 2018 WL 11435659, at *4 (D. Colo. Dec. 12, 2018) ("Even when the court has concurrent diversity jurisdiction and admiralty jurisdiction, federal maritime

will follow the parties' lead and skip over admiralty jurisdiction, and its accompanying maritime law, when deciding this motion.

### 1. Diversity Jurisdiction and Conflict of Laws Analysis

The parties have left the court rudderless in a sea of potentially applicable law. Thus, assuming without deciding that these third-party claims fall under the court's diversity jurisdiction, the court undertakes a conflict of laws analysis.

When a court sits in diversity, it must apply the conflict of laws rules of the state in which it sits to determine the applicable law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In Kansas, if the relevant contract contains a choice of law provision, "Kansas courts generally effectuate the law chosen by the parties to control the agreement." *Brenner v. Oppenheimer & Co.*, 273 Kan. 525, 539 (2002). One foundational justification for recognizing parties' contractual choice of law provisions is to comport with the parties' expectations. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (AM. L. INST. 1971) ("Prime objectives of contract law are to protect the justified expectations of the parties[.]").

Absent a choice of law provision, Kansas conflict of laws rules apply the *lex loci contractus* doctrine, that is, "the law of the state where the contract is made governs." *In re K.M.H.*, 285 Kan. 53, 60 (2007). "A contract is made where the last act necessary for its formation occurs." *Id*. "In cases involving insurance policies, [Kansas] courts have repeatedly held the contract is made where the policy is delivered." *Layne Christensen Co. v. Zurich Canada*, 30 Kan. App. 2d 128, 144 (2002).

---

law governs. . . . Plaintiff's decision to bring [a] case pursuant to the court's diversity jurisdiction is not determinative."). *But see Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310 (1955) (holding that where there is no "judicially established federal admiralty rule" state law should govern marine insurance contracts).

Finally, the party seeking to apply the law of a jurisdiction other than the forum generally "has the burden to present sufficient facts to show that other law should apply." *In re K.M.H.*, 285 Kan. at 60. If the party fails to provide a "clear showing that another state's law should apply," then "Kansas courts have often leaned toward a *lex fori*, or law of the forum, approach, opting to apply Kansas law." *Id*. at 60–61.

Here, the case sounds in tort but the issue at hand is one of contract interpretation, so contract law is the substantive law used to resolve the pertinent questions. The court thus applies Kansas's contract law rules for conflict of laws. Under Kansas's contract law rules for conflict of laws, New York law applies because of the contractual choice of law provision. But, if that provision didn't apply, Kansas law would apply because of both the *lex loci contractus* and the *lex fori* choice of law doctrines. The court considers these alternatives in turn below to determine whether to apply New York or Kansas state contract law.

### 2. The Contractual Choice of Law Provision

Kansas's routine enforcement of contractual choice of law provisions suggests that the court should apply New York law here, because the contract at issue so provides.[7] *Brenner*, 273 Kan. at 539. But this is problematic. The parties agree that Concept isn't a signatory to the contract, begging the question how a contractual choice of law provision can bind Concept. The parties argue ardently about whether the contract can bind Concept under a non-signatory theory. But to resolve this non-signatory question by applying the choice of law specified in the contract

---

[7]     The contract's choice of law provision reads as follows: "It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York." Doc. 1-1 at 16.

seems circular.  These considerations suggest the contractual choice of law provision shouldn't apply here.

The court recognizes countervailing considerations, however.  First, Arch Nemesis alleges that Concept drafted the contract.  Doc. 23 at 1.  And Concept doesn't challenge this allegation.  *See generally* Doc. 27.  Concept's role as a drafter of the contract, and its intimate knowledge of the contract's contents implied by this role, both suggest Concept expected New York law to apply.  Second, a footnote in Concept's Reply appears to concede that the contract's choice of law provision will apply.[8]  This tacit concession is surprising given Concept's strenuous efforts elsewhere to avoid the contract's terms.  But, the court remains unpersuaded that these countervailing considerations are sufficient to invoke the contractual choice of law provision as controlling, particularly given that the parties didn't address this choice of law question directly.

### 3.  The *Lex Loci Contractus* and *Lex Fori* Doctrines

Without an applicable choice of law provision, Kansas conflict of law rules select the law of Kansas because that's where the parties made the contract.  *In re K.M.H.*, 285 Kan. at 60. With an insurance contract, Kansas law defines that location as the place of delivery.  *Layne Christensen Co. v. Zurich Canada*, 30 Kan. App. 2d at 144.  Dr. McAtee received the insurance policy on February 14, 2022.  Doc. 12 at 69 (Third-Party Compl. ¶ 69).  The allegations in the Third-Party Complaint don't identify, at least not clearly, where that delivery occurred.  Instead, the allegations assert a chain of deliveries from Clear Spring to West Coast to Dr. McAtee.  *Id.* And though it seems likeliest that the final delivery to Dr. McAtee occurred in Kansas—which

---

[8]     Concept's footnote, quoted in note 4 above, states that "New York law applies to the interpretation of the policy and any actions under the policy."  Doc. 27 at 2 n. 6.

would mean the *lex loci contractus* doctrine would select Kansas law—the court declines to adopt pure speculation.

The court thus applies the *lex fori* doctrine instead.  Neither party has made a clear showing that another state's law applies.  Thus, the court selects the law of the forum—Kansas—and applies it in part D.

### D. THE ALTERNATIVE SERVICE OF PROCESS PROVISION'S APPLICABILITY TO CONCEPT

#### 1. Contract Interpretation and the Terms "Underwriters" & "Underwriting Agents"

When construing an unambiguous insurance policy, Kansas courts utilize a word's "plain, ordinary, and popular sense." *Kemper Ins. Companies v. Weber*, 38 Kan. App. 2d 546, 551 (2007).  "Dictionary definitions are good sources for the 'ordinary, contemporary, common' meanings of words." *Midwest Crane & Rigging, LLC v. Kansas Corp. Comm'n*, 306 Kan. 845, 851 (2017).  Black's Law Dictionary defines "underwriter" as "insurer." *Underwriter*, BLACK'S LAW DICTIONARY (11th ed. 2019).  It also quotes a treatise, which asserts that the "'party who takes upon himself the risk is called the *insurer*, sometimes [called] the *underwriter* from his subscribing his name at the foot of the policy.'" *Id*. (citing 1 Samuel Marshall, A Treatise on the Law of Insurance 1–2 (J.W. Condy ed., 2d Am. ed. 1810) (emphases added)).

Here, the insurance contract at issue doesn't define the term "Underwriters." *See* Doc. 1-1.  But it does place the word "Underwriters" directly next to the word "Insurers," separated by a backslash, under the signature line where Clear Spring signed the contract as the "Insurance Provider." Doc. 1-1 at 2.  This apparently interchangeable use of "Underwriters" with "Insurers" is consistent with the dictionary definition and, based on the Treatise of the Law of Insurance, appears to reach back at least two centuries. *Underwriter*, BLACK'S LAW DICTIONARY (11th ed.

2019).  Based on the dictionary definition and long-standing usage, the court is unpersuaded that

Concept is an "Underwriter."

Even if Concept were an "Underwriter," Arch Nemesis also must convince the court that

the contract binds Concept to the alternative service provision.  Arch Nemesis tries to do this

with the incorporation by reference theory and the closely related doctrine.  The court is

unpersuaded by these efforts as well, and now explains why.

### 2.  Incorporation by Reference

Generally, "a document is considered incorporated by reference where the incorporating

document specifically provides that it is subject to the incorporated one" and describes the

incorporated document "in such terms that its identity may be ascertained beyond reasonable

doubt."  *L. Co. Bldg. Assocs. v. L.*, 444 P.3d 376 at *15 (Kan. Ct. App. 2019).  But Kansas courts

"do not necessarily require an express incorporation by reference."  *Id.*  Instead, Kansas courts

read multiple agreements together, even without such express incorporation, if "executed at the

same time, between the same parties, and in connection with the same transaction."  *Id.*

Here, Arch Nemesis asserts, in effect, that Concept is a contracting party on a theory of

incorporation by reference.  Arch Nemesis contends that attaching the privacy notice to the

contract at the time of delivery effected incorporation of the privacy notice.  Doc. 23 at 8.  But

under Kansas law, the contract only could incorporate the privacy notice in one of two ways:

either (i) the contract, as the incorporating document, referred explicitly to the privacy notice and

sufficiently described the notice to identify it beyond any doubt; or, (ii) Arch Nemesis and

Concept executed the privacy notice as an agreement simultaneously with the contract.  *L. Co.

Bldg. Assocs.*, 444 P.3d 376 at *15.  Arch Nemesis hasn't alleged that the contract contains a

clear reference to the privacy notice, nor has the court discovered one itself.  Also, Arch Nemesis

hasn't alleged that the parties executed the privacy notice as an agreement simultaneously with the contract.  Arch Nemesis thus has failed to allege the requisite facts to bind Concept to the contract under an incorporation by reference theory.

### 3.  The Closely Related Doctrine

Arch Nemesis also tries to use the closely related doctrine to tie Concept to the contract's alternative service of process provision.  Arch Nemesis argues that non-signatory Concept is closely related to signatory Clear Spring, citing a Fifth Circuit case that invoked the closely related doctrine.  *See Franlink v. BACE Servs.*, 50 F.4th 432 (5th Cir. 2022).  There, the Fifth Circuit explained that the closely related doctrine binds non-signatories to a forum selection clause when "the non-signatories enjoyed a sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that they would be bound."  *Franlink v. BACE Servs.*, 50 F.4th 432, 439 (5th Cir. 2022).  But the court, in its research, found no Kansas law recognizing the closely related doctrine.  And Arch Nemesis has directed the court to no such authority.  So, this attempt to hook Concept likewise fails.

If the contract doesn't bind Concept as an "Underwriter," and also cannot bind Concept as a non-signatory under either of Arch Nemesis's proposed theories, then the alternative service provision doesn't apply to Concept.  In sum, the court concludes that Arch Nemesis cannot use the contract's service of process provisions as safe harbor.  The court thus holds that Arch Nemesis didn't serve Concept properly.

### IV.  MOTION TO DISMISS VERSUS MOTION TO QUASH SERVICE OF PROCESS

Having found Arch Nemesis's service of process insufficient under Federal Rule of Civil Procedure 12(b)(5), the court must decide whether to grant Concept's Motion to Dismiss under that rule or, instead, grant Concept's Motion to Quash Service of Process.  "Motions under Rule

12(b)(5) offer the district court the option of quashing the improper service of process without dismissing the action." *Washington v. City of Okla. City*, No. CIV-20-266-D, 2021 WL 798384, at *4 (W.D. Okla. Mar. 2, 2021) (collecting cases and citing 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1354 (3d ed. 2010)).  "The general rule is that when a court finds that service is insufficient but curable, it generally should quash the service and give the plaintiff an opportunity to re-serve the defendant." *Gregory*, 942 F.2d at 1500 (internal citations and quotation marks omitted).  *See also Cortishae-Etier v. Ford Motor Co.*, No. 23-cv-3081-EFM-TJJ, 2023 WL 3600890, at *2 (D. Kan. May 23, 2023) (repeating directive to quash service "when the Court finds that service is insufficient but curable").  Courts remain understandably reluctant to dismiss when effective service is possible because "the dismissal would be without prejudice and probably would lead to the reinstitution of the suit by the plaintiff.  Thus, dismissal needlessly burdens the parties with additional expense and delay and postpones the adjudication of the controversy on its merits."  5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1354 (3d ed. 2023).

Here, Arch Nemesis's service on Concept is insufficient, but also curable.  The court finds that Arch Nemesis has engaged sophisticated counsel capable of effectuating proper service to cure this insufficiency.  Thus, to avoid additional expense and delay, the court quashes Arch Nemesis's service of process and provides Arch Nemesis the opportunity to re-serve Concept. The court grants Concept's Motion to Quash Service of Process and denies Concept's Motion to Dismiss.  The court directs Arch Nemesis to serve Concept properly under Rules 4(f)(1) and 4(h)(2) within 90 days of this Order.

## V.      CONCLUSION

As explained in this Memorandum and Order, the court denies the OTH Defendants'

Motion to Dismiss (Doc. 29).  The court also denies the part of Concept's motion (Doc. 15) that

asks the court to dismiss Arch Nemesis's Third-Party Complaint for lack of personal jurisdiction.

And the court grants the part of Concept's motion (Doc. 15) that asks the court to quash Arch

Nemesis's service of process.  But it denies the portion of Concept's motion asking the court to

dismiss for that reason.

**IT IS THEREFORE ORDERED BY THE COURT THAT** third-party defendants

OTH-NC and OTH-MD's joint Motion to Dismiss Third-Party Complaint (Doc. 29) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** third-party defendant

Concept's Motion to Dismiss or, in the Alternative, to Quash Service of Process (Doc. 15) is

denied in part and granted in part.  The Motion to Dismiss is denied.  The Motion to Quash is

granted.  The court grants Arch Nemesis 90 days from the date of this Order to serve Concept

properly under Rule 4 of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**

**Dated this 19th day of September, 2023, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**