## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**CLEAR SPRING PROPERTY &
CASUALTY COMPANY,**

        **Plaintiff and
        Counter Defendant,**

    **v.**

**ARCH NEMESIS, LLC,**

        **Defendant, Counter Claimant,
        and Third-Party Plaintiff,**

    **v.**

**CONCEPT SPECIAL RISKS LTD., et al.,**

        **Third-Party Defendants.**

**Case No. 22-2435-DDC**

## MEMORANDUM AND ORDER

A yacht sank off the coast of Mexico. The yacht owner filed an insurance claim to recover for the loss. The insurance company denied the claim. Then, the insurance company—plaintiff Clear Spring Property & Casualty Company—filed a declaratory judgment action. That's how this case began. In a nutshell, Clear Spring asks the court to declare there's no coverage for the loss of defendant Arch Nemesis, LLC's yacht.

Then, things got more complicated. Arch Nemesis filed counterclaims against Clear Spring and third-party claims against five third-party defendants, all somehow involved in procuring the yacht or the yacht's insurance. Arch Nemesis later dismissed three of those third-party defendants. *See* Doc. 201. Now, two third-party defendants remain: Concept Special Risks Ltd.—Clear Spring's underwriting agent and claims handler—and West Coast Real Estate & Insurance, Inc.—Arch Nemesis's insurance broker. Highly simplified, Arch Nemesis's

counterclaims and third-party claims contend that Clear Spring and Concept knew all along that the yacht's insurance policy was void from inception—and misrepresented coverage to Arch Nemesis. Arch Nemesis also alleges that West Coast neglected to fulfill its broker duties by not advising Arch Nemesis of the void-from-inception dangers of the policy.

The four parties still in the case have filed three summary judgment motions, four motions to exclude testimony of experts, and one motion for oral argument, all of which the court decides in this Order. The court organizes its analysis by claim. It begins with the heart of the dispute—the one between plaintiff and defendant. The court thus addresses Clear Spring's declaratory claims first, followed by Arch Nemesis's counterclaims. The court concludes that Clear Spring deserves summary judgment on the first of its declaratory claims, making the insurance contract void from inception. It also grants Clear Spring summary judgment on Arch Nemesis's counterclaims. Then, the court moves on to the third-party disputes. It grants summary judgment to Concept on Arch Nemesis's third-party claims. But the third-party claims against West Coast survive. They're not a subject of summary judgment practice. So—all told—just Arch Nemesis and West Coast remain in the case. All claims involving Clear Spring and Concept resolve at summary judgment.

The court finishes the Order with some housekeeping—denying Arch Nemesis summary judgment on its challenge to the other parties' comparative fault designations and denying as moot Clear Spring and Concept's four Motions to Exclude Expert Testimony. It also denies Clear Spring and Concept's request for oral argument. The court explains its decisions, below, starting with the summary judgment facts.

I.      **Background**

### *Buying the Yacht and Procuring Its Insurance Coverage*

In 2021, Arch Nemesis decided to buy a yacht.  Doc. 233-6 at 3–4 (Def. Ex. A-3).  Arch

Nemesis is a Kansas-based LLC whose sole member is the Kimberly D. McAtee Trust.  Doc.

233-27 at 1 (McAtee Decl. ¶ 2).  Dr. Jamie McAtee and his wife, Kimberly D. McAtee, are co-

trustees of the Trust.  *Id.*  To procure insurance for the vessel, Arch Nemesis retained West

Coast—an insurance broker—in November 2021.  Doc. 233-6 at 1–4 (Def. Ex. A-3).  West

Coast worked with Besso, a wholesale broker located in the United Kingdom, who worked with

Concept, an underwriting agent and claims handler for Clear Spring.  Doc. 232-2 at 2 (Usher

Decl. ¶ 4); Doc. 222 at 3 (Pretrial Order Stipulations ¶ 2.a.1.).

Near the end of November 2021, Besso forwarded to Concept a quick quote request for

insurance coverage on Arch Nemesis's vessel.  Doc. 232-9 at 2–4 (Pl. Ex. 5).  Concept provided

the first of three quotes on November 30, 2021.  *See* Doc. 232-10 at 2 (Pl. Ex. 6).  The November

30 quote included the terms of the proposed policy.  *See generally id.*  Arch Nemesis received

the quote at the beginning of December.  Doc. 232-11 at 14 (McAtee Dep. 72:7–17).  Two later

quotes followed—on December 10, 2021, and December 24, 2021—both including the same

policy terms as the November 30 quote.  *See* Doc. 232-12 (Pl. Ex. 8); Doc. 232-16 (Pl. Ex. 12).

On December 14, 2021, Concept emailed Besso and requested a survey of Arch

Nemesis's vessel—a prerequisite to issuing the policy.  Doc. 232-13 at 2 (Pl. Ex. 9); Doc. 232-28

at 3 (Usher Dep. 83:17–22).  So, Arch Nemesis provided a copy of a vessel survey prepared by

Louis Stahlberg.  Doc. 222 at 4 (Pretrial Order Stipulations ¶ 2.a.3.).  The Stahlberg survey

included eight repair recommendations for Arch Nemesis's yacht.  Doc. 232-14 at 10 (Stahlberg

Survey).  Arch Nemesis then provided Clear Spring with a Letter of Compliance (LOC)

certifying it had complied with the recommendations in the Stahlberg survey.  Doc. 222 at 4

(Pretrial Order Stipulations ¶ 2.a.4.). The LOC identified one recommendation—about issues with the refrigerator—as "outstanding."[1] Doc. 232-19 at 2 (LOC) (recommendation #2). The LOC certified that the other seven recommendations had "been complied with[.]" *Id.* Dr. Jamie McAtee signed the LOC. *Id.*; Doc. 232-15 at 4 (McAtee Dep. 94:12–15).

In late January 2022, Arch Nemesis received a Temporary Binder, again including the same policy terms as recited in the three quotes. Doc. 232-18 (Pl. Ex. 14); Doc. 232-11 at 19–20 (McAtee Dep. 82:24–83:3). Then, on February 14, 2022, Clear Spring issued a marine insurance policy to Arch Nemesis. Doc. 222 at 4 (Pretrial Order Stipulations ¶ 2.a.2.). The policy stated it was effective from December 24, 2021, to December 24, 2022. *Id.* Arch Nemesis reviewed the policy, including all warranties. Doc. 232-11 at 47–48 (McAtee Dep. 206:19–207:12) (testifying that Arch Nemesis "reviewed all of the warranties, including the recommendation warranty, prior to the issuance of the policy in question"). Arch Nemesis didn't have any questions about the policy based on that review. Doc. 232-11 at 44, 45, 46 (McAtee Dep. 168:3–12, 169:14–21, 171:1–17).

### The Loss

On May 28, 2022, Arch Nemesis's yacht sank in Santa Maria Bay, near Cabo San Lucas, Mexico. Doc. 222 at 4 (Pretrial Order Stipulations ¶ 2.a.7.). At the time of the loss, Roger Mosqueira served as the vessel's manager. Doc. 243-9 at 2 (McAtee Decl. ¶ 6). Roger Mosqueira and his crew had chartered the vessel for passengers without Arch Nemesis's

---

[1]      To clarify, the LOC lists eight total recommendations as outstanding, each identified numerically. Doc. 232-19 at 2 (LOC). Only one of these, however, falls within numerals one through eight. *Id.* The LOC's other outstanding recommendations fall between numbers 16 and 22, *i.e.*, those items listed as "Deferred Maintenance and Repair" items in the Stahlberg Survey, not as "Recommendations." *See id.*; *see also* Doc. 232-14 at 10–11 (Stahlberg Survey). The policy distinguishes between Deferred Maintenance items and the eight required recommendations. Doc. 233-4 at 35 (Usher Dep. 135:24–136:21). Thus, the LOC identifies just one outstanding recommendation.

authorization when the yacht struck a rock and sank.  Doc. 233-13 at 33 (McAtee Dep. 127:22–128:1); Doc. 233-19 at 3 (McAtee Dep. 147:14–148:8).  Juan Manuel Mosqueira Alcarez was a Clear-Spring-approved operator of the boat and named as approved operator in the policy.  Doc. 238-1 at 4 (WC Ex. A); Doc. 232-2 at 3 (Usher Decl. ¶ 9); Doc. 232-5 at 2 (Pl. Ex. 1).  Mr. Alcarez was the operator of the boat at the time of the loss.  Doc. 238-2 at 9 (WC Ex. B).  In a court in Mexico, Roger Mosqueira is the target of a criminal action based on the vessel's loss. Doc. 243-9 at 2 (McAtee Decl. ¶ 6); Doc. 238-2 at 10–11 (WC Ex. B).  No similar action targets Mr. Alcarez.  Doc. 243-9 at 2 (McAtee Decl. ¶ 7).

### *The Claim*

On May 29, 2022, Arch Nemesis tendered a claim on the policy.  Doc. 222 at 4 (Pretrial Order Stipulations ¶ 2.a.8.).  Concept appointed Arnold & Arnold to investigate the claim.  Doc. 233-4 at 45 (Usher Dep. 175:15–176:3).  In its first report to Concept, Arnold & Arnold asked for Concept's advice about requesting receipts from Arch Nemesis demonstrating the completed Stahlberg survey recommendations.  Doc. 233-21 at 5 (First Report).  And Concept confirmed it would require receipts or certifications evidencing compliance.  *See* Doc. 233-22 at 1 (Def. Ex. A-19).

Arnold & Arnold then sought evidence from Arch Nemesis that it "did in fact comply with all the survey recommendations set forth" in the Stahlberg survey.  Doc. 232-3 at 3 (Caravaggio Decl. ¶ 7).  Arch Nemesis provided Arnold & Arnold with just three documents demonstrating compliance.  *Id.* at 4 (Caravaggio Decl. ¶ 14).  One of those documents—an Alvarez Diesel invoice dated May 3, 2022—showed that the lone "outstanding" recommendation identified in the LOC—the one about the refrigerator—was complete.  *Id.*; Doc. 232-21 at 3 (Pl. Ex. 17).  Clear Spring considered this Alvarez Diesel document as evidence that Arch Nemesis had complied with the second recommendation.  Doc. 233-4 at 48 (Usher Dep. 188:19–189:4).

But those three documents didn't mention or demonstrate compliance with the other seven recommendations. Doc. 232-11 at 28–30 (McAtee Dep. 115:17–117:24). And Arch Nemesis concedes it "was unable to produce a 'writing' for the other seven" recommendations. Doc. 233-1 at 13; *see also* Doc. 233-23 at 3–4 (Def. Ex. A-20) (email explaining that "the other [seven] items had been completed by the previous owner" and Arch Nemesis didn't "have receipts from the previous boat owners on that specific work"); Doc. 232-11 at 23 (McAtee Dep. 93:18–21).

On August 17, 2022, Arnold & Arnold sent an email to Concept stating that Arch Nemesis hadn't "complied with any of the recommendations except for having the refrigerator/freezer breaker tripping diagnosed." Doc. 232-23 at 2 (Pl. Ex. 19). And it stated that Arch Nemesis hadn't located "any additional supporting documentation which reflects [it] has complied with the remaining seven items listed[.]" *Id.* The next day, Clear Spring issued a reservation of rights letter to Arch Nemesis. Doc. 222 at 4 (Pretrial Order Stipulations ¶ 2.a.9.). On October 24, 2022, Clear Spring denied coverage for Arch Nemesis's Claim and declared the policy void. *Id.* (Pretrial Order Stipulations ¶ 2.a.11.). Clear Spring filed this declaratory judgment action the same day. Doc. 1 (Compl.).

## II.    Legal Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is

essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart

Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

     The moving party bears "'both the initial burden of production on a motion for summary

judgment and the burden of establishing that summary judgment is appropriate as a matter of

law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v.

Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To carry this burden, the

moving party "'need not negate the non-movant's claim, but need only point to an absence of

evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO,

Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).  Even if the non-moving party fails to respond

adequately, "the district court may not grant the motion without first examining the moving

party's submission to determine if it has met its initial burden of demonstrating that no material

issues of fact remain for trial and the moving party is entitled to judgment as a matter of law."

*Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

     If the moving party satisfies its initial burden, the non-moving party "'may not rest on its

pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those

dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169

(quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  The specific "facts must be identified

by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."

*Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144

F.3d at 671).  Affidavits and testimony "must be based upon personal knowledge and set forth

facts that would be admissible in evidence; conclusory and self-serving affidavits are not

sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Finally, ever since 1986, federal courts haven't viewed summary judgment as a "disfavored procedural shortcut[.]" *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.    Analysis

This case has escalated from a two-party dispute over an insurance claim to a multi-party case with motion-to-exclude papers, summary judgment briefs, and accompanying exhibits. These submissions number in the thousands of pages. But at its core, the case remains a simple one. Does Clear Spring's contract with Arch Nemesis provide a basis for Clear Spring to deny coverage? The court's conclusion: yes, it does. That conclusion takes the wind out of Arch Nemesis's sails—not only as a defendant against Clear Spring's declaratory action, but also as a counterclaimant and third-party plaintiff. So, the only claims left standing after this Order issues are those left unchallenged at summary judgment—namely, Arch Nemesis's third-party claims against West Coast.

Before explaining its conclusions, the court endeavors to provide a little clarity by setting forth the various parties, their roles, and claims in graphic form.



The court's analysis begins at the top of the graphic, addressing the dispute—and accompanying cross motions for summary judgment—between Clear Spring and Arch Nemesis. It starts with Clear Spring's claims for declaratory judgment against Arch Nemesis and then moves to Arch Nemesis's tort-and-contract-based counterclaims against Clear Spring. Then the court pivots to Arch Nemesis's third-party claims, first, against Concept and, second, against West Coast. It concludes with some housekeeping—*i.e.*, motions denied as moot based on the court's summary judgment rulings. Start with Clear Spring's affirmative claims.

**A.    Clear Spring's Declaratory Judgment Claims**

Clear Spring asserts seven declaratory judgment claims. Each asks the court to declare that there's no coverage for Arch Nemesis's loss. *See* Doc. 222 at 18–19 (Pretrial Order 4.a.1–

7.).  Specifically, Clear Spring contends Arch Nemesis breached the following contractual

provisions, blocking coverage:  the Recommendations Warranty, the Misrepresentation

Provision, the Fire Extinguisher Warranty, the Seaworthiness Warranty, and the Regulations

Warranty.  *Id.*  Clear Spring also asserts declaratory judgment claims premised on the federal

admiralty doctrine of *uberrimae fidei* and, more generally, on "the terms, conditions, exclusions

and warranties under the Policy."  *Id.*

Clear Spring and Arch Nemesis have filed cross summary judgment motions on several

of Clear Spring's declaratory judgment claims.  *See* Doc. 232 at 1 (Clear Spring moves for

partial summary judgment on five declaratory judgment claims); Doc. 233 at 1 (Arch Nemesis

requests summary judgment on Clear Spring's "claims against" Arch Nemesis).  The court

decides the declaratory judgment portions of the cross motions together, given the motions'

nearly identical arguments.  *See Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D.

Kan. 2010) ("To the extent the cross-motions overlap, however, the court may address the legal

arguments together.  The Court notes that in this case, the legal issues and arguments made with

respect to both motions are virtually identical.  Thus, the Court will address the legal issues

together.").

As it turns out, the court need only reach Clear Spring's first declaratory judgment claim:

Arch Nemesis's breach of the Recommendations Warranty.[2]  Because the court concludes Arch

Nemesis's Recommendations Warranty breach voids the insurance policy from inception, it

needn't reach Clear Spring's other declaratory judgment claims seeking the same relief.  *See*

*Openwater Safety IV, LLC v. Great Lakes Ins. SE* (*Openwater-Great Lakes*), 435 F. Supp. 3d

---

[2]      The court notes that Clear Spring moved for summary judgment on just five of its seven claims.
*See* Doc. 232 at 1 (moving for partial summary judgment on counts 1–4 and 7).  But as things played out,
that's of no moment here.  The court grants Clear Spring summary judgment on one declaratory judgment
claim, making the other claims moot.

1142, 1154 (D. Colo. 2020) ("[Insurer's] Motion for Summary Judgment as to its counterclaim that [insured] breached the Named Operator Warranty should be granted, thereby rendering the insurance policy at issue in this case void.  Accordingly, I do not substantively discuss [insurer's] remaining arguments for summary judgment in its favor.").  Before the court explains this conclusion, however, it must determine which law to apply to evaluate Clear Spring's Recommendations Warranty declaratory judgment claim.

### 1.    Choice of Law

"Marine insurance contracts qualify as maritime contracts, which fall within the admiralty jurisdiction of the federal courts and are governed by maritime law."  *GEICO Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1139 (11th Cir. 2019); *see also Com. Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1299 (10th Cir. 2001) ("[D]isputes pursuant to marine insurance contracts are governed by federal admiralty law when an established federal rule addresses the issues raised.").  But "it does not follow . . . that every term in every maritime contract can only be controlled by some federally defined admiralty rule."  *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955).  The court must ask whether "there [exists] a judicially established federal admiralty rule[.]"  *Id*. at 314.  "[W]hen no 'judicially established federal admiralty rule' resolves the issue at hand, federal courts 'rely on state law when addressing questions of maritime insurance.'"  *Clear Spring Prop. & Cas. Co. v. Big Toys LLC*, 683 F. Supp. 3d 1297, 1301 (S.D. Fla. 2023) (quoting *Wilburn Boat*, 348 U.S. at 314); *see also Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*, 601 U.S. 65, 70 (2024) ("When no established rule exists, and when the federal courts decline to create a new rule, federal courts apply state law.").

Other courts have recognized specifically that "there is no firmly established federal maritime precedent governing . . . survey-compliance warranties[,]" like the one at issue here.

*Clear Spring Prop. & Cas. Co. v. Viking Power LLC*, 608 F. Supp. 3d 1220, 1226 (S.D. Fla. 2022).  And *Wilburn Boat* "concluded that state law governs the effect of a breach of warranty in a marine-insurance policy."  *Raiders Retreat Realty*, 601 U.S. at 81 (Thomas, J., concurring). So, the court here looks to state law for legal principles of substance.

Which state's law applies—at least to any contractually-based claims—is straightforward.  The Supreme Court recently confirmed that "[c]hoice-of-law provisions in maritime contracts are presumptively enforceable."  *Id.* at 70.  And the policy at issue here includes just such a provision:

> It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law . . . but where no such . . . precedent exists, this insuring agreement is subject to the substantive laws of the State of New York.

Doc. 232-5 at 17 (Insurance Agreement).  Only "narrow exceptions" overcome the presumption of enforceability, such as if the law "would contravene a controlling federal statute," "conflict with an established federal maritime policy," or "when parties can furnish no reasonable basis for the chosen jurisdiction."  *Raiders Retreat Realty*, 601 U.S. at 67, 76.  No party argues that any of these exceptions apply here.  *See generally* Doc. 232; Doc. 233-1.  Indeed, the parties agree that—at least on the contractual claims—New York law applies when there's no entrenched federal admiralty law.  *See* Doc. 232 at 30 ("[W]here there is no entrenched federal admiralty law . . . New York law applies."); Doc. 233-1 at 17 ("New York law governs the interpretation of the Policy.").  Since admiralty law doesn't provide established principles for survey-compliance warranties like the Recommendations Warranty at issue here, *Viking Power*

*LLC*, 608 F. Supp. 3d at 1226, the court thus applies New York law to Clear Spring's

Recommendations Warranty claim.[3]

## 2.     Breach of Warranty and New York Law

"Under New York law, express warranties in policies of marine insurance mandate strict

and literal compliance." *Great Lakes Ins. SE v. Chartered Yachts Miami LLC*, 676 F. Supp. 3d

1251, 1264 (S.D. Fla. 2023) (first citing *Stony Brook Marine Transp. Corp. v. Wilton*, No. 94-

5880-CIV, 1997 WL 538913, at *11 (E.D.N.Y. Apr. 21, 1997); and then citing *Colvin v. Cigna*

*Prop. & Cas. Co.*, No. 90-3788-CIV, 1992 WL 188347, at *2 (S.D.N.Y. July 27, 1992)).  "New

York law has long provided that the breach of an express warranty in a marine insurance policy,

whether material to the risk or not, whether a loss happens through the breach or not, absolutely

determines the policy and the assured forfeits his rights under it."  *Id.* (quotation cleaned up).

That is—as New York's Court of Appeals has explained—an "express warranty in a marine

insurance policy must be literally complied with" and "noncompliance forbids recovery,

regardless of whether the omission had a causal relation to the loss."  *Id.*  (quotation cleaned up).

In short, failing to comply with a warranty in a marine policy "affords a complete defense to

---

[3]     *Wilburn Boat* declared that state law should interpret warranty clauses in marine insurance policies.  348 U.S. at 314–16 ("Whatever the origin of the 'literal performance' rule may be . . . it has not been judicially established as part of the body of federal admiralty law . . . . Therefore, the scope and validity of the policy provisions . . . and the consequences of breaching them can only be determined by state law[.]").  Since then, "a few circuits have announced" that a warranty-clause federal rule nonetheless exists.  *Guam Indus. Servs., Inc. v. Zurich Am. Ins. Co.*, 787 F.3d 1001, 1004 n.1 (9th Cir. 2015).  This federal rule provides "that 'admiralty law requires the strict construction of express warranties in marine insurance contracts; breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss.'"  *Id.* at 1005 (citing *Lexington Ins. Co. v. Cooke's Seafood,* 835 F.2d 1364, 1366 (11th Cir. 1988)).

The "Tenth Circuit has neither announced nor disclaimed such a federal rule."  *Openwater-Great Lakes*, 435 F. Supp. 3d at 1155 n.9.  So, under *Wilburn Boat*'s binding precedent, this court applies state law.  But, the court notes, the same result would follow under either New York law or the articulated federal rule.  Both sources require strict construction, and both ignore whether the loss stemmed from noncompliance.

coverage[.]" *Sirius Ins. Co. (UK) v. Collins*, No. CV 92-3544, 1993 WL 645926, at *2

(E.D.N.Y. June 29, 1993), *aff'd*, 16 F.3d 34 (2d Cir. 1994).

New York's strict-and-literal-compliance requirement leaves room for just one question

here: Did Arch Nemesis comply with the Recommendations Warranty in the policy? The short

answer is no. Here's why.

> The Recommendations Warranty reads as follows:
>
> Unless we agree in writing to the contrary, if we request a survey of the Scheduled Vessel then it is warranted that such survey is in existence prior to the effective date of this insurance and a copy of the same must be received by us within 30 days of the effective date of this agreement. If the survey makes any recommendations with respect to the Scheduled Vessel, then it is warranted that all such recommendations are completed prior to any loss giving rise to any claim hereunder, by skilled work men using fit and proper materials and that either:
>
> a. The surveyor who carried out the survey certifies in writing that all recommendations have been completed to his (the surveyor's) satisfaction prior to any loss and/or claim
>
>    Or,
>
> b. The workmen/repair yard that carried out the said work and/or recommendations certifies in writing that all recommendations have been completed prior to any loss and/or claim. Failure to comply with this warranty will void this agreement from inception.

Doc. 232-5 at 15 (Insurance Agreement).

Here, the parties' interactions triggered both portions of the Recommendations Warranty.

*First*, Clear Spring/Concept requested a survey of the vessel. Doc. 233-11 at 2 (Def. Ex. A-8)

(December 10, 2021, quote indicating that agreement would issue subject to, among other things,

an "out-of-water survey"); Doc. 232-13 at 2 (Pl. Ex. 8) (email explaining quote showed

documents still required and noting survey still apparently not provided). Without the survey—

among other required documents—the policy wouldn't issue. Doc. 232-28 at 3 (Usher Dep.

83:1–6, 17–22). So, as part of the application process, Arch Nemesis provided Clear Spring with

a copy of a yacht survey prepared by Louis Stahlberg.  Doc. 222 at 4 (Pretrial Order Stipulations

¶ 2.a.3.).  This survey request triggered the Recommendations Warranty.  Doc. 232-5 at 15

(Insurance Agreement) ("[I]f we request a survey of the Scheduled Vessel then it is warranted

that such survey is in existence . . . and a copy of the same must be received by us within 30 days

of the effective date of this agreement.").

Second, the Stahlberg survey made eight recommendations.  Doc. 232-14 at 10 (Pl. Ex.

10) (survey outlining eight recommendations in bullet-pointed list under "Deficiency Review").

Those recommendations triggered the portion of the warranty requiring certification.  Doc. 232-5

at 15 (Insurance Agreement) ("If the survey makes any recommendations with respect to the

Scheduled Vessel, then it is warranted that . . . either . . . [t]he surveyor who carried out the

survey certifies in writing . . . [o]r [t]he workmen/repair yard that carried out the said

work . . . certifies in writing that all recommendations have been completed prior to any loss

and/or claim.").  In a nutshell, Arch Nemesis warranted that it would produce a "writing" (or

certification) manifesting that it had completed all eight survey recommendations.  Arch

Nemesis didn't produce the requisite certifications for seven of the eight recommendations.  To

be sure, Arch Nemesis certified in writing to completing one of those recommendations—

improvements to the refrigerator/freezer.  See Doc. 232-21 at 3 (receipt from Alvarez Diesel

indicating new refrigerator ordered).  And Clear Spring never disputes Arch Nemesis's

successful compliance with the Recommendations Warranty when it comes to the refrigerator

recommendation.  See Doc. 233-4 at 48 (Usher Dep. 188:19–189:9) (confirming, from Clear

Spring's perspective, that Arch Nemesis completed refrigerator recommendation).

But Arch Nemesis concedes it "was unable to produce a 'writing' for the other seven"

recommendations.  Doc. 233-1 at 13; see also Doc. 233-23 at 3–4 (Def. Ex. A-20) (email

explaining that "the other [seven] items had been completed by the previous owner" and Arch Nemesis didn't "have receipts from the previous boat owners on that specific work"); Doc. 232-11 at 28–30 (McAtee Dep. 115:9–117:7) (Arch Nemesis corporate representative testifying that receipts it provided don't reflect remediation of seven recommendations). Arch Nemesis's concession ends the inquiry. That is, its concession precludes any reasonable jury from finding Arch Nemesis complied with the Recommendations Warranty. In short, Clear Spring has pointed to "an absence of evidence" that Arch Nemesis complied with the Recommendations Warranty's certification requirement. *Kannady*, 590 F.3d at 1169. And Arch Nemesis has failed to "bring forward specific facts showing a genuine issue" for trial about compliance. *Id.* Indeed, Arch Nemesis concedes it can't produce the requisite certifications. Without such summary judgment evidence of compliance, Clear Spring's claim for a declaratory judgment based on the Recommendations Warranty succeeds as a matter of law.

There's one final nail in the coffin holding Arch Nemesis's declaratory judgment claims: New York law clarifies that it just doesn't matter whether the loss flowed from noncompliance with the breached warranty. *See Chartered Yachts Miami*, 676 F. Supp. 3d at 1264. Noncompliance with the certification requirement forbids recovery—full and hard stop— regardless of the actual condition of the boat. *Id.* So, Arch Nemesis's protests that its boat broker—Mr. Al DiFlumeri—attested to the yacht's "absolutely perfect" condition is of no moment here. Doc. 233-8 at 34 (DiFlumeri Dep. 131:6–11). Mr. DiFlumeri never put anything in a written report. *Id.* at 36 (DiFlumeri Dep. 138:24–139:4; 139:18–140:12). Nor does he qualify as a "surveyor" or "workmen/repair yard"—one of whom must provide the requisite certifications under the policy. *Id.* at 34–35, 36 (DiFlumeri Dep. 133:24–134:4; 141:1–9). So, even if the boat was in mint condition, Arch Nemesis can't produce the required documents to

establish it.  The documents—not the boat's actual condition or the condition's relationship to the loss—are the controlling issue here.  And it's undisputed that those requisite documents are MIA.[4]

The conclusion that Arch Nemesis breached the Recommendations Warranty has significant implications for this case.  For starters, the warranty itself specifies that "[f]ailure to comply with this warranty will void this agreement from inception."  Doc. 232-5 at 15 (Insurance Agreement).  And even if it didn't, there's a catch-all contractual provision providing that any breach of a warranty voids the policy from inception:

> Where any term herein is referred to as a 'warranty' or where any reference is made herein to the word 'warranted', the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception.

*Id.*

So, the court must hold Arch Nemesis to the terms of its agreement.  Under those terms, Arch Nemesis's failure to produce writings that certify the completion of the other seven recommendations voids the policy *ab initio*.  And Clear Spring is entitled to summary judgment on its first declaratory judgment claim.

Other courts' decisions bolster the court's conclusion.  Addressing similar marine insurance contractual provisions at summary judgment, they have concluded similarly.

### 3.    Breaches of Warranty and Void Policies in the Case Law

In *Chartered Yachts Miami*, for instance, the Southern District of Florida granted summary judgment to an insurance company in a marine insurance policy dispute.  676 F. Supp.

---

[4]    This outcome might feel, to some, counterintuitive.  But intuition can't supplant established principles of contract law.  Nor can it replace the parties' bargain with one another.  They chose New York state law to control their agreement.  And the court can't rewrite New York law or the parties' bargain with one another.

3d at 1254.  There, as here, the insurance company asked the court to declare the policy didn't afford coverage for a damaged vessel.  *Id.*  There, like here, the insurance company contended that the insured had breached the policy's survey compliance warranty.  *Id.* at 1263–64.  The *Chartered Yachts Miami* policy contained identical survey-recommendations-warranty language as the policy here.  *Id.* at 1256–57, 1265.  And it contained identical any-breach-voids-policy-from-inception language, too.  *Id.* at 1257, 1265.  To be sure, the insured in *Chartered Yachts Miami* breached the Recommendations Warranty in a different fashion.  There, the boat didn't sink, so the insurer conducted a post-incident investigation and found a life raft's certification tag had expired.  *Id.* at 1265.  And, the court noted, the insured "provide[d] no evidence to dispute" the raft's expired tag.  *Id.*  So, the court held:

> The failure to inspect and tag the life raft annually, as expressly required by the Global Survey and the Policy, constitutes a breach of the survey compliance warranty under New York law.  Due to this breach, the Policy is rendered void *ab initio* and [the insurer] is entitled to summary judgment.

*Id.*

The court doesn't see the cases as identical.  In *Chartered Yachts Miami*, the insured hadn't completed the recommendation, thus breaching the Recommendations Warranty.  Here, the insured didn't provide writings proving it had completed the recommendations.[5]  The controlling law views that as a distinction without a difference.  The operative warranty requires both that the insured complete the recommendations, *and* that the insured certify as much in a writing provided by specified individuals.  In *Chartered Yachts Miami*, the insured breached one

---

[5]    The parties here also dispute whether Arch Nemesis completed the recommendations.  Doc. 232 at 33; Doc. 233-1 at 25–26; Doc. 239 at 28–29; Doc. 243 at 17–18.  As *Chartered Yachts Miami* demonstrates, established non-completion of the recommendations would produce the same result—summary judgment premised on breach of warranty and voiding the policy from inception.  676 F. Supp. 3d at 1265.  But the court needn't enter the completed-or-not-completed fray.  It's undisputed that—completed or not—Arch Nemesis doesn't have the requisite writings.  So, the court declines to consider any party's completion arguments.

requirement of the warranty. Here, the insured breached another requirement of the warranty. In both cases, the insured "provided no evidence to dispute" the breach. *Id.* So, under either set of facts, the result remains the same—summary judgment goes to the insurer along with a conclusion that the policy was void from inception.

This result is consistent with another case where the marine insured also couldn't provide sufficient evidence to dispute an alleged warranty breach. *Openwater-Great Lakes*, 435 F. Supp. 3d at 1157. In *Openwater-Great Lakes*, an insured vessel's mast fell during travel, causing extensive damage to the boat. *Id.* at 1148. Only one individual was available to testify about who was operating the vessel when the mast fell—all other potential testifiers had "disappeared." *Id.* at 1157. That lone individual testified that Mr. Yupanqui was "helming the boat" when the dismasting occurred. *Id.* (quotation cleaned up). Mr. Yupanqui was "not one of the two 'Named Operators'" under the policy. *Id.* And the underlying insuring agreement contained a "Named Operator Warranty" provision requiring that only persons specified on the application could operate the vessel. *Id.* at 1156. The agreement there also included the same language as the agreement here voiding the policy from inception upon any warranty breach. *Id.* at 1147–48. Consistent with the result in *Chartered Yachts Miami*, *Openwater-Great Lakes* concluded that summary judgment for the insurer was appropriate. *Id.* at 1157. The insurer had "met its burden of establishing that there [was] no genuine dispute of material fact . . . that [the insured had] breached the Named Operator Warranty, and . . . [the insured had] failed to set forth specific facts establishing an issue most properly reserved for trial." *Id.* And, the court concluded, "upon [the insured's] breach . . . the insurance coverage issued by [the insurer] to [the insured] was rendered void from its inception." *Id.* at 1158.

So too in the present case.  Arch Nemesis fails to identify specific facts demonstrating it provided written certifications as required by the Recommendations Warranty.  Indeed, Arch Nemesis concedes it doesn't have the requisite receipts.  The absence of receipts breached the Recommendations Warranty's writing requirement.  And, under the terms of the policy, that breach voids the policy from inception.  At bottom, the case law and summary judgment facts— or really, the absence of required facts—all point one direction:  summary judgment for Clear Spring on its Recommendations Warranty declaratory judgment claim.

Arch Nemesis floats several arguments trying to avoid this result.  None are availing. [6]

### 4.    Arch Nemesis's Arguments Counteracting Breach

Arch Nemesis argues Clear Spring isn't entitled to summary judgment on its Recommendations Warranty claim for two reasons:  *One*, the timeline of the survey request and survey submission here doesn't implicate the Recommendations Warranty.  *Two*, Clear Spring waived any opportunity to rely on the Recommendations Warranty by its conduct during the application process.  *Three*, the loss occurred during unauthorized use, negating Clear Spring's reliance on contractual warranties.  The court explains why none of these arguments persuade, below.

---

[6]    Arch Nemesis develops these arguments most fully in its own Motion for Summary Judgment (Doc. 233) and accompanying Memorandum in Support (Doc. 233-1).  And it explicitly refers the court back to that briefing when responding to Clear Springs's summary judgment motion, often identifying the overlapping arguments by specific page.  *See, e.g.*, Doc. 243 at 13 ("As set forth in Arch Nemesis's motion . . . *See* Doc. 233-1 at 17–21[.]").  Following Arch Nemesis's lead—and for the sake of efficiency—the court cites primarily to that Arch-Nemesis-initiated iteration of summary judgment briefing in evaluating these arguments.  But—the court notes—the arguments overlap with those presented in the Clear-Spring-initiated summary judgment papers.  In adopting this approach, the court seeks simply to avoid tedious dual citations at every turn.

### a.    Warranty Not Implicated

*First*, Arch Nemesis contends that the Recommendations Warranty doesn't apply here because Arch Nemesis undisputedly submitted the requested survey *before* Clear Spring/Concept issued the policy. Doc. 233-1 at 18–19. This timeline doesn't implicate the Recommendations Warranty, Arch Nemesis contends, because the Warranty assumes the survey remains outstanding. *Id.* at 19. It's been a minute or two, so here again is the contractual language:

> Unless we agree in writing to the contrary, if we request a survey of the Scheduled Vessel then it is warranted that such a survey is in existence prior to the effective date of this insurance and a copy of the same must be received by us within 30 days of the effective date of this agreement. If the survey makes any recommendations with respect to the Scheduled Vessel, then it is warranted that all such recommendations are completed prior to any loss giving rise to any claim[.]

Doc. 232-5 at 15 (Insurance Agreement). It's "nonsensical," Arch Nemesis argues, to require a potential insured to warrant a survey's existence and *future* submission if the insured *already* has submitted a survey. Doc. 233-1 at 18. So, Arch Nemesis asserts, the court should construe the warranty "as only applying when a survey has been requested but has not been received prior to the policy being issued." *Id.*

The court rejects the very idea at the core of this argument. When interpreting a contract, New York's highest state court maintains—unsurprisingly—that a court should enforce the terms of the contract. *See Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) ("When interpreting contracts, we have repeatedly applied the familiar and eminently sensible proposition of law that, when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms[.]" (quotation cleaned up)). And this New York court warns that courts shouldn't "by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing[.]" *Id.* (quotation cleaned up).

Arch Nemesis, in essence, asks the court to alter the language triggering the Recommendations Warranty here.  Per the policy language, the Warranty includes two triggers for two requirements:  "if [the insurer] requests a survey of the Scheduled Vessel" and "if the survey makes any recommendations."  Doc. 232-5 at 15 (Insurance Agreement) (quotation cleaned up).  The summary judgment facts here satisfy both triggers.  *See* § III.A.2.  But note the language missing from that first trigger—language Arch Nemesis's argument would add:  The Warranty doesn't trigger if the insurer requests a survey, *and the potential insured hasn't provided one yet*.  Such a reading would require that the court "add" terms "by construction" to the trigger, "thereby mak[ing] a new contract for the parties under the guise of interpreting the writing[.]"  *Vt. Teddy Bear*, 807 N.E.2d at 879.  Indeed, Arch Nemesis's own briefing reveals this addition-by-construction dilemma.  It asserts:  "[T]he 'recommendations warranty' is only implicated when Clear Spring requests a survey *and* that survey is not received prior to Clear Spring issuing a policy."  Doc. 243 at 13 (emphasis in original).  The court declines to insert Arch Nemesis's suggested language—"and the potential insured hasn't provided [a survey] yet"—to the contractual terms chosen by the parties.

What's more, other courts have found this precise request-a-survey triggering language "plain and unambiguous" in the context of an identical Recommendations Warranty.  *See Clear Spring Prop. & Cas. Co. v. Bluewater Adventures of Sarasota*, No. 22-CV-60554-GAYLES/STRAUSS, 2022 WL 18027821, at *7–8 (S.D. Fla. Dec. 6, 2022), *report and recommendation adopted*, 2022 WL 18024868 (S.D. Fla. Dec. 30, 2022).  *Bluewater* concluded the "plain and unambiguous" meaning of this trigger language required that the insurer request a survey "sometime shortly before or around the effective date of the Subject Policy[.]"  *Id.* at *8.  To be sure, when the *Bluewater* court applied that "plain and unambiguous" trigger language, it

did so to opposite effect. It dismissed the insurer's claim because the insurer had requested the survey "two policies ago"—but not in connection with the policy at issue. *Id.* at *8–9. Here, it's undisputed that Clear Spring/Concept requested a survey "sometime shortly before or around the effective date of the Subject Policy[.]" *Id.* at *8. Under the policy's plain language, that's all that's required to trigger the Recommendations Warranty. When—precisely—Arch Nemesis fulfilled that survey request doesn't factor into the triggering analysis required by the policy's terms. And so, Arch Nemesis's argument that the survey timeline precludes applying the Recommendations Warranty here fails.

Arch Nemesis's second argument to avoid summary judgment fares no better. By way of foreshadowing, the court notes that these same warranty-waived theories resurface in Arch Nemesis's counterclaims and third-party claims. So, this Order will refer to the following section with some frequency. The court thus provides a more thorough analysis than it might otherwise.

### b.    Warranty Waived

*Second*, Arch Nemesis contends that estoppel or waiver prevents Clear Spring from relying on the Recommendations Warranty, under two theories. Doc. 233-1 at 21–25. Both waiver theories point to Clear Spring's conduct during the application period. At that time, Arch Nemesis argues, Clear Spring knew facts rendering the policy void, but Clear Spring issued the policy anyway. *Id.* at 21–23. Also at that time, Arch Nemesis avers, Clear Spring never requested any certifications or made any further inquiry into the recommendations' completion. *Id.* at 23–24. So, Arch Nemesis contends, Clear Spring can't come back and demand those documents later. Doc. 243 at 14 ("New York law also protects an insured by not allowing an insurer to demand documentation and/or information regarding issues that an insurer should have made 'further inquiry' into during the application process."). Both theories fail on the summary

23

judgment facts because both misconstrue when the policy terms required Arch Nemesis to complete the recommendations.

### i.    Void at Issuance

For starters, no reasonable jury could find that Clear Spring knew—at issuance—that the policy was void for failure to complete the recommendation certifications. That's so because, under the policy's terms, Arch Nemesis had until a loss occurred to complete those recommendations. The policy didn't require the recommendations' completion at issuance. And no reasonable jury could find that Clear Spring knew at issuance that Arch Nemesis would fail to complete any recommendations before a loss occurred.

A New York court has concluded that an insurer can't deny coverage based on facts that would void the policy when it knew those facts at issuance. *See Contractors Realty Co. v. Ins. Co. of N. Am.*, 469 F. Supp. 1287, 1294–95 (S.D.N.Y. 1979). In *Contractors Realty*, a fire began in the engine room of a boat and, eventually, consumed it completely. *Id.* at 1293. The defendant insurance company attempted to elude coverage on two theories—the boat wasn't seaworthy and the boat owner didn't disclose relevant facts about the risks of insuring the boat, such as the vessel's breakdowns and the boat owner's filing a lawsuit against the manufacturer. *Id.* at 1293–94. Neither theory persuaded the court. Of particular relevance here, the court concluded that the insurance company couldn't deny coverage on an owner-didn't-disclose theory. The court determined that the insurance company's agent was "fully familiar" with the boat owner's dissatisfaction with the boat and his lawsuit against the manufacturer. *Id.* at 1294. And the agent had authority to recommend cancellation of a policy—and didn't. *Id.* at 1294–95. So, the insurer had waived its right to deny coverage on a non-disclosure basis. *Id.*

But the summary judgment facts here are different. For ease of understanding, here's the relevant policy language again: "If the survey makes any recommendations with respect to the Scheduled Vessel, then it is warranted that all such recommendations are completed prior to any loss giving rise to any claim hereunder[.]" Doc. 232-5 at 15 (Insurance Agreement). Arch Nemesis contends Clear Spring knew, at issuance, that Arch Nemesis hadn't completed the refrigerator recommendation—knew it was "outstanding." Doc. 233-1 at 22. And, based on that knowledge, Clear Spring knew the warranty "had not been satisfied prior to issuing a policy[.]" *Id.* So, Clear Spring allegedly knew that the policy was void, but "accepted Arch Nemesis's premium dollars" anyway. *Id.*

But failing to complete the refrigerator recommendation before issuance isn't what voided the policy. Arch Nemesis simply was required to complete the recommendations "prior to any loss giving rise to any claim"—not before the policy issued. Doc. 232-5 at 15 (Insurance Agreement). So, even if Arch Nemesis could establish Clear Spring's knowledge about an outstanding recommendation when the policy issued, it doesn't follow that Clear Spring was "fully familiar" with facts rendering the policy void. In short, Arch Nemesis doesn't identify any facts allowing a reasonable jury to conclude that Clear Spring knew Arch Nemesis would fail to fix the refrigerator recommendation before incurring a loss. Arch Nemesis's waiver argument misses the mark.[7]

---

[7]    Ironically, the only recommendation that didn't void the policy, in the end, was the refrigerator recommendation. It's undisputed that Arch Nemesis represented to Clear Spring—before the policy issued—that it would remedy the refrigerator recommendation. Doc. 232-19 at 2 (LOC) (indicating expected completion date of outstanding refrigerator recommendation (#2) as "Jan-Mar 2022"). The same LOC indicated it had complied with the other seven recommendations already. *Id.* Arch Nemesis completed the outstanding refrigerator recommendation. Doc. 233-4 at 48 (Usher Dep. 188:19–189:9) (Clear Spring testifying that it considered the refrigerator recommendation satisfied). And Arch Nemesis had receipts to prove it. Doc. 232-21 at 3 (Pl. Ex. 17) (Alvarez Diesel document indicating refrigerator repair). The refrigerator recommendation met the policy's requirements. So, Arch Nemesis's argument that Clear Spring knew—based on the refrigerator recommendation—that the policy was void at issuance

## ii.    No Further Inquiry

Likewise, no reasonable jury could find that Clear Spring should've requested certifications earlier and—because they didn't, waived the right to do so later. To support its further-inquiry waiver theory, Arch Nemesis points to New York case law suggesting a deficient application—once accepted by the insurance company—can't provide the basis for denying coverage later. Doc. 231-1 at 23 (citing *Integris Risk Retention Grp. v. Cap. Region Orthopaedics Assocs., PC*, No. 23-cv-00989 (AMN/MJK), 2024 WL 4347791 (N.D.N.Y. Sept. 30, 2024), *appeal withdrawn*, No. 24-2892(XAP), 2025 WL 1254208 (2d Cir. Feb. 11, 2025)). In *Integris*, plaintiff insurance company filed a declaratory action against insureds—a medical practice and its providers. *Id.* at *1. The practice and its providers had submitted three applications—on two-page forms—to secure professional liability insurance from plaintiff. *Id.* at *1, 3. Section II of each form required the applicant to "attach a separate explanation" for any affirmative responses. *Id.* at *3. Combining all three applications, 34 of the 39 questions in Section II received affirmative answers. *Id.* at *14. But two of the three applications didn't attach any additional explanation. *Id.* And the third application provided only a seven-sentence summary—purporting to explain 44 malpractice claims and multiple severe adverse patient outcomes. *Id.* at *8, 14. So, plaintiff's declaratory action asked the court to rescind the insurance policy because of these Section II deficiencies. *Id.* at *8. The court rejected the insurer's request concluding that plaintiff had "waived its rescission claims based on information omitted from the Applications." *Id.* at *14. It explained:

> "It is well-settled that where upon the face of an insurance application, a question appears to be not answered at all, or to be imperfectly answered, and the insurers issue a policy without further inquiry, they waive the want or imperfection in the answer, and render the omission to answer more fully immaterial."

can hold no water. That's the very recommendation Arch Nemesis relies on to prove Clear Spring's void-at-issuance knowledge. Doc. 233-1 at 22.

*Id.* (quotation cleaned up) (quoting *Phila. Indem. Ins. Co. v. Horowitz, Greener & Stengel, LLP*, 379 F. Supp. 2d 442, 453 (S.D.N.Y. 2005)).

But the case here differs meaningfully from *Integris*. Here, the application wasn't deficient. Clear Spring didn't expect completed certifications at issuance. Doc. 232-5 at 15 (Insurance Agreement) ("[I]t is warranted that all such recommendations are completed *prior to any loss* giving rise to any claim[.]" (emphasis added)). Instead, they accept an LOC at issuance, attesting that the insured has completed *or will complete* the requisite recommendations. Doc. 232-19 at 2 (LOC) (asking vessel's owner to certify that "all recommendations pertaining to the above vessel contained within the detailed survey submitted herein, have been complied with, other than those listed below." (quotation cleaned up)). In short, the insurer in *Integris* departed from its own outlined procedures—the application form itself required a separate explanation— and then sought recission on that basis. That's not this case. Here, Clear Spring didn't depart from its outlined procedures. The policy makes clear that the certifications are a pre-loss—not a pre-issuance—expectation. So, Arch Nemesis fails to create a triable issue of waiver on a further-inquiry theory.

### c.    Loss Occurred During Unauthorized Use

Arch Nemesis tries one final tack to avoid the court's Recommendations Warranty conclusion. It argues that "it is well established that a claim cannot be denied if the basis for that denial arises out of the unauthorized use of a vehicle[.]" Doc. 233-1 at 26 (first citing *Sunny S. Aircraft Serv., Inc. v. Am. Fire & Cas. Co.*, 140 So. 2d 78, 80 (Fl. Dist. Ct. App. 1962) ("When an article insured against theft is stolen and the article is subsequently damaged under circumstances which, but for the theft, would fall within an exclusionary provision, the loss represented by such damage is recoverable[.]"); and then citing *P.E. Ashton Co. v. Joyner*, 406

P.2d 306, 308 (Utah 1965)).  Arch Nemesis contends the use of the yacht leading to the loss at issue here was unauthorized.  *Id.*  And it emphasizes that Clear Spring didn't negotiate for a contract that excludes coverage for losses caused by theft.  *Id.* (citing *AGCS Marine Ins. v. World Fuel Servs., Inc.*, 187 F. Supp. 3d 428, 446 (S.D.N.Y. 2016)).  So, Arch Nemesis argues, Clear Spring can't deny its claim given that the loss flowed from unauthorized use.  *Id.*

But this argument conflates the basis for Clear Spring's denial of coverage—absence of writings certifying completed recommendations—with the circumstances leading to the loss, *i.e.*, the unauthorized use.  Succinctly, the unauthorized use caused the loss, but it didn't cause the warranty breach.  To be sure, the loss triggered the timeline to produce the requisite Recommendations Warranty receipts.  But the policy language puts the onus on the insured to complete the recommendations "prior to any loss"—not upon loss.  Doc. 232-5 at 15 (Insurance Agreement).  And Arch Nemesis already had represented that it had completed the recommendations—long before the unauthorized use and loss.  Doc. 232-19 at 2 (LOC).  So, the unauthorized use didn't affect Arch Nemesis's ability (or inability) to produce the receipts evidencing the repairs.  One of the cases Arch Nemesis relies on, *P.E. Ashton Co. v. Joyner*, helps illuminate why.  406 P.2d 306.

In *P.E. Ashton*, an automobile insurance contract excluded coverage when the person operating the vehicle was under 25 years of age.  *Id.* at 306–07.  A couple's vehicle sustained damages when their 13-year-old son used the car without their permission.  *Id.* at 307.  The insurance carrier sought to deny coverage by relying on the age-based exclusion.  *Id.*  The Utah Supreme Court was unpersuaded.  The underage use resulted directly from the unauthorized use.  And, so, the court concluded that the exclusion "would apply only in those instances where the person under that age has permission or authority to use the vehicle."  *Id.* at 308.  In short, the

unauthorized use invalidated the contractual age exclusion because the unauthorized use directly caused breach of the underage rule.

Not so here.  The unauthorized use can't invalidate the Recommendations Warranty because the unauthorized use didn't cause the breach at issue here—the missing receipts. Instead, the unauthorized use triggered Arch Nemesis's obligation *to produce* the writings—not its obligation *to secure* them.  Clear Spring's basis for denial—an absence of certifications— didn't arise out of the yacht's unauthorized use.  And so, Arch Nemesis's final attempt to evade having breached the Recommendations Warranty here fails.  And the court grants Clear Spring summary judgment on its Recommendations Warranty claim, thus voiding the policy from inception.

Given this conclusion, the court needn't reach the other alleged warranty breaches and declaratory judgment claims from which Clear Spring would receive the same relief.  The court turns next to Arch Nemesis's counterclaims against Clear Spring.

### B.    Arch Nemesis's Counterclaims against Clear Spring

Arch Nemesis asserts five counterclaims against Clear Spring:  Fraud, Negligent Misrepresentation, Estoppel, Breach of Contract, and Breach of the Implied Duty of Good Faith and Fair Dealing.  Doc. 222 at 21–22 (Pretrial Order ¶¶ 4.c.1.–5.).  Clear Spring's motion moves for summary judgment against all five.  Doc. 232 at 1.  Arch Nemesis's papers, in contrast, move for summary judgment on just one claim—the breach-of-contract claim.  Doc. 233-1 at 2.  So, the court starts with the breach-of-contract claim—where the parties have submitted cross motions.  Then, it turns to Arch Nemesis's other counterclaims—where Clear Spring is the movant and Arch Nemesis the non-movant.

### 1.    Arch Nemesis's Breach-of-Contract Counterclaim

The court's Recommendations Warranty conclusion—above—makes short work of Arch Nemesis's breach-of-contract claim.  Because the contract is void from inception, the claim fails.  Functionally, there's just no contract to breach.  *See Openwater-Great Lakes*, 435 F. Supp. 3d at 1158 n.10 ("Necessarily, [granting summary judgment to insurer on breach of warranty grounds] also decides Plaintiff's breach of contract claim . . . because the policy was rendered void from its inception, there was no contract for [insurer] to breach.").  And even if the Recommendations Warranty breach didn't void the policy from inception, Arch Nemesis's breach-of-contract claim still would fail.  Arch Nemesis's sole argument for summary judgment on this counterclaim is that Clear Spring hasn't met its burden to justify its denying coverage under the policy.  Doc. 233-1 at 37.  But Arch Nemesis's breach of the Recommendations Warranty justifies coverage denial.  *See* § III.A.3–4.  So, even if the policy still were in force, Clear Spring didn't breach the contract by denying coverage.  And no reasonable jury could conclude otherwise.  The court thus grants Clear Spring summary judgment against Arch Nemesis's breach-of-contract counterclaim.

Arch Nemesis asserts four other counterclaims against Clear Spring:  fraud, negligent misrepresentation, estoppel, and breach of the implied duty of good faith and fair dealing.  According to Arch Nemesis, the first three of these claims sound in tort while the last one sounds in contract.  Doc. 243 at 30, 38–39 (applying Kansas law to fraud, negligent misrepresentation, and estoppel claims because they are tort claims); *id.* at 39 (identifying that fair-dealing claim "sounds in contract and arises out of the Policy" and so "is subject to New York law").  Arch Nemesis premises all its tort claims on the same four theories, outlined below.  So, the court addresses Arch Nemesis's tort-based claims together, theory by theory.  But it begins with a threshold issue:  choice of law for the tort-based claims.

### 2.    Arch Nemesis's Tort-based Counterclaims

Arch Nemesis concedes that New York law governs the parties' contractual claims under the policy's choice-of-law provision.  Doc. 243 at 39 ("As this claim sounds in contract and arises out of the Policy, it is subject to New York law.").  But it contends that Kansas law governs its tort-based counterclaims.  *See id.* at 26–27.  Arch Nemesis's theory relies on *Great Lakes Insurance SE v. Andersson*, 66 F.4th 20 (1st Cir. 2023).  *Andersson* concluded that a choice-of-law provision—identical to the one in the present case—"arguably contemplated" "two distinct classes of claims[.]"  *Id.* at 27.  It's thus "entirely unclear[,]" *Andersson* determined, "whether extracontractual claims—even if they may be said to arise hereunder—are also subject to New York law."  *Id.* (quotation cleaned up).  Resolving the ambiguity in favor of the insured results in one "inescapable conclusion"—"*only* contract-related claims are subject to the substantive laws of New York."  *Id.* at 28 (emphasis in original).  So, Arch Nemesis argues, Kansas law should apply to its tort-based counterclaims.  *See* Doc. 243 at 26–27.

Clear Spring sees just the opposite.  Doc. 232 at 29.  Clear Spring identifies a set of cases—again interpreting a choice-of-law provision identical to the one here—that found that provision's scope encompassed tort claims as well as contract claims.  *See id.* 29–30 (first citing *Openwater Safety IV, LLC v. Concept Special Risks, LTD (Openwater-Concept)*, No. 18-cv-01400-NYW, 2018 WL 11435659, at *6 (D. Colo. Dec. 12, 2018); then citing *Great Lakes Reinsurance (UK) PLC v. Tico Time Marine, LLC*, No. 10-CV-2060, 2011 WL 1044154, at *4 (S.D. Tex. Mar. 16, 2011); then citing *Clear Spring Prop. & Cas. Co. v. Matador Sportfishing, LLC*, 593 F. Supp. 3d 157, 163 (M.D. Pa. 2022); and then citing *Great Lakes Reinsurance (UK) PLC v. Sea Cat I, LLC*, 653 F. Supp. 2d 1193 (W.D. Okla. 2009)).  *Tico Time* concluded, for instance, that it's inappropriate to read any phrase of the choice-of-law provision in isolation.  2011 WL 1044154, at *3.  And read in context, *Tico Time* found the choice-of-law provision

"broad enough to encompass the [tort] claims." *Id.* at *4. And so—like the other cases Clear

Spring cites—*Tico Time* applied the substantive law of New York to tort claims as well as

contract claims. *Id.* Clear Spring acknowledges the *Andersson* holding. Doc. 232 at 30 n.4.

But, in light of the string of cases it cites, contends that "*Andersson* runs against the weight of

authority." *Id.*

      As it turns out, the court here needn't pick a side on this debate. That's so because, under

either state's law, these tort claims all require a misrepresentation, false representation, or

omission—even if the state laws diverge in other respects. And Arch Nemesis fails to adduce

sufficient summary judgment facts to support the requisite untrue representation or omission.

So, "the choice of law is not outcome determinative[.]" *Armata v. Certain Underwriters at

Lloyd's London*, No. 21-CV-00160-NYW, 2022 WL 3227619, at *4 (D. Colo. Aug. 10, 2022).

In short, the summary judgment facts won't establish a triable claim on any of Arch Nemesis's

misrepresentation or omission theories—regardless which state's law applies—and so, the court

"declines to engage in an unnecessary analysis[.]" *Id.; see also Big-D Constr. Midwest, LLC v.

Zurich Am. Ins. Co.*, No. 16-cv-00952-BSJ, 2018 WL 3849923, at *9 (D. Utah Aug. 13, 2018)

("Because Utah and Minnesota law produce the same outcome, a choice of law analysis is

unnecessary[.]").[8]

---

[8]      Here's a brief primer to demonstrate the overlap in a misrepresentation, false representation, or omission requirement under both New York and Kansas law for all three torts asserted.

    *First*, to establish fraud, both states require a misrepresentation or omission. *Compare Skyline Risk Mgmt., Inc. v. Legakis*, 733 F. Supp. 3d 316, 329 (S.D.N.Y. 2024) ("Under New York law, the elements of a fraud claim are: (1) a material misrepresentation or omission of fact[.]" (internal quotation marks and citation omitted)), *with Jayhawk 910VP, LLC v. WindAirWest, LLC*, No. 18-11534-KGG, 2020 WL 1686793, at *9 (D. Kan. Apr. 7, 2020) ("Pursuant to Kansas law, the elements of fraud are as follows: (1) There was an untrue statement of fact made by the insured or an omission of material fact[.]" (internal quotation marks and citation omitted)).

    *Second*, to establish negligent misrepresentation both states require a false representation. *Compare Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) ("To state a claim for

In large part, Arch Nemesis tries to demonstrate a misrepresentation or omission by repackaging the waiver theories it argued above. Namely, Arch Nemesis recycles two theories that the court already has rejected: *First*, Clear Spring knew the contract was void at issuance because there was an outstanding refrigerator recommendation, so issuing the policy constituted a misrepresentation. Doc. 243 at 29–31. And, *second*, Clear Spring didn't make any effort or engage in further inquiry to acquire the requisite certifications during the application process, a form of omission. *Id.* at 31–32.[9] The court refers to its analysis of these theories, above. *See* § III.A.4.b.i.–ii. In brief, neither theory can support Arch Nemesis's tort-based counterclaims because Arch Nemesis hasn't adduced summary judgment facts to demonstrate that, *one*, Clear Spring knew the contract was void when it issued and, *two*, Clear Spring should have further inquired to secure certifications during the application process. So, Arch Nemesis's tort-based counterclaims can't survive summary judgment on either theory.

---

negligent misrepresentation under New York law, the plaintiff must allege that . . . the defendant made a false representation that he or she should have known was incorrect[.]"), *with FDX Supply Chain Servs., Inc. v. N. Face, Inc.*, 98 F. Supp. 2d 1244, 1248 (D. Kan. 2000) ("For its negligent misrepresentation claim, the defendant must prove that the plaintiff made false representations and that the plaintiff failed to exercise reasonable care in communicating the information.").

    *Finally*, to establish equitable estoppel, both states require a false representation, concealment, or conduct that otherwise induced a party to believe certain facts existed. *Compare Liberty Mut. Ins. Co. v. Atain Specialty Ins. Co.*, 126 F.4th 301, 307 (4th Cir. 2025) ("[U]nder New York law, . . . the elements of equitable estoppel are, with respect to the party estopped, (1) conduct which amounts to a false representation or concealment of material facts[.]" (quotation cleaned up)), *with Pruitt v. Lincoln Nat'l Life Ins. Co.*, 609 F. Supp. 3d 1193, 1198 (D. Kan. 2022) ("Under Kansas law, the party asserting equitable estoppel must show that (1) another party induced reliance on certain facts[.]" (quotation cleaned up)).

[9]    The cited pages explain the theories undergirding Arch Nemesis's fraud counterclaim. But the same theories support its other two tort-based counterclaims. *See* Doc. 243 at 38 (explaining that "Clear Spring's representations that a valid policy was in place . . . support [its negligent misrepresentation] claim"); *id.* at 39 ("Arch Nemesis's theory [of estoppel] is simple and well known at this point. Clear Spring issued a policy that it did not believe was effective at the time it was issued and then denied a claim for reasons that existed at the time the policy issued and of which it was aware.").

Arch Nemesis also presents two as-yet unaddressed misrepresentation/omission theories to undergird its tort claims: *One*, Clear Spring never intended to pay any claim on the policy, so issuing the policy was a misrepresentation; and *two*, Clear Spring had a duty to warn Arch Nemesis that—after the loss—it would require certification documents not required during the application process, an omission. The court considers these theories in turn, below, and concludes that Arch Nemesis hasn't created a triable issue on either theory.

### a.    Clear Spring's Intent to Pay Claims

*First*, Arch Nemesis contends that Clear Spring never intended to pay any claim Arch Nemesis submitted. Doc. 243 at 33. Instead, Clear Spring "had buried a landmine" in the policy—the Recommendations Warranty—that later it would "utilize in an attempt to get out of paying any claim that Arch Nemesis made[.]" *Id.* Clear Spring, for its part, asserts that there's "no evidence of intent" here. Doc. 232 at 40. In response, Arch Nemesis identifies four sources of intent-not-to-pay evidentiary support. Doc. 243 at 37.

The first two sources are familiar and unavailing—Clear Spring believed the policy was invalid at the time of issuance and Clear Spring never "followed up" (or further inquired) about the Recommendations Warranty after Arch Nemesis submitted the LOC.[10] *Id.* The court's

---

[10]    Arch Nemesis also argues—in light of the outstanding refrigerator recommendation—that Clear Spring should have put the yacht on "port risk." Doc. 243 at 37 (quotation cleaned up). And Clear Spring's failure to do so reveals Clear Spring's intent to "hid[e] its true position" and never pay on the policy. *Id.* But the summary judgment evidence Arch Nemesis cites in support of this contention doesn't indicate that "port risk" status follows from an outstanding refrigerator recommendation. *See id.* (citing Clear Spring's SOF ¶¶ 70, 72, 74). The cited evidence—an email exchange about "port risk" and a declaration explaining that same email—solely addresses the seven other recommendations, not the outstanding refrigerator recommendation. Doc. 232-25 at 2 (Pl. Ex. 21) (email outlining seven uncertified recommendations—not including refrigerator recommendation—and corresponding statement about "port risk"); Doc. 232-2 at 3–4 (Usher Decl. ¶ 10) (declaration reciting and agreeing with "port risk" assessment memorialized in same email).

Because Arch Nemesis's "port risk" contention lacks evidentiary support, the court doesn't consider it in assessing these counterclaims or—later—when evaluating Arch Nemesis's third-party claims against Concept. *See In re Grandote Country Club Co.*, 252 F.3d 1146, 1149 (10th Cir. 2001)

already addressed these theories.  *See* § III.A.4.b.i.–ii.  Arch Nemesis also indicates two other sources of intent-not-to-pay support in the summary judgment evidence:  *One*, Concept's "longstanding" adjuster asked immediately about securing receipts demonstrating remedied recommendations.  Doc. 243 at 37 (quotation cleaned up).  *Two*, Clear Spring has relied on the same Recommendations Warranty to deny dozens of other claims, and its underwriter and claims handler—Concept—has utilized the warranty hundreds of times to accomplish the same.  *Id.*  Start with the immediate request for receipts by the adjustor.

### i.    Adjustor's Immediate Receipts Request

Arch Nemesis argues that Arnold & Arnold's immediate question—in its first report to Concept—about requiring certifications reveals Clear Spring's intent never to pay Arch Nemesis's claim.  Doc. 243 at 37.  Arch Nemesis is right about one thing:  the summary judgment evidence demonstrates that Arnold & Arnold, the claims adjustor, asked Concept right away about requesting the Recommendations Warranty certifications from Arch Nemesis, and Concept said yes.  *See* Doc. 233-21 at 5 (Def. Ex. A-18) (adjustor asking in first report whether Concept wanted adjustment firm "to request receipts from the assured and/or statements by crewmembers which reflect the survey recommendations have been accomplished prior to this loss"); Doc. 233-22 at 1 (Def. Ex. A-19) (confirming Concept "will require evidence that this assured did in fact comply with the recommendations before [Concept] can confirm that coverage is in place").  But that's all Arch Nemesis has—just the simple ask and reply.  And that's simply not enough.

---

("The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims.  Unsupported conclusory allegations thus do not create a genuine issue of fact.").

Those bare summary judgment facts don't demonstrate Clear Spring's intent—from policy issuance—to avoid paying Arch Nemesis's claim. It would require multiple inferential leaps to get from an adjustor asking whether to request receipts to Clear Spring intending never to pay on any claim. *See Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1187 (10th Cir. 2013) ("Although our summary judgment standard requires us to view the facts in the light most favorable to the non-moving party, it does not require us to make unreasonable inferences in favor of the non-moving party." (internal quotation marks and citation omitted)); *see also Norwood v. United Parcel Serv., Inc.*, No. 19-2496-DDC-JPO, 2021 WL 3022315, at *16 (D. Kan. July 16, 2021) ("At summary judgment, the non-movant surely deserves the benefit of all reasonable inferences. But this principle doesn't entitle the non-movant to unreasonable inferential leaps lacking any evidentiary support."), *aff'd*, 57 F.4th 779 (10th Cir. 2023). A factfinder reasonably couldn't infer that the adjustor's singular question—after the loss—evinces Clear Spring's intent (from issuance) never to pay claims. No triable issue of intent inheres on this summary judgment evidence. And Arch Nemesis's second attempt to prove Clear Spring was avoiding payouts—addressed next—suffers a similar deficiency.

### ii.     Frequency of Recommendations Warranty-Based Denials

Arch Nemesis also highlights the frequency with which Clear Spring's underwriter, Concept, has relied on the Recommendations Warranty to deny claims—hundreds of times. Doc. 243 at 37. And it identifies Clear Spring's own rate of denial based on this same Warranty—dozens of denials. *Id.* Then, it asks the factfinder to conclude that these other denials demonstrate Clear Spring's "intent to defraud." *Id.* Two issues arise.

For starters, the evidence Arch Nemesis relies on to establish the frequency of denials doesn't address denials expressly—as Arch Nemesis's argument suggests it does. Instead, it

references a standard practice between Concept's claims and underwriting departments in

evaluating coverage.  Here's the exchange in question:

> Q:  I believe you stated on Monday that it is standard practice for Concept claims
> to email Concept's underwriting [di]vision and ask whether underwriting would
> have issued the policy in question had it known that not all the recommendations
> in a survey had been completed.  Is my memory correct?
> A:  That's correct.
> Q:  And I believe you further stated that with regard to claims made on Clear
> Spring's policies that Concept had gone through this exercise at least 30 times; is
> that correct?
> A:  Yes.
> Q:  And broadening that, prior to writing for Clear Spring, you further stated that
> Concept engaged in this same practice for Great Lakes, correct?
> A:  Correct.
> Q:  And you estimated that this exercise has been done at least a hundred times for
> Great Lakes, correct?
> A:  Yes.  Probably more over a 17-year period.

Doc. 233-5 at 21 (Usher Dep. 81:2–24).  This exchange focuses on internal emails at Concept

about situations where recommendations remained incomplete.  Arch Nemesis asks the

factfinder to extrapolate that Concept's internal practice of emailing about incomplete

recommendations necessarily resulted in claim denials each time.  Arch Nemesis adduces no

evidence to demonstrate that Clear Spring (in those 30 cases) and Concept (in those 100 cases)

actually denied the claims.

But even if a reasonable jury could leap from question emailed to claim denied, Arch

Nemesis asks for yet another inference.  Arch Nemesis then wants the factfinder to infer from

those other "denials"—about which Arch Nemesis provides no more detail—that Clear Spring

intended from the beginning to deny its claim here.  That's a bridge too far.  Recall, the court

isn't required to make "unreasonable inferences" in favor of the non-movant, *Llewellyn*, 711

F.3d at 1187, nor does the summary judgment standard entitle a non-movant to make "inferential

leaps lacking any evidentiary support[,]" *Norwood*, 2021 WL 3022315, at *16.  It's unreasonable

to infer that any denials in the other cases necessarily were unjustified, particularly when Arch Nemesis adduces no evidence to support the inference. And then, even if a reasonable jury could make that unjustified-denial inference, it also would have to infer that those unjustified denials demonstrate Clear Spring's intent—from issuance—not to pay the claim here.

In sum, Clear Spring "'point[ed] to an absence of'" intent-to-deny evidence. *Kannady*, 590 F.3d at 1169 (quoting *Sigmon*, 234 F.3d at 1125); *see also* Doc. 232 at 40 ("There is no evidence of intent."). So, Arch Nemesis had to "'bring forward specific facts showing a genuine issue for trial'" on Clear Spring's intent. *Kannady*, 590 F.3d at 1169 (quoting *Jenkins*, 81 F.3d at 990). Arch Nemesis failed to adduce any such specific facts. Instead, it sought repeated inferential leaps in its favor. This approach can't survive summary judgment. Arch Nemesis thus fails to rescue its tort counterclaims on an intent-to-deny theory. The court turns to Arch Nemesis's final attempt to shield its tort counterclaims from summary judgment: Clear Spring's duty to warn.

### b.    Clear Spring's Duty to Warn

Arch Nemesis next contends Clear Spring committed fraud and negligent misrepresentation, in part, by "not warning Arch Nemesis that, if a claim was ever made, it intended to require documentation that it had not required during the application process." Doc. 222 at 21, 22 (Pretrial Order ¶¶ 4.c.1., 2.) (quotation cleaned up). And Arch Nemesis avers that Clear Spring "should be estopped from denying Arch Nemesis's insurance claim because . . . prior to Clear Spring's issuance of the Policy[,] Clear Spring never warned Arch Nemesis of its position that the policy . . . was void from inception for reasons that existed at the time the Policy was issued and of which Clear Spring was aware." *Id.* at 22 (Pretrial Order ¶ 4.c.3.). In a nutshell, Arch Nemesis alleges that Clear Spring tricked it into believing the policy covered the vessel against loss—but it didn't. Doc. 243 at 33. And that trickery

undergirds its fraud, negligent misrepresentation, and estoppel claims. Under this final omission

theory, Arch Nemesis emphasizes Clear Spring's duties under the doctrine of *uberrimae fidei*—

or more accurately, "Clear Spring's silence in the face of" those duties. *Id.* The court starts with

a brief primer on the admiralty doctrine of *uberrimae fidei*.

      *Uberrimae fidei* is "a well-established and entrenched principle of admiralty law" that

confers a "duty of utmost good faith and disclosure of all facts material to the insured risk[.]"

*Sea Cat I*, 653 F. Supp. 2d at 1200. "Admiralty law scrupulously applies the doctrine[.]"

*Openwater-Concept*, 2018 WL 11435659, at *6. In its typical formulation, the doctrine "puts the

burden on the assured to 'disclose to the insurer all known circumstances that materially affect

the risk being insured'—whether or not the insurer asks about them[.]" *Com. Union Ins. Co. v.

Flagship Marine Servs., Inc.*, 982 F. Supp. 310, 313 (S.D.N.Y. 1997) (quoting *Knight v. U.S.

Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986)). "The assured's failure to make such disclosure

entitles the underwriter to void the policy *ab initio*." *Id.* Some courts have concluded admiralty

law limits the doctrine's application "to situations of concealment or misrepresentation by the

insured, not denial of a claim by the insurer." *Openwater-Concept*, 2018 WL 11435659, at *6

(collecting cases). But others have determined the doctrine requires a reciprocal duty from the

insurer. *Contractors Realty*, 469 F. Supp. at 1294; *see also Thebes Shipping, Inc. v.

Assicurazioni Ausonia SPA*, 599 F. Supp. 405, 427 (S.D.N.Y. 1984) ("Contracts of marine

insurance are *uberrimae fidei* and there is an obligation voluntarily to disclose all facts and

circumstances which are material to the risk and not *within the knowledge of both parties*."

(emphasis added) (quotation cleaned up)). Specifically, the insurer's reciprocal duties require it

to "deal fairly, . . . give the assured fair notice of his obligations, and . . . furnish openhandedly

the benefits of a policy of 'all risks' insurance." *Contractors Realty*, 469 F. Supp. at 1294.

Assume the doctrine of *uberrimae fidei* confers reciprocal duties on Clear Spring, as some courts have concluded. Even still, Arch Nemesis hasn't raised a triable issue that Clear Spring breached those duties by not warning it of the Policy's certification requirements. It's uncontroverted that Clear Spring provided Arch Nemesis with the policy terms—including the Recommendations Warranty—on four separate occasions before issuing the policy: the November 30 Quote; the December 10 Quote; the December 24 Quote; and the Temporary Binder.[11] Arch Nemesis agrees. The Recommendations Warranty specifically "was disclosed to Arch Nemesis prior to the issuance of the policy[.]" *See* Doc. 233-14 at 18 (McAtee Dep. 67:9–13); Doc. 232 at 17 (SOF ¶ 41); Doc. 243 at 3 (identifying SOF ¶ 41 as uncontroverted for purposes of the motion). It's also uncontroverted that Arch Nemesis read and reviewed the policy before it issued. Doc. 243 at 35; *see also* Doc. 232-11 at 47–48 (McAtee Dep. 206:19–207:12) (testifying that Arch Nemesis "reviewed all of the warranties, including the recommendation warranty, prior to the issuance of the policy in question"). And—although Arch Nemesis argues Clear Spring's position in this case isn't consistent with Arch Nemesis's reading of the policy—it's also uncontroverted that Arch Nemesis didn't have any questions about the policy upon reviewing it. Doc. 243 at 3; Doc. 232-11 at 44, 45, 46 (McAtee Dep. 168:3–12, 169:14–21, 171:1–17). And Arch Nemesis couldn't recall having any questions about the Recommendations Warranty specifically. Doc. 232-11 at 42–43 (McAtee Dep. 166:21–

---

[11]    Here's the summary judgment evidence that indicates Arch Nemesis received the Recommendations Warranty four distinct times. *See* Doc. 232-10 at 2, 14–15 (Pl. Ex. 6) (Recommendations Warranty provision included—Nov. 30 Quote); Doc. 232-12 at 2, 14–15 (Pl. Ex. 8) (same—Dec. 10 Quote); Doc. 232-16 at 2, 14–15 (Pl. Ex. 12) (same—Dec. 24 Quote); Doc. 232-18 at 2, 15–16 (Pl. Ex. 14) (same—Temporary Binder); Doc. 232-11 at 14 (McAtee Dep. 72:7–17) (Nov. 30 Quote provided to Arch Nemesis); *id.* at 16–17 (McAtee Dep. 78:19–79:3) (Dec. 10 Quote—same); *id.* at 18 (McAtee Dep. 81:11–12) (Dec. 24 Quote—same); *id.* at 19–20 (McAtee Dep. 82:24–83:3) (Temporary Binder—same).

167:1).  All of this suggests Arch Nemesis was on notice of the Recommendations Warranty's certification requirement from the policy terms.

Nonetheless, Arch Nemesis contends, Clear Spring owed a duty to warn Arch Nemesis further about the requisite certifications under the Recommendations Warranty.  Doc. 222 at 21–22 (Pretrial Order ¶¶ 4.c.1.–3.).  Arch Nemesis explains its position this way:  it believed Clear Spring "had in their possession everything they needed to provide coverage for this specific type of loss" and so it didn't anticipate needing to provide certifications after the application period because "the recommendations warranty had already been satisfied."  Doc. 233-14 at 38, 57 (McAtee Dep. 146:8–15, 147:6–13, 222:23–223:6).  Apparently, Arch Nemesis assumed the LOC provided during the application process would suffice to fulfill any recommendations requirement.  *Id.* at 61 (McAtee Dep. 240:7–9).  And—if it didn't—Clear Spring should have clarified that, Arch Nemesis contends.  *Id.* at 37 (McAtee Dep. 144:23–145:20).

When making this argument, Arch Nemesis tries to use the *uberrimae fidei* doctrine in a novel fashion.  It asks the court to impose a duty on Clear Spring to warn Arch Nemesis about its contractual obligations beyond providing Arch Nemesis with the policy itself.  But Arch Nemesis hasn't directed the court to any case where an insurance company violated the *uberrimae fidei* doctrine by not providing warnings or explanations—beyond the contractual terms themselves—about the insurance policy's provisions.  To be sure, *Contractors Realty* suggests—invoking the doctrine—that Clear Spring had to provide fair notice to Arch Nemesis of its obligations under the policy.  469 F. Supp. at 1294.  But the policy terms explicitly require the missing certifications.  *See* Doc. 232-5 at 15 (Insurance Agreement) ("It is warranted . . . that either the surveyor who carried out the survey certifies in writing that all recommendations have been completed . . . or the workmen/repair yard that carried out the said work and/or

41

recommendations certifies in writing that all recommendations have been completed prior to any loss and/or claim." (quotation cleaned up)).  And Arch Nemesis never explains why those terms—ones it undisputedly received four separate times and admittedly read before the policy issued—don't satisfy the doctrine's fair notice duty.  A deeper dive into *Commercial Union*, 982 F. Supp. 310, illuminates why Clear Spring's supplying written policy terms suffices.

In *Commercial Union*, an insurance company commenced a declaratory judgment action against Flagship after Flagship sought to recover on an insurance policy after one of its employees sustained injury aboard its ship.  982 F. Supp. at 310–11.  The insurance company alleged, among other claims, that the insurance policy was void from the start because Flagship didn't disclose the full scope of its operations.  *Id.* at 311.  Namely, the insurance company contended that Flagship failed to disclose that its business operations included numerous services beyond towing pleasure crafts—such as towing large commercial vehicles, emergency salvage operations, oil spill clean-up, and the like.  *Id.* at 313.  After a four-day bench trial, the court denied this failure-to-disclose claim.  *Id.* at 314.  It concluded that Flagship's "extensive documentation provided . . . as part of the application process placed Commercial Union on reasonable notice of every aspect of Flagship's business[.]"  *Id.* at 313.  The court gave no credence to Commercial Union's explanation that it had failed to read those documents.  *Id.* at 314.  Instead, it concluded that the "'assured complies with the rule of *uberrimae fidei* if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter requires further information, he can ask for it.'"  *Id.* (quoting *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 871 (2d Cir. 1985)).  So, *Commercial Union* stands for the proposition that disclosure through written documents satisfies *uberrimae fidei* disclosure duties, provided the disclosure is "sufficient to call" a reader's attention to it.  *Id.* (quotation cleaned up).

In light of this case law, no reasonable jury could conclude that Clear Spring breached any *uberrimae fidei* duty of disclosure here. Clear Spring provided the policy's terms—four times—to Arch Nemesis before the policy issued. And even though Arch Nemesis thought it already had complied with those terms—through the LOC—it hadn't. The policy terms don't ask for a LOC signed by the boat owner. Instead, the policy terms require a surveyor or worker/repair yard to certify to the completed recommendations. *See* Doc. 232-5 at 15 (Insurance Agreement). The LOC didn't originate with a surveyor or worker/repair yard— instead, James McAtee signed it. Doc. 232-15 at 4 (McAtee Dep. 94:12–15). So, under the policy's plain terms, the LOC didn't satisfy the Recommendations Warranty. And Clear Spring disclosed those policy terms sufficiently "to call the attention of" Arch Nemesis to the requirement of documents beyond an LOC signed by the boat owner. *Com. Union*, 982 F. Supp. at 314 (quotation cleaned up). What's more, had Arch Nemesis required further clarifying information, it could have asked for it. *See id.* Just as the documents in *Commercial Union* sufficed to fulfill the insured's *uberrimae fidei* duties, the policy terms here function the same way. So, Arch Nemesis has failed to adduce evidence of a breach of disclosure duties—even assuming *uberrimae fidei* creates a duty for Clear Spring to disclose.

To recap, none of the theories Arch Nemesis relies on to support its tort-based counterclaims are viable. Arch Nemesis hasn't adduced evidence to show that Clear Spring knew the policy was void at issuance. *See* § III.A.4.b.i. Nor can Arch Nemesis's no-further-inquiry theory hold any water. *See* § III.A.4.b.ii. Its intent-to-deny theories require multiple inferential leaps—impermissible at summary judgment. *See* § III.B.2.a. And it hasn't adduced evidence to show a breach of any *uberrimae fidei* duty to warn. With no viable underlying theory, Arch Nemesis's tort-based counterclaims can't survive summary judgment. No

reasonable factfinder could return a verdict for Arch Nemesis—the non-movant—on its tort-based counterclaims. The court thus grants Clear Spring's motion for summary judgment on Arch Nemesis's fraud, negligent misrepresentation, and estoppel counterclaims.

One counterclaim remains: Clear Spring's breach of the implied duty of good faith and fair dealing. The court takes this counterclaim up, next.

### 3. Arch Nemesis's Implied Duty of Good Faith and Fair Dealing Counterclaim

Arch Nemesis undergirds its fair-dealing counterclaim with the same theories already rejected as unsupported by the summary judgment facts. Arch Nemesis's Response contends that Clear Spring conducted itself in bad faith when handling the Claim. Doc. 243 at 39. At first blush, that claim-handling language sounds different than the theories already-rejected. But, looking more closely, it becomes clear that this counterclaim is just the same old theories repackaged in a "fair dealing" wrapper. That is, Arch Nemesis cites summary judgment evidence that simply repeats arguments it made elsewhere. *See* Doc. 243 at 39 (citing its Response to CSSOF ¶ 73 and ANSOAF ¶ 3).[12]

For instance, Arch Nemesis supports its bad-faith-claims-handling contention with the following evidentiary cite:

---

[12] The parties also dispute whether an implied duty of good faith and fair dealing claim is a separate cause of action under New York and Kansas law. *See* Doc. 232 at 44–46; Doc. 243 at 39–40. Predictably, Clear Spring argues that neither New York nor Kansas recognizes such a claim because it's duplicative of Arch Nemesis's breach-of-contract claim—both stemming from the insurer's failure to pay policy benefits. Doc. 232 at 44–46 (first citing *Conmed Corp. v. Fed. Ins. Co.*, No. 23-CV-766 (MAD/ML), 2024 WL 2976604, at *9 (N.D.N.Y. June 13, 2024); and then citing *Cincinnati Ins. Co. v. Kan. State Univ. Found.*, No. 23-cv-1139-EFM, 2024 WL 1856316, at *6 (D. Kan. Apr. 29, 2024)). Arch Nemesis contends New York law governs this fair-dealing claim because it "sounds in contract and arises out of the Policy[.]" Doc. 243 at 39. Then, it argues New York law doesn't find a fair-dealing claim always duplicative of a breach-of-contract claim if the fair-dealing conduct is distinct from the breach-of-contract conduct. *Id.* at 39–40 (citing *Grey Rock Gathering & Mktg., LLC v. Liberty Mut. Ins. Co.*, No. 23-CV-3347 (JPO), 2024 WL 3520470, at *6 (S.D.N.Y. July 23, 2024)). Because the court concludes the claim—even if legally permissible—fails as unsupported by the summary judgment facts. Thus, the court needn't resolve this dispute.

> [A]n insurer does not deny a claim for breach of warranty that it believed the insured was in breach of at the time the insurer issued their policy. Additionally, insurers do not claim that an insured has made material misrepresentations or violated applicable law unless they have 'specific evidence of either,' which Clear Spring does not. In short, Clear Spring, and those acting on its behalf, did not act as they should in the claims handling process because 'the focus of Arnold's investigation appears to be to satisfy a pre-determined decision to deny coverage based on the directive for Arnold & Arnold to secure information the insurer/underwriter failed to secure prior to policy issuance and was entirely self-serving and wholly against insurance industry practice.'

*Id.* at 9 (internal citations omitted) (Response to CSSOF ¶ 73). Arch Nemesis cites Clear Spring's alleged knowledge that Arch Nemesis was in breach at issuance; Clear Spring's post-loss attempt to secure information it should've asked for during the application process; and Clear Spring's alleged intent to deny coverage from the get-go. That's all very familiar. Arch Nemesis also directs the court to Arnold's "'longstanding' connection with Concept" and how Concept confirmed that Arnold "should 'request receipts'"—both implying Concept's intent to deny coverage. *Id.* at 10 (ANSOAF ¶ 3). Again, there's nothing new here. And that's it—that's the sum total of the summary judgment facts Arch Nemesis's Response includes in its fair-dealing section. *See id.* at 39–40. Other than that, Arch Nemesis simply asserts—in a conclusory fashion—that "there is evidence of bad faith in claims handling[.]" *Id.* at 40. But a conclusory allegation like that one can't withstand summary judgment. *In re Grandote Country Club*, 252 F.3d at 1149–50 ("The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims. Unsupported conclusory allegations thus do not create a genuine issue of fact.").

These arguments are repetitive. The court already determined that they don't survive this round of motion practice. As explained above, the summary judgment facts don't align with these theories, and no reasonable factfinder could conclude that it does. *See* §§ III.A.4.b.i.–ii., III.B.2.a. So, Clear Spring is entitled to summary judgment on this claim, too.

The court draws one final counterclaim conclusion. Arch Nemesis contends it's entitled to punitive damages on two different grounds: its fraud claim and its fair-dealing claim. Doc. 243 at 40. Neither claim survives summary judgment, which precludes any award of punitive damages, as well. *See Est. of Betty Lou McDermed v. Ford Motor Co.*, No. CV 14-2430-CM, 2016 WL 4142107, at *4 (D. Kan. Aug. 3, 2016) ("Because plaintiffs' tort claims fail as a matter of law, plaintiffs' claim for punitive damages likewise fails."); *Bisel v. Matco Tools*, 715 F. Supp. 316, 319–20 (D. Kan. 1989) ("In the absence of any underlying tort, moreover, plaintiff's prayer for punitive damages must also fail.") (citing *Equitable Life Leasing Corp. v. Abbick*, 757 P.2d 304 (Kan. 1988)).

The court thus concludes its review of Arch Nemesis's counterclaims. It grants Clear Spring summary judgment against all five of them, as well as the punitive damages claim. The court has addressed all summary judgment arguments included in Clear Spring's Motion for Summary Judgment (Doc. 232), and a good portion of those arguments are included in Arch Nemesis's motion (Doc. 233) as well.

Here's what's left to consider: Arch Nemesis's third-party claims against Concept, Arch Nemesis's third-party claims against West Coast, Arch Nemesis's arguments about comparative fault, and four Motions to Exclude Expert Testimony. The court takes up each, below, in the order listed.

### C.    Arch Nemesis's Third-Party Claims against Concept

Arch Nemesis has asserted two third-party claims against Concept, Clear Spring's underwriting agent: fraud and negligent misrepresentation. Doc. 222 at 25–26 (Pretrial Order ¶¶ 4.e.1.–2.). Concept moves for summary judgment on both claims. Doc. 234 at 1. Arch Nemesis didn't file a cross motion for summary judgment on these claims. *See* Doc. 233 at 1. So, Concept is the movant and Arch Nemesis the non-movant here. As a threshold matter, the

court must settle—again—the question of personal jurisdiction over Concept before it reaches the merits of these third-party claims.

### 1.    Personal Jurisdiction

Concept already has challenged this court's personal jurisdiction over it in three separate motions. *See* Doc. 15; Doc. 92; Doc. 97. And the court already has concluded—twice—that it possesses personal jurisdiction over Concept. *See* Doc. 42 at 3; Doc. 171 at 7. It won't recycle that analysis again. But, Concept contends, things have changed. *See* Doc. 234 at 33. Now "Arch Nemesis has narrowed the scope of its claims" against Concept. *Id.* And so, Concept reasserts its challenge to this court's personal jurisdiction. *Id.*

In a nutshell, Concept's new challenge argues that Arch Nemesis's alleged injuries derive solely from pre-loss conduct. *Id.* at 33–34. But Concept directly communicated with Arch Nemesis only *after* the loss—not before it. *Id.* at 34. Before the loss, Concept only communicated directly with other entities—like Besso. *Id.* at 36. And this absence of direct communication between Concept and Arch Nemesis before May 29, 2022, is uncontroverted. Doc. 234-10 at 12–13 (McAtee Dep. 46:25–47:3); *see also* Doc. 244 at 5. Since all Arch Nemesis's alleged injuries occurred pre-loss, Concept's post-loss communications with Arch Nemesis in Kansas don't count for minimum contacts purposes, Concept asserts. Doc. 234 at 36–37. Concept's personal jurisdiction argument fails once again.

There's nothing against resurrecting a personal jurisdiction challenge later in a case. 5B *Wright & Miller's Federal Practice & Procedure* § 1351 (4th ed. 2025) ("A party who has unsuccessfully raised an objection under Rule 12(b)(2) may proceed to trial on the merits without waiving the ability to renew the objection to the court's jurisdiction."). Tenth Circuit case law suggests such a renewed objection follows when new evidence calls jurisdiction into question. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069 n.3 (10th Cir. 2008) ("Of

course, even if personal jurisdiction is contested and found initially on the pleadings and by affidavit, it may be reviewed again at subsequent stages in the trial court proceedings as evidence accumulates."); *see also Arocho v. Nafziger*, 367 F. App'x 942, 950 (10th Cir. 2010) ("Of course, the question of personal jurisdiction can always be revisited at a post-pleading stage of the proceedings, where the evidence may show that the relevant facts are other than they have been pled[.]").

Here, Concept hasn't presented new evidence. Nor has it shown that "relevant facts are other than they have been pled[.]" *Arocho*, 367 F. App'x at 950. Instead, Concept argues that the scope of Arch Nemesis's claims have changed. Doc. 234 at 33. And so, the court should limit which evidence it considers to align with that scope. *Id.* at 37. Specifically, Concept proposes that the court draw a boundary between pre-loss and post-loss conduct and consider only the timeframe directly causing Arch Nemesis's injuries—*i.e.*, pre-loss conduct.

But the Supreme Court has disavowed such a strict causal relationship between the defendant's in-state activity and a plaintiff's claim. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) ("None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do."). As the Tenth Circuit explained, "exclusively" relying on "the contacts out of which a plaintiff's claim arises" is "incompatible with the [*Ford*] Court's conclusion[.]" *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1226 (10th Cir. 2021). In short, "purposefully directed in-state contacts can be sufficiently related to the plaintiff's injury despite the absence of a causal connection." *Id.*

Here, Concept doesn't contend it never directed any contacts to Arch Nemesis in Kansas. It "acknowledges that it communicated with Arch Nemesis after the loss[.]" Doc. 234 at 37. That acknowledged, post-loss contact sufficiently connects to Arch Nemesis's injury here to

48

sustain personal jurisdiction.  Splitting the case into pre- and post-loss conduct—as Concept

proposes—implicates a more rigorous conduct-to-injury causal relationship than the law

demands.  Indeed, both the Supreme Court and our Circuit expressly have rejected that rigor.

This court must reject it, as well.  So, Concept's fourth challenge to personal jurisdiction fails.[13]

Satisfied that it has jurisdiction, the court moves on to consider the merits of Arch

Nemesis's third-party claims against Concept.

### 2.     Third-Party Claims on the Merits

In the Pretrial Order, Arch Nemesis recites its third-party claims against Concept in

language nearly identical to the counterclaims alleged against Clear Spring.  The overlap is

nearly word-for-word.  *Compare* Doc. 222 at 21–22 (Pretrial Order ¶¶ 4.c.1.–2.), *with id.* at 25–

26 (Pretrial Order ¶¶ 4.e.1.–2.).  In short, Arch Nemesis premises its third-party claims against

Concept on four familiar theories:  (1) Concept's knowledge that the policy—when issued—

didn't cover the vessel; (2) Concept never made 'further inquiry' into the recommendations

during the application period; (3) Clear Spring never intended to pay any claim but Concept

issued the policy anyway—amounting to a misrepresentation; and (4) Concept didn't warn Arch

Nemesis that it would later require documents not requested during the application process—thus

breaching its duty of utmost good faith inherent in all marine insurance contracts (*uberrimae*

---

[13]     The court could reach the same conclusion under an analysis of Concept's pre-loss
communications, even if Concept didn't communicate directly with Arch Nemesis.  As Arch Nemesis
identifies, Doc. 252 at 15, *Dudnikov* directs courts to look at a party's "further intended end" when
assessing jurisdiction.  514 F.3d at 1075.  *Dudnikov* explained this further intended end as "something
like a bank shot in basketball."  *Id.*  "A player who shoots the ball off of the backboard intends to hit the
backboard, but he does so in the service of his further intention of putting the ball into the basket."  *Id.*
As the court explained in an earlier Order, there's ample email evidence that Concept's pre-loss
communications with other entities functioned like a "bank shot."  *See* Doc. 171 at 6–7 n.2.  Concept's
"further intention" for those pre-loss communications was to transfer the information to Arch Nemesis in
Kansas.  *Dudnikov*, 514 F.3d at 1075; *see* Doc. 171 at 6–7 n.2.  Because the court already has detailed
some of these pre-loss communications, *see* Doc. 171 at 6–7 n.2, it confines its analysis to Concept's
split-the-case-in-two approach, one unsupported by the controlling case law.

*fidei*). Doc. 244 at 21–31. None are new theories.[14] The question for the court, then, is whether anything distinguishes Arch Nemesis's claims against Concept from those same counterclaims against Clear Spring. *See* § III.B.

Much of the briefing is identical. The parties' papers addressing Clear Spring's (Doc. 232) and Concept's (Doc. 234) summary judgment motions largely duplicate one another—with entire pages copied-and-pasted from one set of briefs to the other. To their credit, the parties themselves—both Arch Nemesis and Concept—acknowledge this overlap. *See, e.g.*, Doc. 244 at 16 ("This 'analysis' is verbatim the same as the one put forth by Clear Spring, (*compare* Doc. 234 at 14–16, *with* Doc. 232 at 20–22), and fails for the same exact reasons that it failed for Clear Spring."); *id.* at 27 ("Like Clear Spring, Concept continues to labor under the misguided impression that the Policy disclosed the position it has staked in this litigation."); Doc. 234 at 24 ("These are the same misrepresentations that Arch Nemesis alleges that Clear Spring made."); Doc. 252 at 11 n.2 ("These are the same allegations Arch Nemesis makes against Clear Spring."). The summary judgment arguments likewise duplicate one another—including the dispositive misrepresentation/omission arguments on which the court granted Clear Spring summary judgment, above.[15] So, absent some distinguishing element, it would seem the failure of Arch Nemesis to adduce evidence to survive Clear Spring's summary judgment motion likewise disposes of Concept's summary judgment motion.

One distinction emerges, however. At bottom, though, it's a distinction without a difference. Concept, unlike Clear Spring, was a disclosed agent, not a signatory to the insurance

---

[14]    A chart in Appendix A highlights the nearly identical nature of Arch Nemesis's tort counterclaims against Clear Spring and its third-party claims against Concept.

[15]    A chart in Appendix B demonstrates that Clear Spring and Concept's summary judgment arguments on Arch Nemesis's fraud and negligent misrepresentation claims are nearly identical.

contract.  Doc. 16-1 at 1–2 (Usher Decl. ¶¶ 4–5); Doc. 234 at 24 n.3.  Concept served as "the claim handler and underwriting agent to Clear Spring" and wasn't a party to the policy.  Doc. 234-2 at 2 (Usher Decl. ¶¶ 2–3).  Arch Nemesis doesn't dispute this.  *See* Doc. 234 at 17 (CSOF ¶ 54); Doc. 244 at 6 (Response to CSOF ¶ 54).  Instead, Arch Nemesis disputes the significance of Concept's agency role when it comes to Arch Nemesis's third-party tort claims.  Specifically, the parties argue about  (i) how *uberrimae fidei* duties extend to Concept and (ii) how the policy's choice-of-law provision applies to these third-party claims.  Doc. 234 at 27; Doc. 244 at 16, 24; Doc. 252 at 10.  Neither argument changes the summary judgment outcome already reached under Clear Spring's motion, and that outcome equally resolves Concept's highly similar motion.  Here's why.

*First*, Concept argues that the *uberrimae fidei* doctrine doesn't apply to it as a non-party to the policy.  Doc. 234 at 27.  Recall Arch Nemesis's tort theory under this doctrine:  Concept didn't fulfill its *uberrimae fidei* duties to warn Arch Nemesis about the certifications' requirement—an omission supporting its fraud and negligent misrepresentation claims.  The *uberrimae fidei* doctrine provides the source of those duties.  No doctrine, no duties.  So, if *uberrimae fidei* doesn't apply to Concept, Arch Nemesis's failure-to-warn tort theory fails.  Not so fast, Arch Nemesis responds.  It contends the doctrine applies to Concept—as "a matter of basic agency principles[.]"  Doc. 244 at 24.  Concept shouldn't "get a free pass simply because it is not an insurer and was not a formal party to the Policy[,]" Arch Nemesis argues.  *Id.*

Let's assume for a moment that Arch Nemesis is right:  the doctrine applies to Concept as underwriting agent.  Still, the court concluded earlier that Arch Nemesis's receipt of the policy terms—in quadruplicate—fulfills any *uberrimae fidei* duty Clear Spring may have possessed.  *See* III.B.2.b.  This conclusion applies with equal force to Concept.  So, the way Concept's

agency role interacts with the doctrine of *uberrimae fidei* is of no moment here.  Either the doctrine doesn't apply—and Concept had no duties—or the doctrine applies, and Concept didn't breach those duties.  In either scenario, Arch Nemesis's omission-by-no-warning argument can't survive summary judgment.

*Second*, the parties dispute which state's law applies to these third-party claims, given Concept's non-party status.  Doc. 244 at 16; Doc. 252 at 10.  Arch Nemesis contends the policy's choice of New York law can't apply to Concept for two reasons:  Concept isn't a party to the policy and Concept disavowed being bound by the policy in an earlier service dispute so it's now judicially estopped from invoking the policy's benefits.  Doc. 244 at 16.  Concept replies that the choice-of-law provision can encompass non-parties because its language reaches "any dispute" under the contract, not just disputes between parties.  Doc. 252 at 10.  Here, too, the court declines to join this fray.  The court already has determined that the choice-of-law analysis won't change the outcome.  Both Kansas and New York law require a misrepresentation or omission for fraud and negligent misrepresentation.  *See above* note 8.  Arch Nemesis hasn't adduced facts capable of supporting a reasonable finding of a misrepresentation or omission under any of its theories.  So, no matter which state's law applies, Arch Nemesis's tort claims fail. The parties spilled much ink arguing choice of law, but it makes no difference here.  And neither does Concept's ability to invoke the contractual choice-of-law provision.

Succinctly, Arch Nemesis's third-party fraud and negligent misrepresentation claims against Concept can't survive summary judgment.  They fail for the same reasons its counterclaims against Clear Spring fail.  As a refresher, Arch Nemesis hasn't adduced evidence to show that Concept knew the policy was void at issuance.  *See* § III.A.4.b.i.  Nor did the policy suggest Concept should have inquired further about the certifications during the application

period.  *See* § III.A.4.b.ii.  Arch Nemesis's intent-to-deny theories require multiple inferential

leaps, all of them impermissible even at summary judgment.  *See* § III.B.2.a.  And Arch Nemesis

hasn't adduced evidence to show a breach of any *uberrimae fidei* duty to warn.  *See* § III.B.2.b.

With no viable misrepresentation or omission, Arch Nemesis's third-party tort claims against

Concept can't survive summary judgment.  The court thus grants Concept summary judgment on

Arch Nemesis's fraud and negligent misrepresentation claims.

Now, on to Arch Nemesis's final third-party claims—those against West Coast.

### D.    Arch Nemesis's Third-Party Claims against West Coast

#### 1.    Claims Survive

Arch Nemesis asserts four claims against its insurance broker, third-party defendant West

Coast:  Constructive Fraud, Negligent Misrepresentation, Negligence, and Breach of Contract.

Doc. 222 at 28–29 (Pretrial Order ¶¶ 4.g.1.–4.).  To a certain extent, Arch Nemesis premises

these claims on now-familiar allegations:

- West Coast "procur[ed] insurance that was never effective and was void from

  inception[;]"

- West Coast made negligent misrepresentations to Arch Nemesis by "stating that coverage

  of the Vessel was in place, and giving no indication that anything related to the

  'recommendations' . . . could preclude[]coverage[;]"

- West Coast "never advised Arch Nemesis of provisions in the Policy that could

  potentially affect coverage . . . or of the possible need of securing documentation before a

  loss occurred[;]" and

- West Coast failed "to procure coverage for the Vessel that would compensate Arch

  Nemesis if the Vessel were to be destroyed."

*Id.* All these allegations merely are variations on themes already addressed by this Order. But Arch Nemesis also invokes the "confidential relationship between West Coast and Arch Nemesis" based on West Coast's alleged "expertise" and its "longstanding relationship with Arch Nemesis's representatives." *Id.* at 28 (Pretrial Order ¶ 4.g.1.). And it alleges that "a heightened duty applied to West Coast." *Id.* (Pretrial Order ¶ 4.g.3.). The allegations against West Coast thus merit a separate analysis.

But neither Arch Nemesis nor West Coast moved for summary judgment on any of these claims. Arch Nemesis, for its part, solely seeks a narrow summary judgment decision on West Coast's comparative fault affirmative defense—addressed next. *See* Doc. 233 at 1. West Coast's only summary judgment briefing involves Responses—a Response, Doc. 237, to Clear Spring and Concept's Motion to Exclude (Doc. 229) and a Response, Doc. 238, to Arch Nemesis's limited comparative fault summary judgment request. And so, Arch Nemesis's third-party claims against West Coast survive this round of dispositive motions.

## 2.     Comparative Fault

Tying up loose ends, one final summary judgment dispute remains unaddressed: comparative fault. Arch Nemesis's motion seeks summary judgment on "certain comparative-fault designations that have been made by Clear Spring, Concept Special Ltd., and West Coast[.]" Doc. 233 at 1. More specifically, Arch Nemesis argues that "Clear Spring cannot compare fault on Arch Nemesis's breach-of-contract claim against it; Clear Spring, Concept, and West Coast cannot compare Roger Mosqueira or any of his crew members' alleged fault to their own; and Clear [Spring] and Concept cannot compare their intentional misconduct to any other actors' alleged fault." Doc. 233-1 at 38. The court's summary judgment conclusions moot any comparative-fault argument about Arch Nemesis's breach-of-contract claim against Clear Spring. And the same goes for the intentional misconduct claims against Clear Spring or

Concept.  Arch Nemesis's third-party claims against West Coast persist, however.  So, the court addresses solely Arch Nemesis's request for summary judgment on West Coast's comparative-fault affirmative defense, below.

The burden on an affirmative defense rests on the party asserting the defense—here, the nonmovant West Coast.  *See Sibley v. Sprint Nextel Corp.*, No. 08-CV-2063-KHV, 2016 WL 11185552, at *25 (D. Kan. Oct. 15, 2016), *report and recommendation adopted,* 2017 WL 2471304 (D. Kan. June 8, 2017).  Nonetheless, the Tenth Circuit has explained that the moving party "'still has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Id.* (quoting *Eaves v. Fireman's Fund Ins. Cos.*, 148 F. App'x 696, 700 (10th Cir. 2005)).  "'The moving party may carry its initial burden by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial.'"  *Eaves*, 148 F. App'x at 700 (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).

Here, Arch Nemesis tries to negate West Coast's comparative-fault affirmative defense by producing evidence that Roger Mosqueira's misconduct was intentional—and under Kansas law intentional misconduct precludes comparative fault.  Doc. 233-1 at 40.  Recall that Roger Mosqueira and his crew had chartered—without authorization—Arch Nemesis's yacht when the yacht struck a rock and sank.  Doc. 233-13 at 33 (McAtee Dep. 127:22–128:1); Doc. 233-19 at 3 (McAtee Dep. 147:14–148:8).  Arch Nemesis argues that Mr. Mosqueira's conduct constituted intentional misconduct—*i.e.*, theft or conversion.  Doc. 233-1 at 40.  And, under Kansas law, Arch Nemesis asserts, a party can't compare its fault using intentional acts—only negligent conduct.  *Id.*  Arch Nemesis then identifies two cases where the Kansas comparative fault statute,

Kan. Stat. Ann. § 60-258a, didn't apply because a party sought to compare fault with thieves or converters. *Id.* (first citing *M. Bruenger & Co. v. Dodge City Truck Stop, Inc.*, 675 P.2d 864, 869–70 (Kan. 1984); and then citing *Heintzman v. Sunflower Bank, N.A.*, No. 93-4224-RDR, 1994 WL 675403, at *4 (D. Kan. Nov. 22, 1994) ("The Kansas comparative statute applies only to causes of action where contributory negligence has traditionally been a defense. Contributory negligence is not a defense to conversion because it is an intentional tort." (internal citation omitted))).

This court needn't decide whether Kansas law should apply here—a position West Coast never disputes. *See generally* Doc. 238. Nor need it determine whether Arch Nemesis has shouldered its production burden to establish that Mr. Mosqueira's conduct amounted to theft or conversion. Instead, a simpler analysis disposes of Arch Nemesis's summary judgment comparative-fault arguments: West Coast never suggested that it aspired to compare its fault to Roger Mosqueira's conduct.

The Pretrial Order makes clear that West Coast's comparative fault defense involved *a* Mosqueira—but not *Roger* Mosqueira. Doc. 222 at 29 (Pretrial Order ¶ 4.h.3.). Instead, West Coast attempts to reduce its damages by "*Juan Manual* Mosqueira's comparative fault"—not Roger Mosqueira's. *Id.* Juan Manuel Mosqueira Alcarez was a Clear-Spring approved operator of the boat and named in the policy. Doc. 238-1 at 4 (WC Ex. A); Doc. 232-2 at 3 (Usher Decl. ¶ 9); Doc. 232-5 at 2 (Pl. Ex. 1). To be sure, Juan Manuel Mosqueira Alcarez was the operator of the boat at the time of the loss. Doc. 238-2 at 9 (WC Ex. B). Nonetheless, Arch Nemesis never adduced any evidence to show that Mr. Alcarez engaged in theft or conversion of the yacht, as West Coast contends. Doc. 238 at 3 ("[T]here has been no allegation and no evidence in the case that J. Mosqueira committed any criminal act in the operation of the vessel at the time

of the incident.").  And Dr. McAtee—as co-trustee of Arch Nemesis's sole owner, the Trust—

declared as much.

> [T]he only action that has been brought based on the loss of Arch Nemesis's vessel
> has been brought against Mr. Roger Mosqueira, who was the manager of Arch
> Nemesis's vessel at the time of its sinking. . . . I am unaware of Mr. Alcarez facing
> any criminal action for the loss of Arch Nemesis's vessel.

Doc. 243-9 at 2 (McAtee Decl. ¶¶ 6, 7).  The documents filed in the criminal case in Mexico

concur, mentioning Juan Manuel Mosqueira Alcarez's captaincy, but accusing only Roger

Mosqueira of wrongdoing.

> [T]he boat was being captained at that time by Mr. Juan Manuel Mosqueira
> Alcarez . . . . On May 28, 2022 . . . I learned that Mr. Rogelio Mosqueira disposed
> of the boat I owned without permission . . . . Mr. Rogelio Mosqueira, had the
> possession of the boat because he was managing the permits . . . . Mr. Rogelio
> Mosqueira, completely destroyed the boat of my property, by sinking it.

Doc. 238-2 at 9–11 (WC Ex. B).  So, all the summary judgment evidence identifies Roger

Mosqueira, and not Juan Manuel Mosqueira Alcarez, as the perpetrator of intentional

misconduct.  What's more, in its Reply, Arch Nemesis never addresses this mistaken identity or

provides evidence of Mr. Alcarez's intentional misconduct.  *See generally* Doc. 254.  Instead,

Arch Nemesis simply reiterates—in conclusory fashion—that "[i]ntentional conduct cannot be

compared."  *Id.* at 15.  The court thus concludes Arch Nemesis hasn't satisfied its burden of

production to negate an essential element of West Coast's affirmative defense.  Arch Nemesis

failed to adduce evidence that Juan Manuel Mosqueira Alcarez engaged in intentional

misconduct.  Instead, it adduced evidence solely of just Roger Mosqueira's intentional

misconduct.  Without adducing any facts in the summary judgment record demonstrating Mr.

Alcarez's intentional misconduct, there's nothing to negate an essential element of West Coast's

comparative fault affirmative defense.  The court thus denies the comparative-fault portion of

Arch Nemesis's summary judgment motion (Doc. 233).

IV.        **Motions to Exclude Expert Testimony**

Finally, four Motions to Exclude Expert Testimony are also pending in this case.  Doc.

228; Doc. 229; Doc. 230; Doc. 231.  Clear Spring and Concept jointly filed all four motions.  But

the court reached its decisions on the parties' cross motions for summary judgment without

considering these experts' opinions.  And the court has granted summary judgment for Clear

Spring and Concept, thus dismissing all Arch Nemesis's counterclaims and third-party claims

against those two parties.  So, the parties seeking to exclude testimony are no longer in the case.

The court thus denies as moot the four exclusion motions.  *See N.J. Div. of Inv. v. Sprint Corp.*,

No. 03-2071-JWL, 2010 WL 5416837, at *1 (D. Kan. Dec. 17, 2010) ("Because the court

granted the motions for summary judgment without regard to the testimony of any experts, it

denied as moot the motions to exclude the testimony of those experts and did not reach or

resolve the merits of those motions in any respect."); *Harmon v. Sprint United Mgmt. Corp.*, 264

F. Supp. 2d 964, 971 (D. Kan. 2003) ("Because the court concludes that Defendant is entitled to

summary judgment on Plaintiff's claims, it need not address and, therefore, denies as moot

Defendant's motion to exclude expert testimony[.]").

V.        **Conclusion**

Clear Spring is entitled to summary judgment on its Recommendations Warranty

declaratory judgment claim.  This conclusion makes the Insurance Agreement between Clear

Spring and Arch Nemesis void from inception, kneecapping Arch Nemesis's breach-of-contract

counterclaim.  None of Arch Nemesis's other counterclaims survives summary judgment, either,

nor do its third-party claims against Concept.  The third-party claims against West Coast persist

as uncontested, however.  The court also denies as moot Arch Nemesis's summary judgment

challenge to Clear Spring's and Concept's comparative fault designations.  And it denies as moot

Clear Spring and Concept's Motions to Exclude Expert Testimony.  The court also denies Arch

Nemesis's summary judgment challenge to West Coast's comparative fault designations. Finally, it denies Clear Spring and Concept's request for oral argument. The court decided the issues on the papers.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff Clear Spring Casualty Company's Motion for Summary Judgment (Doc. 232) is granted in part and denied as moot in part. The court grants summary judgment on Clear Spring's Recommendations Warranty declaratory judgment claim and declares that there is no coverage for Arch Nemesis's claim under the policy. The policy thus is void from its inception. The court denies Clear Spring's summary judgment motion on its other six declaratory judgment claims as moot. The court also grants Clear Spring summary judgment on Arch Nemesis's counterclaims.

**IT IS FURTHER ORDERED THAT** defendant Arch Nemesis, LLC's Motion for Summary Judgment (Doc. 233) is denied.

**IT IS FURTHER ORDERED THAT** third-party defendant Concept Special Risks Ltd.'s Motion for Summary Judgment (Doc. 234) is granted.

**IT IS FURTHER ORDERED THAT** plaintiff Clear Spring Casualty Company and third-party defendant Concept Special Risks Ltd.'s Motions to Exclude Expert Testimony (Doc. 228; Doc. 229; Doc. 230; Doc. 231) are denied as moot.

**IT IS FURTHER ORDERED THAT** plaintiff Clear Spring Casualty Company and third-party defendant Concept Special Risks Ltd.'s Motion for Oral Argument (Doc. 253) is denied.

**IT IS FURTHER ORDERED THAT** Arch Nemesis's third-party claims against third-party defendant West Coast Real Estate & Insurance, Inc. survive because none were at issue on summary judgment.

**IT IS SO ORDERED.**

**Dated this 13th day of August, 2025, at Kansas City, Kansas.**

                                              <u>s/ Daniel D. Crabtree</u>
                                              **Daniel D. Crabtree**
                                              **United States District Judge**

**APPENDIX A**

| Arch Nemesis's Tort Theory | Alleged Against Clear Spring | Alleged Against Concept |
|---|---|---|
| **POLICY VOID AT ISSUANCE** | Clear Spring "issued a policy that it believed was void at the time of issuance, as one 'recommendation' was still outstanding[.]"  Doc. 243 at 29.<br><br>So, "the acts of issuing the Policy and Temporary Binder constituted misstatements of present fact[.]"  Doc. 243 at 31. | Concept "issued a policy that it believed was void at the time of issuance, as one 'recommendation' was still outstanding[.]"  Doc. 244 at 20.<br><br>So, "the acts of issuing the Policy and Temporary Binder constituted misstatements of present fact[.]"  Doc. 244 at 21. |
| **NO FURTHER INQUIRY ABOUT RECOMMENDATIONS** | Clear Spring "never once made 'further inquiry' into the 'recommendations,' even while making numerous other requests of Arch Nemesis."  Doc. 243 at 31. | Concept "never once made 'further inquiry' into the 'recommendations,' even while making many other requests of Arch Nemesis."  Doc 244 at 22. |
| **INTENT TO DENY CLAIM FROM ISSUANCE** | "Clear Spring misrepresented its future intent to pay on claims made under the Policy[.]"  Doc. 243 at 31. | "Concept misrepresented Clear Spring's future intent to pay on claims made under the Policy[.]"  Doc. 244 at 21. |
| **DUTY TO WARN UNDER *UBERRIMAE FIDEI*** | "Clear Spring stayed silent while it had a duty to speak."  Doc. 243 at 31. | "Concept stayed silent while it had a duty to speak."  Doc. 244 at 21. |

**APPENDIX B**

| Arch Nemesis's Tort Theory | Clear Spring's SJ Argument | Concept's SJ Argument |
|---|---|---|
| **POLICY VOID AT ISSUANCE** | "Arch Nemesis alleges that there was a misrepresentation that the Vessel was covered . . . . However, the Policy specifically states coverage is predicated on Arch Nemesis' compliance with the warranties in the Policy. . . . [T]here could be no misrepresentation in issuing the Policy, because the Policy states the terms upon which coverage would be granted or, conversely, denied." Doc. 232 at 24–25. | "Arch Nemesis contends that Concept made a misrepresentation by 'issuing the Policy' . . . when the Vessel was never covered by the terms of the Policy . . . . The Policy provides, accurately, that coverage is conditioned on Arch Nemesis's compliance with the Policy's provisions . . . . The Policy did not by its terms promise unconditional coverage." Doc. 234 at 18 (quotation cleaned up). |
| **NO FURTHER INQUIRY ABOUT RECOMMENDATIONS** | "Arch Nemesis contends that Clear Spring made an omission in that it failed to inform Arch Nemesis that it intended to require documentation not required during the application process.  The Recommendations Warranty was not omitted." Doc. 232 at 40. | "Arch Nemesis contends that Concept made an omission in that it failed to inform Arch Nemesis that it intended to require documentation not required during the application process.  The Recommendations Warranty was not omitted." Doc. 234 at 28. |
| **INTENT TO DENY CLAIM FROM ISSUANCE** | Arch Nemesis adduces "no evidence of intent" resulting in a misrepresentation.  Doc. 232 at 40. | Arch Nemesis adduces "no evidence of intent" resulting in a misrepresentation.  Doc. 234 at 28. |
| **DUTY TO WARN UNDER *UBERRIMAE FIDEI*** | "Arch Nemesis admits that the Recommendations Warranty was disclosed to it.  Further, Arch Nemesis had read all of the warranties in the Policy prior to the Policy being issued.  Accordingly, all of the Policy warranties were within the knowledge of Arch Nemesis." Doc. 232 at 39 (internal citations omitted). | "Arch Nemesis admits that the Recommendations Warranty was disclosed to it.  Further, Arch Nemesis had read all of the warranties in the Policy prior to the Policy being issued.  The doctrine of *uberrimae fidei* is completely inapplicable here where Arch Nemesis had received the policy language multiple times and had read it." Doc. 234 at 27 (emphasis added) (internal citations omitted). |