**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**CLEAR SPRING PROPERTY & CASUALTY COMPANY,**

**Plaintiff and Counter Defendant,**

**v.**

**ARCH NEMESIS, LLC,**

**Defendant, Counter Claimant, and Third-Party Plaintiff,**

**v.**

**CONCEPT SPECIAL RISKS LTD., et al.,**

**Third-Party Defendants.**

**Case No. 22-2435-DDC**

# MEMORANDUM AND ORDER

This is a case about a boat that sank. But the case itself just keeps on swimming. Arch Nemesis, LLC—the sunken boat's owner—has filed a Motion for Reconsideration (Doc. 262). It asks the court to reconsider its Memorandum and Order (Doc. 255), granting summary judgment to insurance company Clear Spring Property & Casualty Company and insurance underwriter and claims-handler Concept Special Risks Ltd. As Arch Nemesis sees it, the court's summary judgment Order clearly erred on multiple fronts—misconstruing Arch Nemesis's legal theories and the governing law, as well as failing to consider relevant summary judgment evidence. The court denies Arch Nemesis's motion. The court isn't persuaded that it misconstrued legal theories or the law. And any error the court made in considering evidence proves harmless. The court thus denies defendant's Motion for Reconsideration (Doc. 262).

Not to be outdone, Clear Spring and Concept also have filed a motion. They seek attorneys' fees and costs under Fed. R. Civ. P. 54 because, in their view, Arch Nemesis acted in bad faith. Doc. 263. The court denies their motion. Arch Nemesis's allegedly offending litigation conduct doesn't clear our Circuit's high bar to merit award of attorneys' fees under the bad-faith exception. The court explains these rulings, below, starting with the background facts.

## I. Background

The court recited the summary judgment facts in its earlier Memorandum and Order. Doc. 255 at 3–6. It now provides an abbreviated version of these facts to reacquaint readers with just those facts relevant to the motions resolved here.

### *The Boat Purchase and Insurance Coverage*

In 2021, Arch Nemesis decided to buy a yacht. Doc. 233-6 at 3–4 (Def. Ex. A-3). To procure insurance for the vessel, Arch Nemesis retained West Coast Real Estate & Insurance Inc.—an insurance broker—in November 2021. *Id.* at 1–4 (Def. Ex. A-3). West Coast worked with Besso, a wholesale broker located in the United Kingdom, who worked with Concept, an underwriting agent and claims handler for Clear Spring. Doc. 232-2 at 2 (Usher Decl. ¶ 4); Doc. 222 at 3 (Pretrial Order Stipulations ¶ 2.a.1.).

In late 2021, Concept provided Arch Nemesis with three insurance-coverage quotes. *See* Doc. 232-10 at 2 (Pl. Ex. 6); Doc. 232-12 (Pl. Ex. 8); Doc. 232-16 (Pl. Ex. 12). And Concept requested a survey of Arch Nemesis's vessel—a prerequisite to issuing the policy. Doc. 232-13 at 2 (Pl. Ex. 9); Doc. 232-28 at 3 (Usher Dep. 83:17–22). Arch Nemesis provided a copy of a vessel survey prepared by Louis Stahlberg. Doc. 222 at 4 (Pretrial Order Stipulations ¶ 2.a.3.). The Stahlberg survey included eight repair recommendations for Arch Nemesis's yacht. Doc. 232-14 at 10 (Stahlberg Survey). Arch Nemesis then provided Clear Spring with a Letter of Compliance (LOC), certifying that it had completed all but one recommendation in the Stahlberg

survey. Doc. 222 at 4 (Pretrial Order Stipulations ¶ 2.a.4.). The LOC identified the one uncompleted recommendation—about issues with the refrigerator—as "outstanding."[1] Doc. 232-19 at 2 (LOC) (recommendation #2). The LOC certified that the other seven recommendations had "been complied with[.]" *Id.*

On February 14, 2022, Clear Spring issued a marine insurance policy to Arch Nemesis. Doc. 222 at 4 (Pretrial Order Stipulations ¶ 2.a.2.). The policy stated it was effective from December 24, 2021, to December 24, 2022. *Id.* Arch Nemesis reviewed the policy, including all its warranties. Doc. 232-11 at 47–48 (McAtee Dep. 206:19–207:12) (testifying that Arch Nemesis "reviewed all of the warranties, including the recommendation warranty, prior to the issuance of the policy in question"). Arch Nemesis didn't have any questions about the policy based on that review. Doc. 232-11 at 44, 45, 46 (McAtee Dep. 168:3–12, 169:14–21, 171:1–17).

***The Loss and the Insurance Claim***

On May 28, 2022, Arch Nemesis's yacht sank in Santa Maria Bay, near Cabo San Lucas, Mexico. Doc. 222 at 4 (Pretrial Order Stipulations ¶ 2.a.7.). The next day, Arch Nemesis tendered a claim on the policy. *Id.* (Pretrial Order Stipulations ¶ 2.a.8.). Concept appointed Arnold & Arnold to investigate the claim. Doc. 233-4 at 45 (Usher Dep. 175:15–176:3). In its first report to Concept, Arnold & Arnold asked for Concept's advice about requesting receipts from Arch Nemesis demonstrating the completed Stahlberg survey recommendations. Doc. 233-

[1] The LOC lists eight total recommendations as outstanding, each identified numerically. Doc. 232-19 at 2 (LOC). Only one of these recommendations, however, qualifies as a recommendation under the policy, falling within numerals one through eight. *Id.* The LOC's other outstanding recommendations fall between numbers 16 and 22, *i.e.*, those items listed as "Deferred Maintenance and Repair" items in the Stahlberg Survey, not as "Recommendations." *See id.*; *see also* Doc. 232-14 at 10–11 (Stahlberg Survey). The policy distinguishes between Deferred Maintenance items and the eight required recommendations. Doc. 233-4 at 35 (Usher Dep. 135:24–136:21). Thus, the LOC identifies just one outstanding recommendation.

21 at 5 (First Report). And Concept confirmed it would require receipts or certifications evidencing compliance. *See* Doc. 233-22 at 1 (Def. Ex. A-19).

Arnold & Arnold then sought evidence from Arch Nemesis that it "did in fact comply with all the survey recommendations set forth" in the Stahlberg survey. Doc. 232-3 at 3 (Caravaggio Decl. ¶ 7). Arch Nemesis provided Arnold & Arnold with just three documents demonstrating compliance. *Id.* at 4 (Caravaggio Decl. ¶ 14). One of those documents showed that the lone "outstanding" recommendation identified in the LOC—the one about the yacht's refrigerator—was complete. *Id.*; Doc. 232-21 at 3 (Pl. Ex. 17). Clear Spring considered this document as evidence that Arch Nemesis had complied with the second recommendation. Doc. 233-4 at 48 (Usher Dep. 188:19–189:4). But those three documents didn't mention or demonstrate compliance with the other seven recommendations. Doc. 232-11 at 28–30 (McAtee Dep. 115:17–117:24). Arch Nemesis concedes it "was unable to produce a 'writing' for the other seven" recommendations. Doc. 233-1 at 13; *see also* Doc. 233-23 at 3–4 (Def. Ex. A-20) (email explaining that "the other [seven] items had been completed by the previous owner" and Arch Nemesis didn't "have receipts from the previous boat owners on that specific work"); Doc. 232-11 at 23 (McAtee Dep. 93:18–21).

On August 17, 2022, Arnold & Arnold sent an email to Concept stating that Arch Nemesis hadn't "complied with any of the recommendations except for having the refrigerator/freezer breaker tripping diagnosed." Doc. 232-23 at 2 (Pl. Ex. 19). And it stated that Arch Nemesis hadn't located "any additional supporting documentation which reflects [it] has complied with the remaining seven items listed[.]" *Id.* The next day, Clear Spring issued a reservation-of-rights letter to Arch Nemesis. Doc. 222 at 4 (Pretrial Order Stipulations ¶ 2.a.9.). On October 24, 2022, Clear Spring denied coverage for Arch Nemesis's Claim and declared the

policy void. *Id.* (Pretrial Order Stipulations ¶ 2.a.11.). Clear Spring filed this declaratory judgment action the same day. Doc. 1 (Compl.).

With those background facts recapped, the court turns to the legal standard for reconsideration motions.

## II. Legal Standard

"A motion to reconsider must be based on: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice." D. Kan. Rule 7.3. That is, "a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). But it "is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Id.*; *see also Banister v. Davis*, 590 U.S. 504, 508 (2020) (explaining that, on a Rule 59(e) motion, "courts will not address new arguments or evidence that the moving party could have raised before the decision issued"). "Courts are leery to grants motions to reconsider[,]" and "movants must shoulder . . . a substantial burden to succeed on a motion to reconsider." *Rezac Livestock Comm'n Co. v. Pinnacle Bank*, No. 15-04958-DDC-KGS, 2017 WL 86190, at *5 (D. Kan. Jan. 10, 2017). A district court has discretion when deciding whether to grant or deny a motion to reconsider. *Hancock v. City of Oklahoma City*, 857 F.2d 1394, 1395 (10th Cir. 1988).

Arch Nemesis asserts several bases on which the court, it contends, should vacate its summary judgment Order. To impose some sense of order on Arch Nemesis's sprawling reconsideration motion, the court groups its arguments by type. *First*, the court addresses Arch Nemesis's arguments that the court misconstrued its theory and the applicable law. *Then*, the court considers arguments that it failed to consider relevant evidence. *Finally*, the court takes up Arch Nemesis's request to reinstate punitive damages.

Once the court has completed its review of the reconsideration arguments, it turns to Arch Nemesis's alternative request for relief: certifying the summary judgment Order under Rule 54(b). Lastly, it addresses Clear Spring and Concept's request for attorneys' fees. Doc. 263.

## III. Misconstrued Theory and Law

Arch Nemesis argues that the court misconstrued its waiver/estoppel and fraud theories, as well as the law that applies to those theories and, thus should vacate its summary judgment Order. Doc. 262 at 11–15. Arch Nemesis also contends that the court conflated the two theories supporting Arch Nemesis's good-faith-and-fair-dealing claim, improperly finding that this claim repackaged theories already rejected by the court. *Id.* at 11. The court addresses each purportedly misconstrued claim, below.

### A. Waiver/Estoppel and Fraud Claims

Under its waiver/estoppel theory, Arch Nemesis argues that Clear Spring and Concept "at the time of issuance, . . . had a basis to believe that the issued policy may not actually cover a loss if one were to occur." *Id.* Under its fraud theory, Arch Nemesis argues that Clear Spring and Concept knew, when Clear Spring issued the policy to Arch Nemesis, "that the policy d[id] not actually protect the property sought to be insured." *Id.* at 14. Both theories rest, at least in part, on Clear Spring and Concept's knowledge that the refrigerator recommendation was still outstanding at issuance.[2] Arch Nemesis contends that the outstanding refrigerator recommendation demonstrates that Clear Spring and Concept "had a reason to suspect a 'possible invalidity' based on the recommendations warranty[.]" *Id.* at 12. And such a possible

---

[2] Arch Nemesis also rests its waiver/estoppel theory on evidence that Clear Spring and Concept didn't put the boat on port-risk. Doc. 262 at 13–14. The court explains why the port-risk evidence has no bearing on its summary judgment conclusions—including its waiver/estoppel conclusion—later in this Order. *See* § III.A.

invalidity is all that's required to support its waiver/estoppel theory, Arch Nemesis contends. *Id.* at 12–13. Indeed, that same outstanding refrigerator recommendation allegedly shores up Arch Nemesis's fraud theory as well—*i.e.*, because Clear Spring and Concept knew that the refrigerator recommendation was still outstanding, they also knew that Arch Nemesis hadn't satisfied the recommendations warranty at issuance.

The court correctly rejected this knew-at-issuance theory. Doc. 255 at 25–26. And it doesn't matter whether the standard is "possible invalidity" under an estoppel rubric or knowledge under a fraud rubric. Under either rubric, no reasonable jury could conclude that Clear Spring or Concept questioned the validity of the policy at issuance based on the outstanding refrigerator recommendation. There's two reasons why this is so.

For starters, Arch Nemesis told Clear Spring and Concept that it would fix the outstanding refrigerator recommendation. *See* Doc. 232-19 at 2 (LOC) (indicating expected completion date of outstanding refrigerator recommendation (#2) as "Jan-Mar 2022"). And it did. Doc. 233-4 at 48 (Usher Dep. 188:19–189:9) (Clear Spring testifying that it considered the refrigerator recommendation satisfied). When Clear Spring issued the policy, it did so accepting Arch Nemesis's "will-complete" representation in the LOC. And Arch Nemesis's subsequent follow-through on this representation suggests such acceptance was reasonable. How could Clear Spring and Concept foresee possible invalidity when Arch Nemesis promised to fix the refrigerator recommendation? They had no reason to believe Arch Nemesis wouldn't fulfill its obligation. What's more, the Recommendations Warranty didn't require completed recommendations *at issuance*. Instead, to recover under the policy, the insured merely had to rectify the recommendations "prior to any loss giving rise to any claim[.]" Doc. 232-5 at 15 (Insurance Agreement). So, at the point of issuance, no policy invalidity followed from the

Recommendations Warranty because Arch Nemesis had until any loss actually occurred to fix the refrigerator. The outstanding recommendation didn't indicate possible policy invalidity—or knowledge of policy invalidity—at issuance.

More importantly, the policy's validity was completely out of Clear Spring and Concept's hands. Fulfilling the Recommendations Warranty—or not—rested solely with Arch Nemesis. Arch Nemesis needed to check two boxes: fix and certify. Arch Nemesis was on the hook to fix the refrigerator "prior to any loss giving rise to any claim[.]" *Id.* And Arch Nemesis was on the hook to provide certifications "in writing that all recommendations have been completed[.]" *Id.* Arch Nemesis completed the refrigerator recommendation before the loss. Doc. 232-21 at 3 (receipt from Alvarez Diesel indicating new refrigerator ordered). Check box one. But Arch Nemesis didn't submit the required written certifications. *See* Doc. 233-23 at 3–4 (Def. Ex. A-20) (email explaining that "the other [seven] items had been completed by the previous owner" and Arch Nemesis didn't "have receipts from the previous boat owners on that specific work"); Doc. 232-11 at 28–30 (McAtee Dep. 115:9–117:7) (Arch Nemesis corporate representative testifying that receipts it provided don't reflect remediation of seven recommendations). Box two thus remained unchecked, resulting in policy invalidity under the Recommendations Warranty.

In sum, Arch Nemesis argues that Clear Spring and Concept should have known that Arch Nemesis wouldn't follow through on its contractual obligations. That's just preposterous. After all, Arch Nemesis had represented to Clear Spring and Concept that the seven recommendations were complete. *See* Doc. 232-19 at 2 (LOC) (certifying, as vessel owner, that Arch Nemesis had complied with all recommendations save the listed exceptions). Surely, Arch Nemesis's failure to provide the writings doesn't mean that estoppel or fraud applies here.

Under those theories, the contract's validity was in jeopardy at issuance because Arch Nemesis might not follow through on its obligations. That's always possible.

Indeed, Arch Nemesis's theory has ludicrous implications. At bottom, it suggests that a party to a contract later has a claim for estoppel or fraud because that very party didn't perform. Under Arch Nemesis's reasoning, every contract that warrants future performance would carry with it an estoppel or fraud claim. A party who fails to perform simply could say that the other party knew that failure was a possibility, so, estoppel applies. That can't be the law. And the case Arch Nemesis relies on for support reveals just how much of a stretch its theory is. *See* Doc. 262 at 12 (citing *Holmes v. Nationwide Mut. Ins. Co.*, 244 N.Y.S.2d 148 (N.Y. Sup. Ct.), *aff'd*, 245 N.Y.S.2d 330 (N.Y. App. Div. 1963)).

In *Holmes*, plaintiff took out two life insurance policies on the life of his brother-in-law, identifying plaintiff as the beneficiary. 244 N.Y.S.2d at 149. Plaintiff had loaned the brother-in-law money for educational expenses and so, he purportedly had an insurable interest in the insured's life. *Id.* Unbeknownst to plaintiff, New York law required written consent of the insured—here, the brother-in-law—in deference to the public policy against wagering or gambling on human lives. *Id.* at 150. Plaintiff never secured the written consent required by this law. The brother-in-law died and the defendant insurance company refused to pay the policies. The insurance company argued that the policies were void at their inception since there was neither an insurable interest or written consent by the insured. *Id.* The court in *Holmes* thus considered "whether the conceded lack of written consent voids the policy, or whether the principle of estoppel can be applied against the insurance company." *Id.* The court opined as follows:

> To permit the defendant to use the defense of invalidity in this case, when it had notice that the beneficiary was a brother-in-law, when it received the premiums for

> four years without notifying the plaintiff of the necessity for written consent, and then after the event insured against occurred, to deny any liability on the policy is shocking to this court's sense of justice. . . . To permit an insurance company to accept the payment of premiums on a policy which it knew when issued was void from its inception, would constitute a fraud on the policyholders. This same principle must prevail where the company had facts within its control which should have put it on notice of a possible invalidity.

*Id.* at 152, 153 (quotation cleaned up). In Arch Nemesis's view, this case demonstrates that "New York law merely requires 'notice of possible invalidity'" to establish an estoppel theory. Doc. 262 at 12 (quoting *Holmes*, 244 N.Y.S.2d at 153). Maybe so. But *Holmes* doesn't shore up a triable issue of possible invalidity in this case.

To begin with, in *Holmes*, the missing written consent was due when the contract was made. 244 N.Y.S.2d at 150 ("No contract of insurance upon the person shall be made or effectuated unless *at or before the making* . . . the person insured . . . consents in writing[.]" (emphasis added) (quotation cleaned up)). That's not true here. The Recommendations Warranty was more flexible; it required compliance "prior to any loss giving rise to any claim[.]" Doc. 232-5 at 15 (Insurance Agreement). This distinction matters. The insurance company in *Holmes* could ascertain at contract formation that the policy was void given the absence of written consent. But Clear Spring and Concept were under the impression—based on representations by Arch Nemesis—that all the required recommendations were in order, either already or soon. They didn't know until Arch Nemesis had failed to produce the requisite documents that the Recommendations Warranty would void the contract.

*Holmes* is also distinguishable in another key respect. In *Holmes*, the insurance company never informed the plaintiff about the written consent requirement, despite having "notice that the beneficiary was a brother-in-law[.]" 244 N.Y.S.2d at 152. But here, the insurance agreement plainly outlined the recommendations requirement. Doc. 232-5 at 15 (Insurance Agreement).

The *Holmes* court found it "shocking to this court's sense of justice" that the insurance company would know of an invalidity, continue to receive premiums, never inform the plaintiff, and then deny recovery on invalidity grounds. 244 N.Y.S.2d at 152. These "shocking" circumstances don't exist here.

The facts of this case thus don't align with *Holmes*. Arch Nemesis has adduced no summary judgment facts to demonstrate Clear Spring and Concept knew of a possible invalidity at issuance. Clear Spring and Concept are guilty of nothing but believing Arch Nemesis would do what it had said it would do. And Arch Nemesis's contention that the court misconstrued the standard for waiver/estoppel—requiring actual knowledge instead of possible invalidity—is of no moment. *See* Doc. 262 at 11–12. Under either standard, no triable issue exists on these summary judgment facts. The court thus denies the portion of Arch Nemesis's motion asking the court to vacate its summary judgment Order for misconstruing Arch Nemesis's "void at issuance" theory and the applicable law.

**B. Good Faith and Fair Dealing Claim**

Arch Nemesis also contests the court's treatment of its good-faith-and-fair-dealing claim. It challenges the court's characterization of the claim as one that repackages Arch Nemesis's other claims. Doc. 262 at 11. Arch Nemesis contends that such a characterization improperly conflates its two good-faith theories—one premised on failure to compensate for the vessel's loss and one premised on the insurance claim's handling. *Id.*; Doc. 222 at 22 (Pretrial Order ¶ 4.c.5.). The evidentiary support for the second theory "came directly from [Arch Nemesis's] claims-handler expert," Arch Nemesis explains. Doc. 262 at 11. And, it emphasizes, New York law permits a good-faith claim premised on the insurer (or its agent's) mishandling of the claims-adjusting process—wholly apart from any breach of the insurance contract itself. *Id.* (citing *Grey Rock Gathering & Mktg., LLC v. Liberty Mut. Ins. Co.*, 2024 WL 3520470, at *6 (S.D.N.Y.

July 23, 2024)). In other words, according to Arch Nemesis, the court overlooked its claims-handling good-faith claim.

Not so fast, Clear Spring responds.[3] It directs the court to a recent New York holding that a good-faith claim against an insurer is duplicative of a breach-of-contract claim. Doc. 268 at 15 (citing *Deswert v. Travelers Com. Ins. Co.*, 2025 WL 416765, at *1 (N.D.N.Y. Feb. 6, 2025)). And Clear Spring asserts that Arch Nemesis's alleged claims-handling theory simply repackages its breach theories. *Id.* at 16. Clear Spring is right.

"The implied covenant of good faith and fair dealing is a pledge that neither party to the contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract." *Conmed Corp. v. Fed. Ins. Co.*, 2024 WL 2976604, at *9 (N.D.N.Y. June 13, 2024) (quotation cleaned up) (applying New York law). "'New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.'" *Id.* (ellipses in original) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)). Where "the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative." *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012) (applying New York law). "'A good faith claim, however, is not duplicative of a breach of contract claim where the complaint alleges conduct that is separate from the conduct constituting the alleged breach of contract and such conduct deprived the other party of the benefit of its bargain.'"

[3] Arch Nemesis asserted its good-faith claim only against Clear Spring, not Concept. *Compare* Doc. 222 at 22 (Pretrial Order ¶ 4.c.5.), *with id.* at 25 (Pretrial Order ¶ 4.e.). So, although Clear Spring and Concept responded to the reconsideration motion jointly, Doc. 268, the court refers just to Clear Spring in this section.

*Conmed*, 2024 WL 2976604, at *9 (quoting *AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*, 185 N.Y.S.3d 73, 90 (N.Y. App. Div. 2023)).

The question here, then, is whether Arch Nemesis's good-faith claim seeks the benefit of the contractual bargain or, instead, is premised on separate, claims-handling conduct. Some examples help.

In *Deswert*, an insurance company denied an insurance claim stemming from a plumbing leak on the insured's property. 2025 WL 416765, at *1. The insured sued, asserting claims for breach of contract and bad-faith claims handling. *Id*. The insured's bad-faith claim alleged that the insurance company had "engaged in bad faith in the investigation and adjustment of the claim and improperly denied the claim." *Id.* at *3. The District Court of the Northern District of New York concluded that the insured's bad-faith claim duplicated its breach-of-contract claim. *Id.* at *4 (collecting cases). The claim "fail[ed] to allege a violation of any duty independent of the insurance contract at issue in" the breach-of-contract claim. *Id.* at *3.

By contrast, in *National General Insurance Company v. Bokow*, an insurance company denied coverage for the collapse of a home's roof and, on the same day, filed a complaint seeking a declaratory judgment that there was no coverage for the collapse. 237 N.Y.S.3d 370, 2025 WL 2202743, at *1 (N.Y. Sup. Ct. July 3, 2025). The insureds counterclaimed, alleging claims for breach of contract and breach of the implied covenant of good faith and fair dealing. *Id.* To support their good-faith claim, the insureds identified internal emails from the insurance company where an employee stated that the policy covered the collapse. *Id.* at *9. Despite this internal assessment, the insurance company denied coverage—allegedly after learning that it could not pursue claims against the insureds' contractor through subrogation. *Id.* The court concluded that the insureds' good-faith claim might survive alongside their breach-of-contract

claim because the employee's emails might create a material dispute over plaintiff's alleged bad faith (though the court declined to rule without more fulsome briefing). *Id.* at *10.

Here, the conduct on which Arch Nemesis premises its good-faith-and-fair-dealing claim aligns more closely with that of *Deswert* than *Bokow*. At bottom, Arch Nemesis's good-faith claim contends that Clear Spring wrongly denied its insurance claim, and used the claims-handling process to accomplish that already-determined result.

Arch Nemesis directs the court to its expert's conclusion about the claims-handling process. Doc. 262 at 11. This expert opined that "the focus of Arnold's investigation appears to be to satisfy a pre-determined decision to deny coverage based on the directive for Arnold & Arnold to secure information the insurer/underwriter failed to secure prior to policy issuance and was entirely self-serving and wholly against industry practice." Doc. 243 at 9. So, Arch Nemesis's good-faith claim is all wrapped up in what had happened before the claims handling even began—an alleged pre-determined decision and failure to secure information. As in *Deswert*, it's the allegedly improper denial of the claim—as accomplished through the investigation—that's at issue here. Putting it another way, the report from Arnold & Arnold asking Concept whether to request receipts, Doc. 233-21 at 5 (First Report), doesn't resemble the employee emails in *Bokow*. The Arnold request is wholly consistent with the claim's later denial and thus doesn't suggest independent, tortious conduct in the claims-handling process. Such a request is intertwined with the terms of the contract itself.

*Bokow*'s just the opposite. There, the summary judgment evidence indicates a separate wrongful act in the claims-handling process—hiding a determination that the policy covered the loss—apart from the contract itself. Unlike *Bokow* (but like *Deswert*), Arch Nemesis's good-

faith claim thus duplicates its breach-of-contract claim. That conclusion is consistent with the court's treatment of the claim in its earlier Order.

There, the court found Arch Nemesis had simply "repackaged" its breach theories "in a 'fair dealing' wrapper." Doc. 255 at 44. Indeed, the court conceded that the claims-handling language—at first blush—sounded different but concluded that it wasn't, in the end. *Id.* To explain this conclusion, the court quoted—in full—the claims-handling-expert evidence Arch Nemesis now relies on at reconsideration. *Id*. at 45 (quoting Doc. 243 at 9). And the court identified how the good-faith claim intertwines with the familiar Arch Nemesis theories already rejected by the court. *Id.* The court didn't reach the question whether New York law allowed the claim, content simply to pinpoint the already-considered theories and grant summary judgment on that basis. *Id.* at 44 n.12. But its repackaged-theories conclusion suggests just such a duplicative-claim conclusion. And either way, the result is the same. So, the court both reaffirms its earlier Order's repackaged-theories conclusion and decides explicitly here that Arch Nemesis's good-faith claim duplicates its breach-of-contract claim. Each conclusion independently suffices to merit denying Arch Nemesis's reconsideration motion on its good-faith-and-fair-dealing claim.

With that, the court wraps up its consideration of Arch Nemesis's arguments that the court misconstrued legal theories and the governing law. Next, the court takes up Arch Nemesis's arguments about the court's treatment of its evidence.

## IV. Failure to Consider Relevant Evidence

Arch Nemesis also advances a couple lines of argument suggesting that the court's summary judgment Order failed to consider evidence it should have considered. *First*, Arch Nemesis contends the court erred by not considering its expert evidence. Doc. 262 at 3–5. *Second*, Arch Nemesis asserts that the court mishandled evidence about Clear Spring and

Concept's other insurance-claim denials. *Id.* at 6–8. And, *finally*, Arch Nemesis argues that the court didn't account for all the summary judgment evidence supporting Arch Nemesis's intent-to-deny theory. *Id.* at 8–11. Take each argument in turn, below.

**A. Expert Evidence**

Arch Nemesis contends that the court's summary judgment Order erred by failing to consider its expert evidence. *Id.* at 2–3. Surely, a district court's failure to address expert testimony at summary judgment can constitute error. *See id.* at 3 (citing, *e.g.*, *Horton v. Allstate Vehicle & Prop. Ins. Co.*, 2023 WL 7549507, at *2 (5th Cir. Nov. 13, 2023) (reversing and remanding where expert testimony "raise[d] a question of fact" and district court didn't address it at summary judgment)). But our Circuit has suggested that where a district court finds an expert "unpersuasive in the disposition of the issues before it," the court may choose not to rely on the expert's report. *Haltom v. Great Nw. Ins. Co.*, 460 F. App'x 751, 756–57 (10th Cir. 2012) (affirming district court's grant of summary judgment to insurer who had denied insured's claim for coverage under her under-insured motorist policy). Other Circuits and district courts similarly have determined that a court may pass over an expert's opinion if it doesn't bear on a summary judgment ruling. *See Praseuth v. Newell-Rubbermaid, Inc.*, 219 F. Supp. 2d 1157, 1168 (D. Kan. 2002) ("[T]he court concludes that it need not rule on the admissibility of this expert opinion for purposes of the present motions because the opinions offered by these experts will not assist plaintiff at the summary judgment stage."), *aff'd*, 406 F.3d 1245 (10th Cir. 2005); *Struck v. Wal-Mart Stores E., LP*, 2021 WL 5052557, at *4 (11th Cir. Nov. 1, 2021) (affirming grant of summary judgment where appellant argued "district court erred in ignoring her expert's opinion when ruling on the summary judgment motion" because appellant didn't address whether expert opinion offered any evidence on the question before the court).

The court begins by outlining the expert opinion Arch Nemesis raises in its Motion to Reconsider (Doc. 262).[4] This dispute originates in Arch Nemesis's view that Clear Spring should've provided the ill-fated yacht with "port risk" protection while the refrigerator-repair recommendation remained outstanding. Specifically, Arch Nemesis's reconsideration motion argues that the court failed to consider the port-risk opinion from Mike Fitzgerald's expert report. Doc. 262 at 4. The court concludes that it did err by failing to address this port-risk opinion in its summary judgment Order. *See* Doc. 255 at 34 n.10 (discussing the port-risk issue without considering Mr. Fitzgerald's opinion). Correcting that error now, the court considers whether Mr. Fitzgerald's port-risk opinion changes the court's summary judgment conclusions. It does not.

In relevant part, Mr. Fitzgerald opined as follows about putting the vessel on port-risk pending completion of the refrigerator recommendation:

> With regard to the [letter of compliance], any recommendations that show a "to be completed at a future date" should be immediately placed on "Port Risk Only" via an endorsement if there is an existing policy in force or a full hold/stop if a policy has not already been issued. Insurers/underwriters do have the ability to waive requirements and warranties in their policies in order to cover a risk that they are comfortable with. However, unless an insured is specifically put on notice that the insurer or its [managing general agency] is going to require compliance of an unsatisfied requirement or warranty despite issuing a policy, an insurer or its [managing general agency] is not free, under industry standards, to then rely upon that requirement or warranty that they knew of during the application process had not been met and did not require satisfaction of prior to issuing the policy in question to deny a claim that is made on that policy.

---

[4] The court assumes—without deciding—that it needn't exclude any experts' opinions. It does so acknowledging that Clear Spring and Concept asked the court to exclude experts—motions the court denied as moot. Doc. 228; Doc. 229; Doc. 230; Doc. 231; Doc. 255 at 58. The court takes this approach because it finds no reason to revise its previous summary judgment holding on reconsideration. In short, including or directly referencing the experts' testimony wouldn't have changed the summary judgment result because the expert testimony had no bearing on the questions decided by the court at summary judgment. To rule defendants' exclusion motions—simply to conclude that the court needn't have ruled them—departs from Rule 1's "speedy . . . determination" mandate. Fed. R. Civ. P. 1.

Doc. 243-3 at 7 (Fitzgerald Report ¶ 27).

Arch Nemesis contends this expert opinion demonstrates that Clear Spring and Concept deviated from industry standards. More precisely, Arch Nemesis's theory goes like this: Clear Spring and Concept issued Arch Nemesis a policy without placing the boat on port risk when the letter of compliance listed the refrigerator recommendation as "outstanding." This omission didn't comply with the industry standards as outlined by Mr. Fitzgerald. So, Arch Nemesis argues, the "deviation from industry standards is evidence of fraudulent intent, lack of good faith/bad faith, and why [Clear Spring] and Concept should be estopped from taking the breach position that they have taken in this case." Doc. 262 at 5.

But the entirety of this port-risk line of argument is a sideshow. Clear Spring and Concept didn't deny the claim based on the refrigerator recommendation. Had Clear Spring and Concept attempted to deny coverage premised on the refrigerator recommendation—after issuing a policy knowing the refrigerator recommendation was outstanding—it would have violated the industry standards identified by Mr. Fitzgerald. But that's not what it did. Instead, Clear Spring and Concept denied Arch Nemesis's claim based on the other seven recommendations—and Arch Nemesis's uncontroverted inability to provide documents showing it had completed those other seven recommendations. Doc. 233-1 at 13; *see also* Doc. 233-23 at 3–4 (Def. Ex. A-20) (email explaining that "the other [seven] items had been completed by the previous owner" and Arch Nemesis didn't "have receipts from the previous boat owners on that specific work"); Doc. 232-11 at 23 (McAtee Dep. 93:18–21).

These seven recommendations don't fall under the expert's port-risk opinion. That's so because they were certified as *completed* in the letter of compliance, Doc. 1-3 at 1—not as recommendations "to be completed at a future date," Doc. 243-3 at 7. In sum, expert

Fitzgerald's port-risk opinion raises no genuine issue whether Clear Spring and Concept had fraudulent intent, lacked good faith, or are subject to estoppel/waiver because it doesn't opine about the actual basis which Clear Spring and Concept invoked to deny the claim—the written certifications. Fitzgerald only opines about to-be-completed recommendations. But no to-be-completed recommendations affected the insurance claim's denial at issue here.

Arch Nemesis contends that simply failing to place the boat on port risk *at all* violated these industry standards and thus manifested an intent "to hide the true import of the recommendations warranty[.]" Doc. 262 at 5. Arch Nemesis seems to suggest, in other words, that Mr. Fitzgerald's opinion still matters even though it doesn't address the basis for the insurance claim's denial. Two problems with this argument emerge quickly. *First*, Mr. Fitzgerald's report doesn't say that an insurer *always* must put a boat on port risk. He explains that an insurer can waive a requirement to cover a risk they are comfortable with—like an inoperative refrigerator, for example—provided that they do not later rely on that requirement to deny a claim. Doc. 243-3 at 7 (Fitzgerald Report ¶ 27). As already established, it's uncontroverted that Clear Spring and Concept didn't later rely on the refrigerator requirement to deny Arch Nemesis's claim. So, no reasonable jury could conclude that Clear Spring and Concept violated an industry standard simply because they waived a requirement and, in so waiving, declined to place the yacht on port risk. The standard—even as Mr. Fitzgerald describes it—gives the insurer options, but not a required course of action.

Even if Mr. Fitzgerald's opinion could establish that Clear Spring and Concept violated an industry standard, a jury would have to make a significant inferential leap to find fraudulent intent, bad faith, or estoppel. *See Norwood v. United Parcel Serv., Inc.*, 2021 WL 3022315, at *16 (D. Kan. July 16, 2021) ("At summary judgment, the non-movant surely deserves the benefit

of all reasonable inferences. But this principle doesn't entitle the non-movant to unreasonable inferential leaps lacking any evidentiary support."), *aff'd*, 57 F.4th 779 (10th Cir. 2023). A reasonable jury would have to infer that Clear Spring and Concept, by issuing the policy subject to fixing the refrigerator without placing the boat on port risk, somehow lulled Arch Nemesis into failing to document the other seven repairs. This inference makes no sense. And it requires a lot of leaps. Now consider the alternative. Per industry standards, Clear Spring and Concept decided to "waive requirements and warranties in their policies in order to cover a risk that they are comfortable with," Doc. 243-3 at 7 (Fitzgerald Report ¶ 27)—a broken refrigerator. And that's the reason they never put the vessel on port risk.

The theory that choosing not to port risk a boat with a broken refrigerator reveals a nefarious plot to hide the import of the Recommendations Warranty requires an active imagination. Courts shouldn't have to exercise active imaginations to grant summary judgment. *See Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1187 (10th Cir. 2013) ("Although our summary judgment standard requires us to view the facts in the light most favorable to the non-moving party, it does not require us to make unreasonable inferences in favor of the non-moving party." (quotation cleaned up)).

In sum, Mr. Fitzgerald's port-risk opinion changes nothing. It doesn't create a triable issue that Clear Spring and Concept violated industry standards or that they did so harboring an intent to hide the Recommendation Warranty's import. So, while the court erred by not considering Mr. Fitzgerald's port-risk opinion, doing so now doesn't change the outcome. It was harmless error.

**B. Mishandled Evidence**

Arch Nemesis also argues that the court mishandled evidence that Clear Spring had denied at least 30 other insurance claims—and Concept had denied at least one hundred—based on the Recommendations Warranty. Doc. 262 at 6–8. It contends that the court treated this denial evidence as controverted when it wasn't. *Id.* at 6. And it argues that the evidence of many other denials supports an inference that Concept had a recommendations-warranty-based denial "in mind" when it issued Arch Nemesis's policy—*i.e.*, that Clear Spring and Concept had fraudulent intent. *Id.* The court's Order found that inferring malintent simply from the volume of other denials would require an impermissible number of leaps. Doc. 255 at 37. It noted that Arch Nemesis provided no information about the other denials beyond the sheer number. *Id.*

Distilling it down, the question for the court here is whether the frequency of other insurance-claim denials suffices—without any details about the basis or validity of those denials—for a reasonable jury to infer fraudulent intent. To answer that question, Arch Nemesis relies on *Cyprus Federal Credit Union v. Cumis Insurance Society, Inc.*, 2013 WL 7174130 (10th Cir. July 12, 2013). But *Cyprus* is distinguishable—and in precisely the way the court's summary judgment Order found dispositive.

In *Cyprus*, a credit union sought coverage under a bond issued by an insurer after a credit union member had made fraudulent deposits. *Id.* at *1. A credit union member, Shawn Kirby, had engaged in misconduct when depositing checks in his credit union accounts. *Id*. Our Circuit divided the at-issue checks into two groups, finding one group revealed Kirby's fraudulent intent while the other group did not. The first group included 47 checks—made payable to others—that Kirby himself endorsed and deposited. The Circuit held that a "jury could reasonably conclude that Kirby knew it was improper to deposit checks made payable to others based on Kirby's extensive bank activity and common sense." *Id.* at *4. And it determined that "the

frequency of Kirby's improper deposits suggest[ed] that they were not merely accidental" but instead part of a "scheme to defraud." *Id.* So, frequency plus knowledge of impropriety equals an inference of fraudulent intent. The other group of checks eliminated one aspect of the equation: the known impropriety. The second group included 13 checks endorsed either by the payee or the credit union itself—not by Kirby. The Circuit treated this group differently, concluding that "nothing in the record regarding these thirteen checks suggest[ed] fraudulent intent." *Id.* In short, frequency alone didn't manifest fraudulent intent. Instead, improper deposits *plus* frequency did.

The court's summary judgment Order reached the same conclusion about the denial evidence Arch Nemesis adduced. Frequency alone—without evidence of impropriety—didn't cut it. The court explained that Arch Nemesis's summary judgment evidence provided no other details—beyond bare volume—to suggest that Clear Spring and Concept's other denials were improper or unjustified. Doc. 255 at 37–38. And so, the sheer number of other denials didn't suffice to support an inference that Clear Spring intended from issuance not to pay on Arch Nemesis's policy here. *Id.* It would require a jury to infer, *first*, that the other denials were necessarily unjustified and, *then*, to infer that those unjustified denials also demonstrate intent here. *Id.* That's too many inferential leaps. The court thus stands by its conclusion at summary judgment and denies Arch Nemesis's reconsideration motion to the extent it relies on the evidence of other claim denials.

**C. Intent-to-Deny Theory**

Arch Nemesis points to one final way in which the court purportedly failed to consider relevant evidence in its summary judgment Order. It argues that the court inappropriately rejected its theory that Clear Spring and Concept had an intent to deny its insurance claim from

policy issuance. Doc. 262 at 8–11. Arch Nemesis details the summary judgment evidence it argues the court discounted: (1) an expert's opinion about a pre-determined decision to deny coverage based on Clear Spring and Concept's post-loss actions; (2) not putting the vessel on port risk; (3) the longstanding relationship between the adjuster and Concept; and (4) Concept's role as both underwriter and claims handler, who knew at issuance that the Recommendations Warranty remained unsatisfied. *Id.* at 8–10. Arch Nemesis asserts that these summary judgment facts, taken together, cure the court's conclusion that Arch Nemesis's intent-to-deny theory required "'multiple inferential leaps.'" *Id.* at 10 (quoting Doc. 255 at 36).

None of this evidence—separately or taken together—would permit a reasonable jury to infer intent without making multiple inferential leaps. Start with the listed evidence already addressed in this Order: the port risk issue and knowledge that the Recommendations Warranty remained unsatisfied. The court explained above why this evidence doesn't contribute to a triable issue that Clear Spring and Concept had an intent to deny at issuance. *See* §§ III.A; IV.A. That leaves the expert's opinion and the evidence of two relationships—one between Concept and the adjuster, the other between underwriter and claims handler. Take each, in turn, starting with the expert's opinion.

Arch Nemesis's claims-handling expert opined that "'the focus of Arnold's investigation appears to be to satisfy a pre-determined decision to deny coverage based on the directive for Arnold & Arnold to secure information the insurer/underwriter failed to secure prior to policy issuance and was entirely self-serving and wholly against insurance industry practice." Doc. 243 at 9. The court's summary judgment Order concluded that premising Clear Spring and Concept's intent to deny on Arnold & Arnold requesting completed-recommendation receipts would require "multiple inferential leaps." Doc. 255 at 36. And it explained that a "factfinder

reasonably couldn't infer that the adjustor's singular question—after the loss—evinces Clear Spring's intent (from issuance) never to pay claims." *Id.* In so doing, the court identified the disconnect between this expert evidence and what Arch Nemesis contends it proves. That disconnect remains a problem for Arch Nemesis on reconsideration.

Recall that the insurance policy itself informed Arch Nemesis that it must provide completed-recommendation receipts to fulfill the Recommendations Warranty. *See* Doc. 232-5 at 15 (Insurance Agreement) (warranting that "either . . . [t]he surveyor who carried out the survey certifies in writing that all recommendations have been completed . . . [o]r . . . [t]he workmen/repair yard that carried out the said work and/or recommendations certifies in writing that all recommendations have been completed"). And the insurance policy also clarified when those receipts would come due. *Id.* (explaining that written certifications required "prior to any loss and/or claim"). So, Arnold & Arnold's request for those very receipts at the claims-handling stage isn't the least bit probative of Clear Spring and Concept's intent to deny any claim when it issued the insurance policy. Instead, the request tracks lock-step with the terms of the insurance agreement itself—terms that Arch Nemesis received and read before the policy issued. *See* Doc. 232-11 at 47–48 (McAtee Dep. 206:19–207:12) (testifying that Arch Nemesis "reviewed all of the warranties, including the recommendation warranty, prior to the issuance of the policy in question"). This evidence thus doesn't help to create a triable issue of intent as Arch Nemesis contends it does.

Finally, and contrary to Arch Nemesis's assertion, the court's earlier Order accounted for Arch Nemesis's relationship evidence. It identified Concept's relationship with its adjuster as "'longstanding.'" Doc. 255 at 35. And it characterized Concept as Clear Spring's "underwriter and claims handler." *Id.* Arch Nemesis would like the court to deem this relational evidence

sufficient to create a triable issue of Clear Spring and Concept's intent when issuing the policy. But the authority Arch Nemesis relies on doesn't match this case's summary judgment facts.

To argue that this relational evidence supports a triable issue of intent, Arch Nemesis quotes a Sixth Circuit case, *United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003). In *Brown*, two defendants appealed from their conviction and sentence for conspiracy to distribute more than 50 grams of cocaine base. *Id.* at 367. Part of that appeal challenged the sufficiency of the evidence to prove that the defendants specifically intended to join the conspiracy. *Id.* at 372. In particular, defendant Brown argued that there was insufficient evidence to support the jury's finding that he was involved in a conspiracy to distribute crack, rather than merely powder cocaine. *Id.* at 373. At trial, two witnesses had testified that they bought powder cocaine from Brown and one had testified that Brown was a source of cocaine for a third conspirator. *Id.* The Circuit thus concluded that the "evidence at trial established that the conspirators had a regular arrangement with Brown to purchase very large quantities of powder cocaine." *Id.* But, as Brown identified, "no witness specifically testified that [Brown] knew the conspirators cooked some of the cocaine into crack." *Id.* Nonetheless, the Circuit determined that the evidence sufficed to infer Brown's involvement with the crack conspiracy. It explained: "Given the close relationships among the conspirators and the repeated transactions, there was sufficient circumstantial evidence for a rational jury to infer that Brown knew the general gist of the conspiracy when he chose to participate." *Id.*

Papering over the gaps between this case and an out-of-Circuit criminal case addressing an entirely different area of law, Arch Nemesis globs onto *Brown*'s "close relationships" and "repeated transactions" language. Doc. 262 at 10. It implies that the "longstanding" relationship between Arnold & Arnold and Concept, as well as Concept's dual role as underwriter and claims

handler, align with the kind of "close relationships" and "repeated transactions" permitting an inference of intent in *Brown*. *Id.* The court is unimpressed with Arch Nemesis's reasoning. In *Brown*, evidence from two witnesses supported a finding that Brown had engaged in wrongdoing—selling powder cocaine. When a jury added this evidence of wrongdoing to evidence of the close relationships and repeated transactions between Brown and his fellow conspirators, it was reasonable to infer Brown's intent to join a conspiracy distributing crack cocaine.

Here, there's evidence of close relationships and repeated transactions. But there's no evidence of wrongdoing to combine it with. That's where the multiple inferential leaps from the court's earlier Order come into play. *See* Doc. 255 at 36 (granting summary judgment against intent-to-deny theory because it "would require multiple inferential leaps"). A jury would have to infer, first, that Clear Spring and Concept had engaged in repeated wrongful transactions to deny claims before it could infer that the longstanding relationship or dual roles manifested an intent to deny Arch Nemesis's claim. Yet, unlike *Brown*, Arch Nemesis provides no evidence to support a finding of wrongful transactions. To be sure, it directs the court to the number of cases where Clear Spring and Concept have denied claims in allegedly similar situations. Doc. 262 at 10. But it never provides any evidence that Clear Spring or Concept wrongly denied these claims. It simply hangs its hat on the sheer number of other denials. And, as the court already concluded, the sheer number doesn't create a triable issue of intent—not without more. *See* § IV.B. The court thus concludes that it didn't err by resolving Arch Nemesis's intent-to-deny theory based on impermissible inferential leaps.

In sum, none of Arch Nemesis's arguments for improperly considered evidence hold water. And the court denies Arch Nemesis's reconsideration motion premised on these

arguments. Addressing one final issue wraps up the court's reconsideration efforts: punitive damages.

## V. Punitive Damages

Finally, Arch Nemesis argues that the court should reinstate Arch Nemesis's punitive damages request. Doc. 262 at 15. It has viable fraud and good-faith claims, it asserts, so a punitive damages request is appropriate. *Id.* But the court has declined to revive any of Arch Nemesis's claims because it properly granted summary judgment. So, there's no basis for reinstating Arch Nemesis's punitive damages request. This relief, too, is denied.

Having denied all primary relief requested by Arch Nemesis, the court turns next to Arch Nemesis's alternative request. If the court doesn't grant its motion to reconsider—it hasn't—Arch Nemesis asks the court to certify its summary judgment Order under Rule 54(b), and stay the proceedings while that appellate work plays itself out. Doc. 262 at 15. The court denies this request, as well, for reasons explained below.

## VI. Rule 54(b) Certification

Federal Rule of Civil Procedure 54(b) provides, in relevant part:

> When an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

This rule functions to make an immediate appeal available for district-court losers, thus avoiding "'the possible injustice of a delay in entering judgment . . . as to fewer than all of the parties until the final adjudication of the entire case[.]'" *Okla. Tpk. Auth. v. Bruner*, 259 F.3d 1236, 1241 (10th Cir. 2001) (quoting 10 *Wright & Miller's Federal Practice and Procedure* § 2654 (1982)). But, "Rule 54(b) entries are not to be made routinely." *Id.* (quotation cleaned up). A "court applying Rule 54(b) must consider the policy against piecemeal appeals, which is intended to

promote efficiency at the appellate-court level." *Cont'l Materials Corp. v. Valco, Inc.*, 740 F. App'x 893, 899 (10th Cir. 2018) (citing *Jordan v. Pugh*, 425 F.3d 820, 829 (10th Cir. 2005)). This policy "expedites the ultimate termination of an action and relieves appellate courts of the need to repeatedly familiarize themselves with the facts of a case." *Okla. Tpk. Auth.*, 259 F.3d at 1241. To that end, "[i]nterrelated claims should be litigated and appealed together." *Cont'l Materials Corp.*, 740 F. App'x at 899 (citing *Jordan*, 425 F.3d at 829). In short, district courts should "weigh[] Rule 54(b)'s policy of preventing piecemeal appeals against the inequities that could result from delaying an appeal." *Stockman's Water Co. v. Vaca Partners, L.P.*, 425 F.3d 1263, 1265 (10th Cir. 2005) (citing *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980)).

A "certification under Rule 54(b) is only appropriate when a district court adheres strictly to the rule's requirement that a court make two express determinations. First, the district court must determine that the order it is certifying is a final order." *Okla. Tpk. Auth.*, 259 F.3d at 1242. An order is final when "'it is an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Id.* (quoting *Curtiss-Wright Corp.*, 446 U.S. at 8). "Second, the district court must determine that there is no just reason to delay review of the final order until it has conclusively ruled on all claims presented by the parties to the case." *Id.*

The court's inquiry here starts and ends with the first requirement—finality. "'A judgment is not final for the purposes of Rule 54(b) unless the claims resolved are distinct and separable from the claims left unresolved.'" *Cont'l Materials Corp.*, 740 F. App'x at 897 (quotation cleaned up) (quoting *Okla. Tpk. Auth.*, 259 F.3d at 1243). The court must consider the following factors: "'whether the claims under review are separable from the others remaining to be adjudicated and whether the nature of the claims already determined are such that no appellate

court would have to decide the same issues more than once even if there were subsequent appeals." *Stockman's Water Co.*, 425 F.3d at 1265 (quotation cleaned up) (quoting *Curtiss-Wright Corp.*, 446 U.S. at 8). "No bright-line rule establishes whether claims are separable such that certification is proper." *Cont'l Materials Corp.*, 740 F. App'x at 897. "The inquiry focuses on practical concerns, 'particularly the question whether a subsequent appeal of the claims before the district court will require the court of appeals to revisit the same issues decided in the first appeal.'" *Id.* (quoting *Jordan*, 425 F.3d at 827). "'To determine whether separate appeals will be redundant, courts consider whether the allegedly separate claims turn on the same factual questions, whether they involve common legal issues, and whether separate recovery is possible.'" *Id.* (quoting *Jordan*, 425 F.3d at 827)

Here, Arch Nemesis's third-party claims against insurance broker West Coast Real Estate & Insurance, Inc. survived summary judgment. *See* Doc. 255 at 59. Arch Nemesis argues that these remaining claims "involve separate legal issues, permit separate recovery, and . . . are based on actions that West Coast did or did not take." Doc. 262 at 16. Arch Nemesis concedes that "the two distinct sets of claims share some of the same facts." *Id.* But, it asserts, "this does not destroy their separateness." *Id.* Arch Nemesis never explains why this is so. *See id.*

The court disagrees with Arch Nemesis's ipse dixit assessment. The third-party claims it asserts against West Coast share more than simply "some of the same facts," *id.*, though they certainly share those. Specifically, Arch Nemesis's negligent-misrepresentation and negligence claims share significant legal issues with its counterclaims against Clear Spring and its third-party claims against Concept. For example, Arch Nemesis premises its negligent-misrepresentation claim against West Coast on West Coast's alleged misrepresentation that "coverage of the Vessel was in place." Doc. 222 at 28 (Pretrial Order ¶ 4.g.2.). And it takes

West Coast to task for never indicating "that anything related to the 'recommendations'" could preclude coverage and never warning Arch Nemesis "that additional documentation would be needed before its Vessel was actually covered." *Id.* This claim thus implicates the same legal questions about the insurance policy baked into the court's summary judgment Order—*i.e.*, whether the policy was void from inception for Arch Nemesis's failure to produce receipts under the Recommendations Warranty, and whether the policy notified Arch Nemesis of the need to produce these documents or some other warning was necessary. *See, e.g.*, Doc. 255 at 20–27, 38–43.

Arch Nemesis's negligence claim poses a similar problem. It, too, invokes the same legal questions. Take a look. Arch Nemesis contends West Coast was negligent because it

> never advised Arch Nemesis of provisions in the Policy that could potentially affect coverage . . . or of the possible need of securing documentation before a loss occurred, never confirmed with Clear Spring that coverage was actually in place, and did not ensure that Arch Nemesis had all of the documentation necessary to ensure that a situation like the current one never occurred.

Doc. 222 at 28–29 (Pretrial Order ¶ 4.g.2.). Again, policy-validity and documentation issues emerge. The court thus concludes the surviving claims against West Coast are not "distinct and separable" from those decided in the court's summary judgment Order but, instead, are interrelated. And that conclusion ends the 54(b) inquiry.

Our Circuit has a firm "policy against piecemeal appeals." *Cont'l Materials Corp.*, 740 F. App'x at 899. The policy exists "to promote efficiency at the appellate-court level"—not at the district-court level. *Id.* And it seeks to relieve "appellate courts of the need to repeatedly familiarize themselves with the facts of a case." *Okla. Tpk. Auth.*, 259 F.3d at 1241. Were the court to certify its summary judgment Order under Rule 54(b) now, the same factual and legal issues could arise on a subsequent appeal taken from the resolution of Arch Nemesis's third-

party claims against West Coast. Because the claims are interrelated, Arch Nemesis instead must litigate and appeal them together. The court thus denies Arch Nemesis's request for it to certify its summary judgment Order under Rule 54(b).[5]

## VII. Attorneys' Fees

Clear Spring and Concept have filed a motion for attorneys' fees and costs totaling $478,445.90. Doc. 263 at 1. They assert that, under federal admiralty law, a court may assess attorneys' fees "'when [his opponent] has acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]'" *Id.* at 14–15 (quoting *F.D. Rich Co. v. U.S. for Use of Indus. Lumber*

[5] Clear Spring and Concept argue that Arch Nemesis should have appealed already. Doc. 268 at 18. They contend that 28 U.S.C. § 1292(a)(3) provides the court of appeals with jurisdiction over district-court interlocutory decrees in admiralty cases. *Id.* at 18–19 (citing *Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1013 n.2 (9th Cir. 1999)). Arch Nemesis replies—without citing any authority—that Rule 54(b) and § 1292(a)(3) "provide alternative means for appealing an interlocutory summary judgment order[.]" Doc. 269 at 11.

Section 1292(a)(3) provides appellate jurisdiction for appeals from "[i]nterlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." Yet the court questions whether Arch Nemesis could have invoked this provision. Clear Spring asserted admiralty jurisdiction when it filed its declaratory judgment action. Doc. 1 at 1 (Compl. ¶ 2). But Arch Nemesis invoked the court's diversity jurisdiction when it asserted Counterclaims and explicitly chose not to designate its Counterclaims as admiralty or maritime claims. Doc. 11 at 16; Doc. 78 at 16. The Pretrial Order noted both subject-matter-jurisdiction bases and identified the jurisdiction issue as "disputed." Doc. 222 at 2 (Pretrial Order). The case thus stands as one of mixed jurisdiction.

The Sixth Circuit has addressed a similar mixed jurisdiction case, where the complaint invoked both the court's diversity and admiralty jurisdiction. *Buccina v. Grimsby*, 889 F.3d 256, 259 (6th Cir. 2018). Later, plaintiffs opted to proceed under diversity jurisdiction and avail themselves of the right to a jury trial. *Id.* at 261. *Buccina* concluded that, where a party has elected to pursue an action under diversity jurisdiction instead of admiralty jurisdiction, § 1292(a)(3)'s interlocutory-appeal opportunity does not apply. *Id.* ("[H]aving invoked the ordinary civil procedures available under diversity jurisdiction, the parties are not entitled to invoke any of the special procedures or remedies of admiralty, including the right of interlocutory appeal under section 1292(a)(3)." (quotation cleaned up)). The same result might well follow for Arch Nemesis here, but the court declines to decide.

While the court finds the availability of § 1292(a)(3) appeal an interesting issue in this case—and one unusual for a land-locked court—it needn't unravel it. Having concluded that it won't certify the Order for appeal under Rule 54(b), whether Arch Nemesis could have or should have appealed under § 1292(a)(3) changes nothing. Either way, the result remains the same.

*Co.*, 417 U.S. 116, 129 (1974)). Arch Nemesis's litigation conduct purportedly qualifies as bad-faith conduct, Clear Spring and Concept contend, based on four alleged actions: (1) misrepresenting facts in the pleadings, (2) propounding frivolous theories with no basis in fact or law, (3) denying basic facts in discovery without a reasonable basis, and (4) submitting a sham declaration. *Id.* at 12–18. Arch Nemesis responds to all four actions.[6] Doc. 266 at 4–15.

Under "the bedrock principle known as the 'American Rule' . . . [e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Kornfeld v. Kornfeld*, 393 F. App'x 575, 578 (10th Cir. 2010) (quotation cleaned up). The narrow bad-faith exception to this Rule "permits assessment of fees 'when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* (quotation cleaned up) (quoting *Chambers*, 501 U.S. at 45–46). Our Circuit finds bad faith where there's "clear evidence that the challenged claim is 'entirely without color *and* has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons.'" *Banner Bank v. Smith*, 2026 WL 1533417, at *3 (10th Cir. June 1, 2026) [*Banner II*] (emphasis in original) (quoting *F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1201 (10th Cir. 2005)). "The test is 'conjunctive—it requires clear evidence of *both* a complete lack of color *and* an improper purpose.'" *Id.* (emphasis in

---

[6] Arch Nemesis also argues that "maritime law regarding attorneys' fees does not apply in this case." Doc. 266 at 2. But that's neither here nor there. The Supreme Court has recognized that *all* federal courts—not just courts exercising admiralty jurisdiction—possess "inherent power" to "assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (quotation cleaned up). Indeed, Clear Spring and Concept themselves rely on a non-admiralty case when reciting the bad-faith standard. Doc. 263 at 15 (quoting *F.D. Rich*, 417 U.S. at 129); *F.D. Rich*, 417 U.S. at 118 (describing case as arising under surety-bond requirement of the Miller Act and explaining dispute centering on federal-housing project contractor and supplier (quotation cleaned up)). In short, were the court to find bad faith here, it could assess attorneys' fees under the federal "bad-faith exception to the American Rule" no matter whether maritime law applies. *Banner Bank v. Smith*, 30 F.4th 1232, 1241 (10th Cir. 2022) [*Banner I*]. Because Arch Nemesis's maritime-law argument is of no moment, the court declines to address it. *See People for the Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 1008 (10th Cir. 2017) ("If it is not necessary to decide more, then it is necessary not to decide more." (quotation cleaned up)).

original) (quoting *F.T.C. v. Kuykendall*, 466 F.3d 1149, 1153 (10th Cir. 2006)). "[A] claim that fails as a matter of law is not necessarily lacking *any* basis at all." *Freecom Commc'ns*, 401 F.3d at 1201 (emphasis in original) (quotation cleaned up). That is, simply because a case is "'weak or legally inadequate'" doesn't mean it qualifies for a bad-faith award. *Banner II*, 2026 WL 1533417, at *3 (quoting *Kuykendall*, 466 F.3d at 1152). Our "Circuit sets a high bar for bad faith awards[.]" *Mountain W. Mines, Inc. v. Cleveland-Cliffs Iron Co.*, 470 F.3d 947, 954 (10th Cir. 2006).

Clear Spring and Concept's bid for an attorneys' fees award fails to clear that high bar on the second prong of the conjunctive test—improper purpose. "Attorney fees are awarded only when there is *clear evidence* that challenged actions . . . are pursued for improper reasons." *Freecom*, 401 F.3d at 1201 (emphasis added) (quotation cleaned up). "[D]istrict courts in this circuit are 'required to explicitly find improper motive.'" *Hark'n Techs., Inc. v. Orange Whip Fitness X, LLC*, 2026 WL 824587, at *10 (D. Utah Mar. 25, 2026) (quotation cleaned up) (quoting *F.D.I.C. v. Schuchmann*, 319 F.3d 1247, 1253 (10th Cir. 2003)). "'Suspicions' or the 'appearance' of such a motive is not enough." *Schuchmann*, 319 F.3d at 1253. Instead, our Circuit has "insisted that a trial judge make a finding of bad intent or improper motive." *Mountain W.*, 470 F.3d at 954 (quotation cleaned up).

No such finding manifests itself here. Take, for example, the first alleged misrepresentation in Arch Nemesis's Counterclaim and Third-Party Complaint. Clear Spring and Concept direct the court to Arch Nemesis's repeated allegations that Clear Spring was never disclosed as the insurer for the policy. Doc. 263 at 8 (citing Doc. 11 at 19, 22–23 (Counterclaim ¶¶ 17, 34, 36, 38, 40); *id.* at 67–68 (Third-Party Compl. ¶¶ 57, 59–62)). Then, they urge the court to compare those allegations to the deposition testimony of Arch Nemesis's Person Most

Knowledgeable (PMK), who concedes that the not-disclosed allegations were false. *Id.* But a review of the deposition transcript reveals confusion and uncertainty, not malintent.

In his deposition, Arch Nemesis's PMK explained why Arch Nemesis believed that Clear Spring remained undisclosed as the insurer for the policy. He conceded that Clear Spring was listed on a document, but explained "that name had never been circulated to [Arch Nemesis] from West Coast"—the insurance broker. Doc. 264-1 at 17 (Arch Nemesis PMK Dep. 63:3–4). Later, Arch Nemesis's PMK clarified that he didn't understand the relationship between Clear Spring and Concept because he didn't know the difference between an underwriting agent and an insurer. *Id.* at 20 (Arch Nemesis PMK Dep. 75:18–76:7). Though such a contention may sound dubious, our Circuit explicitly has held that "'[s]uspicions' or the 'appearance' of [an improper] motive is not enough." *Schuchmann*, 319 F.3d at 1253. The other misrepresentations Clear Spring and Concept identify similarly may create suspicion or support the appearance of an improper motive. But they don't suffice for the court to make an explicit finding of bad intent.

Nor do Arch Nemesis's allegedly frivolous theories. Clear Spring and Concept contend that Arch Nemesis "had no reasonable basis to assert a fraud claim against Defendants." Doc. 263 at 17. And they argue that Arch Nemesis asserted meritless claims under Texas, Illinois, and Kansas law. *Id.* Finally, they take issue with Arch Nemesis's interpretation of its expert. *Id.* But a court's finding that a claim is unsupported or even frivolous doesn't suffice to establish bad intent. In *Kuykendall*, the Circuit affirmed a decision denying attorneys' fees, despite a case's "factual inadequacies," finding those inadequacies "d[id] not shed light on whether the [opposing party] subjectively acted with an improper purpose." 466 F.3d at 1153. And the Circuit rejected the argument that the case "was so deficient [that it] give[s] rise to an inference that the claim was motivated by an improper purpose." *Id.* In the end, *Kuykendall* concluded

that the bad-faith exception "is not invoked by findings of negligence, frivolity, or improvidence." *Id.* (quotation cleaned up). So too, here. Arch Nemesis's theories didn't pan out. And so, the court granted summary judgment against all its claims against Clear Spring and Concept. The court reiterates in this Order why those theories can't hold water. But neither failed theories nor failed claims equal improper purpose.

Next, Clear Spring and Concept direct the court's attention to a discovery dispute and assert it establishes bad faith. They contend that Arch Nemesis denied discovery facts without a reasonable basis. Doc. 263 at 17. Specifically, Clear Spring and Concept identify Arch Nemesis's denial that it lacked a certification proving that Arch Nemesis had completed the recommended warranties. *Id.* at 11. And they invoke a holding from a Southern District of Georgia case for the proposition that such discovery behavior constitutes bad faith. *Id.* at 17 (citing *JSM Marine LLC v. Gaughf*, 407 F. Supp. 3d 1358, 1380 (S.D. Ga. 2019)).

For starters, *Gaughf* doesn't bind this court. The Tenth Circuit's bad-faith standard does. What's more, Arch Nemesis proffers an explanation for its denial. It explains that it denied the request for admission premised on a separate writing—not a certification. And that interpretation of the request was a reasonable one, Arch Nemesis contends, because the disputed request didn't specify that "writings from a workman/repair yard" necessarily referred to the defined term "certification"—as other requests had. Doc. 266 at 11–12. The court's review of the relevant exhibit confirms that the ambiguity Arch Nemesis identifies indeed does exist. *Compare* Doc. 264-2 at 7–8 (admitting Arch Nemesis didn't possess certification as defined in request for admission), *with* Doc. 232-20 at 4–5 (denying Arch Nemesis lacked "writing from a workman/repair yard"). Again, the court lands in the realm of suspicion. It seems likely that Arch Nemesis understood what Clear Spring and Concept were asking. Indeed, the insurance

agreement requires that the "workman/repair yard that carried out the" work should certify "in writing that all recommendations have been completed prior to any loss and/or claim." Doc. 232-5 at 15 (Insurance Agreement). Nonetheless, the request for admissions didn't reference the term "certification"—and other such requests did. So, the court can't make a finding of explicit bad faith on the basis of this denial. And an explicit finding—not the appearance or suspicion of bad faith—is the governing standard. *See Schuchmann*, 319 F.3d at 1253.

Finally, Clear Spring and Concept argue that Arch Nemesis submitted a sham declaration that amounts to bad-faith litigation behavior and warrants an award of fees. Doc. 263 at 13–14. The declaration attested that Dr. Jamie McAtee had personal knowledge that the fixed fire extinguishing system was inspected and certified. *Id.* at 13 (quoting Doc. 233-27). But Dr. McAtee's deposition testimony indicated that he didn't know whether the system was certified. *Id.* at 13–14. Arch Nemesis responds that the declaration doesn't qualify as a sham because Arch Nemesis didn't use it to create an otherwise non-existent fact issue. Doc. 266 at 12–14. Instead, other facts in the record already established a fact issue about the fire-extinguisher certification. *Id.* at 13–14.

Assuming, without deciding, that the declaration qualifies as a sham, the court declines to award fees on that basis. Clear Spring and Concept never identify any Tenth Circuit authority—even of the strictly persuasive variety—to suggest the court should award bad-faith fees premised on a sham declaration. They instead rely solely on the Southern District of Georgia's opinion in *Gaughf*, once again. Doc. 263 at 18 (citing 407 F. Supp. 3d at 1380–81). But Tenth Circuit precedent suggests another, less severe remedy for a sham declaration: exclusion. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) ("[C]ourts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue."); *L. Co. v.*

*Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (explaining that our Circuit has "affirmed a district court's exclusion of affidavits for inconsistency with prior testimony" where "court first determine[d] whether the conflicting affidavit [wa]s simply an attempt to create a sham fact issue" (quotation cleaned up)). Our Circuit reserves bad-faith fee awards for extreme situations, finding it "is only appropriate in exceptional cases and for dominating reasons of justice." *Kuykendall*, 466 F.3d at 1152 (quotation cleaned up). An allegedly sham declaration—that one arguably didn't create a new sham fact issue anyway—doesn't qualify.

Having reviewed Arch Nemesis's alleged infractions, the court finds no basis for awarding Clear Spring and Concept attorneys' fees premised on Arch Nemesis's bad faith. It thus denies their motion.

## VIII. Conclusion

The court is not persuaded that it misconstrued any of Arch Nemesis's legal theories or the law governing those theories. And any error in its handling of relevant evidence was harmless. The court thus concludes that there's no basis to reconsider and revise its earlier summary judgment Order. It thus denies Arch Nemesis's motion. The court also denies Arch Nemesis's request for the court to certify its Order under Rule 54(b). The circumstances of this case don't align with the standard for a 54(b) certification. Finally, the court denies Clear Spring and Concept's attorneys' fees motion. It concludes Arch Nemesis's alleged behavior doesn't clear the high bar our Circuit has set for a bad-faith award.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Arch Nemesis, LLC's Motion to Reconsider, or in the Alternative, to Certify (Doc. 262) is denied.

**IT IS FURTHER ORDERED THAT** Clear Spring Property & Casualty Company and Concept Special Risks, Ltd.'s Motion for Attorneys' Fees and Costs (Doc. 263) is denied.

**IT IS SO ORDERED.**

**Dated this 24th day of August, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**